IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF ILLINOIS

| | | |
|---|---|---|
| KEVIN CLANTON, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | No. 15-124-NJR-PMF |
| | ) | |
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Defendant. | ) | |

**UNITED STATES OF AMERICA'S
MOTION FOR BLOOD TEST PURSUANT TO FED. R. CIV. P. 35**

The defendant, United States of America, by its attorneys, James L. Porter, Acting United States Attorney for the Southern District of Illinois, and Laura J. Jones, Assistant United States Attorney, pursuant to Rule 35 of the Federal Rules of Civil Procedure, moves the Court for an order requiring the plaintiff, Kevin Clanton, to submit to a blood test to determine if plaintiff's kidney disease was proximately caused by uncontrolled and unmanaged hypertension, as alleged in the complaint, or if his kidney disease would have occurred even in the absence of hypertension in African Americans who have the APOL1 gene variant and/or the associated result of impaired vascular autoregulation/glomerulosclerosis. In support thereof, the United States submits the following:

1.      Plaintiff, Kevin Clanton, filed his complaint against the United States on February 5, 2015, seeking $35 million and any additional amounts allowed under the Federal Tort Claims Act. (Doc. 1).

2.      Plaintiff claimed in the complaint that he is entitled to monetary damages for kidney failure due to uncontrolled hypertension and that he suffered irreversible kidney damage and ultimate kidney failure.    Specifically, he alleged that the United States (¶ 13):

a.      failed to timely and appropriately assess, recognize, diagnose, respond to, follow, and/or treat Kevin Clanton's uncontrolled hypertension;

b.      failed to timely and appropriately assess, recognize, diagnose, respond to, follow, and/or treat Kevin Clanton's renal damage;

c.      failed to timely and appropriately assess, recognize, diagnose and/or respond to Kevin Clanton's July 25, 2011 lab results;

d.      failed to timely and appropriately assess, recognize, diagnose, and/or respond to Kevin Clanton's October 26, 2012 lab results;

e.      failed to appropriately inform, counsel, and/or advise Kevin Clanton of the risks of renal damage associated with uncontrolled hypertension;

f.      failed to timely collaborate and consult with a medical doctor regarding Kevin Clanton's condition, care, and treatment;

g.      failed to timely refer Kevin Clanton to a medical doctor for consultation and treatment;

h.      failed to timely refer Kevin Clanton to a nephrologist for consultation and treatment; and

i.      failed to timely order and obtain appropriate testing of Kevin Clanton's renal function, following the drug manufacturer's withdrawal of Valturna from the market-lace.

3.      Plaintiff's expert disclosures were originally due on November 23, 2015, but plaintiff asked counsel for the United States to accommodate him by agreeing that his expert disclosures could be late and the other dates be delayed if needed.   The United States agreed, and the parties agreed to move the deadlines as needed. Expert reports for both parties have been exchanged although all depositions of witnesses and experts have not occurred (but are set or to be set by agreement of the parties) without any alteration of the trial date.

4.      On or about November 17, 2015, plaintiff had a kidney transplant at Barnes-Jewish Hospital.   Counsel for the United States learned of the kidney transplant on December 1, 2015, and sent releases to plaintiff's counsel on December 21, 2015, for plaintiff's medical records regarding the transplant and aftermath.   The signed releases were returned from plaintiff to

counsel for the United States on February 11, 2016, and counsel for the United States then sent the releases to plaintiff's providers so that the United States could obtain such information and send it to its own experts. Barnes-Jewish Hospital sent documents in response on February 18, 2016, and March 2, 2016.   Other entities sent their responses on March 4, 2016, and March 24, 28, and 30, 2016.   The United States sent these documents to plaintiff's counsel.

5.    Rule 35 of the Federal Rules of Civil Procedure expressly allows for the physical examination of a plaintiff when the physical condition of a party is in controversy.   Rule 35 provides in part as follows:

> (a)    Order for an Examination.
>
>> (1)    In General.   The court where the action is pending may order a party whose mental or physical condition -- including the blood group is in controversy -- to submit to a physical or mental examination by a suitably licensed or certified examiner. . . .
>
>> (2)    Motions and Notice; Contents of the Order.   The order:
>
>>> (A)    may be made only on motion for good cause and on notice to all parties and the person to be examined; and
>
>>> (B)    must specify the time, place, member, conditions, and scope of the examination, as well as the person or persons who will perform it.

6.    Analyzing the language of Rule 35 in the context of applying the standards as to whether the party requesting a mental or physical examination or examinations has adequately demonstrated the existence of the rule's requirement of "in controversy" and "good cause," the Supreme Court in *Schlagenhauf v. Holder,* 379 U.S. 104, 119 (1964), stated:

> Of course, there are situations where the pleadings alone are sufficient to meet these requirements.   **A plaintiff in a negligence action who asserts mental or physical injury . . . places that mental or physical injury clearly in controversy and provides the defendant with good cause for an examination to determine the existence and extent of such asserted injury.**   [Emphasis added.]

3

*See E.H. Reise v. Bd. of Regents of the Univ. of Wisc. System*, 957 F.2d 293, 294 (7th Cir. 1992); *National Utility Service, Inc. v. Northwestern Steel and Wire Co.*, 426 F.2d 222, 225 (1970) ("[g]ood cause for discovery may be apparent from the pleadings alone").   Good cause may also be apparent from the motion itself without any accompanying affidavit where the records and pleadings warrant.   *National Utility Service, Inc.*, 426 F.2d at 225.

7.     In this case, the issues for trial are whether plaintiff's medical treatment violated the standard of care and whether his injuries were proximately caused by actions attributable to the United States. Plaintiff's expert nephrologist's report indicates that plaintiff's hypertension was uncontrolled and unmanaged by agents of the United States and proximately caused plaintiff's injuries including his need for a kidney transplant. It is his opinion that the progression of plaintiff's kidney disease and development of end stage renal disease could have been prevented.

8.     The nephrology expert of the United States, Mohamed G. Atta, M.D., M.P.H., of the Johns Hopkins University School of Medicine, has submitted a report which was previously provided to plaintiff.   Dr. Atta's vitae is provided at Ex. A. In part, the report states or can be summarized as follows:

a. African Americans are at higher risk for kidney disease compared to other racial groups. Plaintiff is an African American individual.

b. Glomerulosclerosis is a known cause for kidney disease in 72% of African Americans that are found to have the APOL1 gene risk variant.

c. Kidney disease would more likely than not occur even in the absence of hypertension in African Americans who have the APOL1 gene variant and/or the associated result of impaired vascular autoregulation/glomerulosclerosis.

d. There is no treatment for kidney disease related to the APOL1 gene risk variant.

e. A blood test (i.e. the APOL1 gene test) exists to determine whether Plaintiff has the APOL1 gene variant.

4

f.  Although hypertension potentially may accelerate pre-existing kidney disease, Mr. Clanton's clinical course disputes this notion.

g.  In view of his racial background, it is more likely that he has an underlying focal global glomerulosclerosis that may be associated with having the APOL1 risk variant.

h.  Mr. Clanton lost 50 ml/min of his GFR (i.e. glomerular filtration rate; ability of kidney to filter) in only 14 months and all of his kidney function in less than 2 years which indicates an aggressive form of kidney disease, rather than hypertensive kidney disease, where the decline in renal function is slow and over many years of hypertension.

i.  Mr. Clanton had significant proteinuria (i.e., protein in the urine) in the range of 4 grams (i.e. reference range: 0) on 2 occasions in the setting of very low glomerular filtration rate.

j.  This amount of proteinuria along with microscopic hematuria (i.e. blood in urine; reference range: 0) are incompatible findings with hypertension causing his kidney disease.

k.  On 10/26/2012, Mr. Clanton's serum creatinine had risen to 3.32 mg/dl compared to the prior level of 1.4 mg/dl on 7/25/2011 (i.e. reference range is 0.6-1.3; elevated serum creatinine may be associated finding of kidney disease.).

l.  Mr. Clanton's blood pressures were improved between 11/29/2010 and 10/26/2012 (i.e., 11/29/2010 BP 160/100; 12/13/2010 BP 130/94; 7/22/2011 BP 140/80; 10/26/2012 BP 140/100) compared to his prior blood pressures that were higher.

m.  Plaintiff's kidney disease was progressive without any sign of partial resolution even with improved blood pressure control.

n.  This clinical course is clearly indicative of a distinctive disease mechanism unrelated to hypertension.

o.  It is with probable medical certainty based on the medical records reviewed and trajectory of plaintiff's glomerular filtration rate that he developed kidney disease independent of his hypertensive disorder.

p.  The rapid decline in renal function and nephrotic range (i.e. kidney disease) proteinuria (i.e. protein in the urine) suggest that the primary cause of his kidney disease was a glomerular rather than hypertensive kidney disease disorder.

q.  Because glomerulosclerosis may be an underlying cause for plaintiff's kidney disease, and because 72% of African Americans found to have glomerulosclerosis are positive for the APOL1 gene risk variant, and because kidney disease may likely develop in African Americans independent of hypertension, and because the plaintiff is African American, the

5

likely cause for his kidney disease may likely be unrelated to his high blood pressure and instead may likely be due to his having the APOL1 gene risk variant, and as such, he should have the APOL1 gene blood test.

r. A positive test result of the plaintiff having the APOL1 gene risk variant would indicate plaintiff's genetic predisposition to end-stage kidney disease, which would show that plaintiff's injuries were not caused by uncontrolled and unmanaged hypertension but instead attributed to a gene which predetermined his kidney disease.

The United States does not believe that plaintiff will object to this synopsis rather than having the report attached, as plaintiff has objected to the attachment of the report to this motion.

9.      A positive result of plaintiff's blood test would indicate plaintiff's genetic predisposition to end-stage kidney disease, which would show that plaintiff's injuries were not caused by uncontrolled and unmanaged hypertension but attributed to a gene which predetermined his kidney failure.

10.     Plaintiff would only have to submit to a simple blood test.   The Seventh Circuit has already held that a "[blood test] . . . is quick, noninvasive, painless – and conclusive." *Minnesota Life Ins. Co. v. Jones*, 771 F.3d 387 (7th Cir. 2014).   The United States does not have other means to obtain this information.   The records produced from Barnes-Jewish Hospital fail to indicate that a test for this gene was done.   Plaintiff's own kidney remained in his body and was thus not available for testing, and no biopsy of his native kidney was done. The United States was unaware of this until it received the plaintiff's transplant records.   The expense of all testing would be borne by the United States.

11.     Counsel for the United States asked plaintiff's counsel on April 28, 2016, if he objected to plaintiff providing a blood test. On May 4, 2016, plaintiff's counsel told counsel for the United States that he would not consent and would like to provide a response to this motion.

12.     A settlement conference has been set for May 27, 2016. It would benefit both parties if this motion was granted and plaintiff submitted to a blood test at least 72 hours prior to the settlement conference.

13.     The United States requests that this Court order plaintiff to submit to a blood test to be performed at Barnes-Jewish Hospital in the office of Dr. John Daniels, Center for Advanced Medicine, Suite 13A, St. Louis, Missouri, on May 16, 2016, at 10 a.m., or any suitable time and date (Monday through Wednesday).   Dr. Atta would order the blood test, and the blood would be taken and sent with the processing form (attached as Exhibit B) to Wake Forest Baptist Health at HLA/Immunogenetics Laboratory, 145 Kimel Park Drive, Suite 250, Winston-Salem, NC 27103. Additional procedures are provided on Exhibit B.   Dr. Atta would receive the analysis which will be provided to the parties, whatever the outcome.

14.     If plaintiff desires another physician at Barnes-Jewish Hospital to administer the test or that other arrangements be made, the United States is amenable to accommodating those requests including other dates or times or physicians or labs involved.

15.     The United States is simultaneously filing a motion to extend the discovery deadline (which is May 9, 2016) to accommodate this motion, order, and possible blood testing, for which it does not expect plaintiff to object.

WHEREFORE, the United States of America requests that the Court order a blood test of plaintiff on the grounds that the plaintiff's blood is in controversy, the United States has shown good cause for the examination, and that Dr. Atta is qualified to order and have the blood test performed.

UNITED STATES OF AMERICA

JAMES L. PORTER
Acting United States Attorney


/s/ *Laura J. Jones*
LAURA J. JONES
Assistant United States Attorney
Nine Executive Drive
Fairview Heights, IL   62208
Phone: (618) 628-3700
FAX: (618) 622-3810
E-mail: Laura.Jones@usdoj.gov

8

**Certificate of Service**

I hereby certify that on May 5, 2016, a true and correct copy of the foregoing document and the notice of electronic filing were sent by United States mail to the following non-CM/ECF participants:

Stephen J. Telken; stelken@schoenwalton.com
Troy E. Walton; twalton@choenwalton.com

UNITED STATES OF AMERICA

JAMES L. PORTER
Acting United States Attorney

/s/ *Laura J. Jones*
LAURA J. JONES
Assistant United States Attorney
Nine Executive Drive
Fairview Heights, IL   62208
Phone: (618) 628-3700
FAX: (618) 622-3810
E-mail: Laura.Jones@usdoj.gov

9