## IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF ILLINOIS

| | | |
|---|---|---|
| KEVIN CLANTON, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | Case No. 15-CV-124-NJR-RJD |
| | ) | |
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Defendant. | ) | |

## <u>MEMORANDUM AND ORDER</u>

**ROSENSTENGEL, District Judge:**

Kevin Clanton, a 36-year-old African-American man, filed this medical malpractice action under the Federal Tort Claims Act ("FTCA") in February 2015. Mr. Clanton alleges that he received negligent medical care for his severe hypertension from nurse practitioner Denise Jordan at Southern Illinois Healthcare Foundation ("SIHF"). He further alleges that as a result of this negligence, he developed kidney disease, which rapidly progressed to full-blown kidney failure and left him dependent on dialysis for two and a half years before he was able to receive a kidney transplant at the age of 35.

SIHF is an entity deemed as a Public Health Service employee under the Federally Supported Health Centers Assistance Act ("FSHCAA"), 42 U.S.C. 233(g)-(n), and by operation of the FSHCAA, SIHF and its employees, who are acting within the scope of their employment, are eligible for coverage under the FTCA, 28 U.S.C. §§ 1346(b), 2401(b), 2671-80. Therefore, this Court has exclusive jurisdiction over this action,

pursuant to 28 U.S.C. §1346(b)(1), because Mr. Clanton seeks money damages against the United States for personal injury caused by the negligent acts and omissions of Government employees while acting within the scope of their employment.[1] Venue is proper, pursuant to 28 U.S.C. §1391(b), because the Government, by and through its agents, resides within the Southern District of Illinois, and the alleged negligent acts and omissions giving rise to this claim occurred within the Southern District of Illinois.

The Court conducted a bench trial from October 25–31, 2016, and now makes the following findings of fact and conclusions of law.

## FACTS

*The Parties*

Kevin Clanton was born on May 23, 1980. He was raised in the nearby community and graduated from East St. Louis High School in 1999.[2] Mr. Clanton married his high school sweetheart, Sheena Clanton, in April 2016; they have two minor daughters, Kvyanna and Kamorra.

As a child, Kevin Clanton was healthy. He had no significant health issues other than asthma, which he grew out of around age 11 or 12. As he grew into adulthood, Mr. Clanton continued to be generally healthy, seeking out medical treatment only when he

---

[1] The Court finds that Mr. Clanton fully exhausted his administrative remedies as required by the FTCA. Before trial, the parties agreed that Mr. Clanton had complied with the FTCA's administrative requirements by timely presenting his administrative tort claim to the appropriate federal agency, the Department of Health and Human Services (HHS), which denied the claim. (*See* Doc. 96, Uncontroverted Facts 6 and 7). After trial, the Court allowed Plaintiff to file a First Amended Complaint to conform to the evidence presented at trial. (*See* Doc. 127). Although the Government objected that Mr. Clanton had not exhausted his administrative remedies with respect to certain allegations in the proposed First Amended Complaint (*see* Doc. 114), the new complaint simply adds slightly greater detail to allegations in the original complaint rather than presenting new claims which require further exhaustion.

[2] Although he was fortunate to obtain a high school diploma, records show that Mr. Clanton was not a very good student. In addition to less than stellar grades, he scored a 14 on the ACT test, which is in the bottom 8th percentile in the nation.

felt bad or was injured, approximately once every three to five years. Significantly, lab work completed in April 2004 shows normal kidney function and no kidney damage.

As previously mentioned, the focus of this lawsuit is the medical care Mr. Clanton received from nurse practitioner Denise Jordan for hypertension. Nurse Jordan earned her AAS in nursing at Belleville Area College in 1987 and her BSN in nursing at Graceland College in Lamoni, Iowa, in 1996. In 2000, she obtained her MS in the Nursing Practitioners Program at Southern Illinois University in Edwardsville, Illinois. Nurse Jordan is licensed in Illinois and Missouri and last obtained her Family Nurse Practitioner certification in Illinois in 2015 and in Missouri in 2016. Her license has never been disciplined or suspended.

Nurse Jordan has been employed by SIHF since 2000 and at the time of trial was working at Windsor Health Center ("Windsor"), a clinic in East St. Louis, Illinois. Nurse Jordan functions as a primary medical care provider, and she treats her own patients for a wide variety of conditions. She typically sees fifteen to twenty patients a day at Windsor, and her patient population is predominantly African-American. Additionally, as a nurse practitioner at Windsor, Nurse Jordan works under the direction of a collaborating physician, Dr. Bassam Albarcha, who was, at all relevant times, also employed by SIHF.[3] When one of her patients presents with a situation that is beyond

---

[3] The Illinois Nurse Practice Act provides that "[a] written collaborative agreement is required for all advance practice nurses engaged in clinical practice, except for advance practice nurses who are authorized to practice in a hospital or ambulatory surgical treatment center." (Exhibit 93–IL Nurse Practice Act, 225 ILCS 65/65-35(a)). SIHF incorporated the collaboration duty arising from the Illinois Nurse Practice Act into SIHF's written Employment Agreements with nurse practitioners like Denise Jordan. Throughout the 2008–2012 time frame when she treated Kevin Clanton, Denise Jordan worked under Employment Agreements which required her to "[agree] to practice within the guidelines, expectations, and limitations set forth in . . . [a] collaborative agreement" with an SIHF physician in the same scope of practice. (Exhibits 45-49). During the time period June 2008 through October 2012, Nurse

her expertise or training, and she needs assistance in diagnosing or treating the patient, Nurse Jordan is required to consult with or refer the patient to Dr. Albarcha.

### Kevin Clanton's Treatment with Nurse Jordan

The relevant facts in this case begin June 2008, when Mr. Clanton was seeking new employment with Stericycle, and he went to an urgent care center for a pre-employment physical examination. The "Physical Assessment" form for this exam notes two blood pressure readings of 200/135 and 200/137.[4] He was told that his blood pressure was too high, and he needed medication to lower it before he could be cleared for work. Significantly, the examination did not suggest any other medical problems.

Following the failed physical exam, Mr. Clanton sought medical care for his high blood pressure at the Quick Care Center in East St. Louis, Illinois, where he was treated by Nurse Jordan. Nurse Jordan noted a diagnosis of obesity and hypertension, ordered routine lab work (*i.e.*, EKG, chest x-ray, CBC, CMP, HA1C, lipid panel, TSH, and T4), and directed Mr. Clanton to follow up with her at Windsor the next week.[5] The follow-up visit was Mr. Clanton's first visit with Nurse Jordan at Windsor. He had ten additional visits with Nurse Jordan at Windsor between July 2010 and October 2012. The details of each office visit are provided here.

---

Jordan and Dr. Albarcha agreed to and entered into Advanced Practice Nursing Written Collaborative Agreements. (Exhibits 42-55).

[4] The Joint National Commission on Prevention, Detection, Evaluation, and Treatment of High Blood Pressure (JNC 7), which was relied on by both parties, classifies blood pressure into four categories: normal, prehypertension, stage one or moderate hypertension, and stage two or severe hypertension. Normal blood pressure measures below 120/80. Prehypertension is blood pressure measuring between 120/80 and 139/89. Stage one is blood pressure measuring between 140/90 and 159/99. And stage two is blood pressure measuring 160/100 or higher.

[5] After the initial encounter at the Quick Care Center, Kevin Clanton received all of his care from Nurse Jordan at the Windsor clinic.

**June 12, 2008**

At the first Windsor office visit with Nurse Jordan, Mr. Clanton presented with blood pressure measuring 210/170, which is considered severe hypertension. Mr. Clanton's extremely high blood pressure, combined with his status as a young, African-American male, put him at high risk for developing kidney disease. Even Nurse Jordan admitted as much. But at that time, his kidney function was normal, and there is nothing that suggests he had kidney disease.[6]

Nurse Jordan's diagnosis at this visit was "hypertension, obesity, and dyslipidemia" (high cholesterol). Nurse Jordan gave Mr. Clanton Clonidine in the office, which immediately lowered his blood pressure to 200/130. She also gave him some sample blood pressure medications to take at home. The medical record also notes "[h]ealthy eating habits," which presumably means that Nurse Jordan talked to Mr. Clanton about this topic. There is no documentation of any other type of patient education. Nurse Jordan signed the form that Mr. Clanton needed to be cleared to return to work, and she told him to come back in a week.

Mr. Clanton did not follow-up with Nurse Jordan as instructed.[7] For approximately the next two years, he generally felt fine, with no symptoms of high

---

[6] The laboratory tests Nurse Jordan ordered at her initial encounter with Mr. Clanton were conducted on June 11, 2008, and she had the benefit of the laboratory reports, which are contained within the Windsor medical chart (*see* Exhibit 2, pp. 41-45), when we saw Mr. Clanton again on June 12. Those tests showed that his kidney function was normal, chest x-ray was normal, and other than elevated triglycerides, everything looked good.

[7] On August 18, 2008, Mr. Clanton visited the emergency room at Touchette Regional Hospital with complaints of a bad headache. He was told at that time his blood pressure was high; he was given medication, and his headache went away. Lab work performed on that day does not indicate any kidney damage or disease. He did not follow up with his medical provider in two days as instructed upon his discharge.

blood pressure, such as blurred vision, headaches, or shortness of breath. Mr. Clanton returned to see Nurse Jordan in July 2010 when he was again told by his employer during a physical examination that his blood pressure was too high and he needed to seek medical care.

**July 21, 2010**

At this visit, Mr. Clanton's blood pressure was 240/150. The medical record indicates that Mr. Clanton had not had any blood pressure medication for two years. The medical record does not reflect that Nurse Jordan discussed the two year absence with Mr. Clanton or provided any further education at that time. Nurse Jordan did, however, make a notation in the chart that he was "Non Compliant." Nurse Jordan again gave Mr. Clanton Clonidine in the office, which immediately lowered his blood pressure to 200/110. Nurse Jordan gave Mr. Clanton prescription blood pressure medication to take at home and told him to return in a week. No lab work was ordered, even though Mr. Clanton's last labs were two years old.

**August 11, 2010**

Mr. Clanton returned approximately three weeks later, instead of one week later as instructed. At this third office visit, Mr. Clanton's blood pressure was 240/160, and he reported blurred vision. This reading was worse than it had been three weeks earlier; in fact, it was the highest reading thus far. Nurse Jordan gave Mr. Clanton two doses of Clonidine in the office in an attempt to immediately lower his blood pressure. When his blood pressure only dropped to 210/140, and in light of the blurred vision Mr. Clanton

was reporting, Nurse Jordan sent him to the emergency room.[8] Mr. Clanton was instructed to return to the clinic "PRN," which means "as needed." There is no indication that she prescribed or gave him any more blood pressure medication.

**August 20, 2010**

Mr. Clanton returned to Nurse Jordan nine days after she sent him to the emergency room. At this fourth visit, his blood pressure was 170/110. Although this was better than his last reading of 240/160, it was still very high. No Clonidine was given in the office, and no laboratory tests were ordered. And, even though Nurse Jordan presumed the emergency room had conducted lab work, she did not obtain the results of that lab work. The record reflects that Nurse Jordan prescribed three blood pressure medications to Mr. Clanton and once again instructed him to return "as needed."

**September 20, 2010**

Mr. Clanton returned to Nurse Jordan the next month. His blood pressure was 260/160, and he complained of neck pain. Apparently Mr. Clanton thought the blood pressure medication he had been prescribed was causing the pain. Nurse Jordan never explained to him that it was improbable that the neck pain was caused by the medication or that the neck pain might be caused by his high blood pressure.

Nurse Jordan again administered Clonidine in the office but did not indicate whether Mr. Clanton's blood pressure came down. Nurse Jordan diagnosed Mr. Clanton's hypertension as "uncontrolled," prescribed him new blood pressure medications, and told him to follow up in one week. No lab work was ordered, and the

---

[8] There were no records from this emergency room visit submitted into evidence.

lab results from the August emergency room visit still had not been obtained.

The medical record from this date also contains a "Refusal of Treatment" form, which states that Mr. Clanton refused the prescribed treatment of "BP Meds" (Exhibit 2, p. 56). The reason for this document is not clear because, even though Mr. Clanton wanted to discontinue the medications Nurse Jordan had previously prescribed, he received Clonidine in the office that day and also left with new blood pressure medications.

**September 27, 2010**

Mr. Clanton returned to the clinic one week later as instructed. His blood pressure was 260/140, very similar to what it had been the week before. The record notes that he had stopped taking one of his medications because he thought it didn't work as well as the others. Mr. Clanton explained at trial that he thought the medication wasn't working because he still felt bad. Once again, Nurse Jordan had Mr. Clanton take some Clonidine in the office but did not record a subsequent blood pressure reading to show whether it came down. She made a one-word notation in the medical record that Mr. Clanton was "noncompliant." Mr. Clanton was told to return to the clinic in four days. There is no documentation that any education or instruction was provided to Mr. Clanton. No laboratory tests were ordered, and the August lab results from the emergency room visit were still not in the chart.

**October 1, 2010**

Mr. Clanton returned to the clinic a few days later as instructed for another blood pressure check. At this visit, his blood pressure was 160/108; again, lower than before, but still higher than optimal. Nurse Jordan diagnosed him with hypertension and "a

history of noncompliance." She again prescribed medications and instructed Mr. Clanton to return to the clinic on "10/11/10."

### November 29, 2010

The next visit was not until November 29, 2010. The medical record from this visit reflects that Mr. Clanton returned for a refill of his blood pressure medications. His blood pressure was 160/100, and the only diagnosis was hypertension. He was again prescribed medication and told to return "as needed."

### December 13, 2010

Mr. Clanton returned to the clinic a few weeks later. His blood pressure was 130/94, which was the lowest reading during his course of treatment with Nurse Jordan. He was again diagnosed with hypertension and given medication. At this visit, there are conflicting notations in the record that Mr. Clanton should follow up in "two months," but also "as needed."

### July 22, 2011

On this date, Mr. Clanton made his way to Nurse Jordan once again for a refill of his medication. His blood pressure was recorded as 140/80, which is slightly above normal. Although it had been seven months since Nurse Jordan had seen Mr. Clanton, there is no indication that this extended absence was discussed with him or that any other education was given.

At this visit Nurse Jordan ordered laboratory tests for the first time since Mr. Clanton's initial visit to her in 2008.[9] These lab results revealed slightly elevated serum

---

[9] Interestingly, the medical record from this date refers to "annual labs"—but it is undisputed that this was the first time Nurse Jordan ordered labs since June 2008.

Creatinine (1.4 mg/dl), elevated urine protein (2+), and an eGFR of 77.[10] This was the first sign of Mr. Clanton's kidney disease. Unfortunately, however, Nurse Jordan never saw these lab results. For some reason, they never made it to Mr. Clanton's medical chart, and no one at Windsor, including Nurse Jordan, did anything to follow up on their whereabouts. Nurse Jordan admitted that if she had seen these results, she likely would have referred Mr. Clanton to a nephrologist at that time.

**October 26, 2012**

Fifteen months passed before Mr. Clanton returned to the clinic. The record does not reflect that Nurse Jordan in any way discussed this extended absence with Mr. Clanton when he arrived at the clinic in October 2012. There is likewise no reference to the missing July 2011 lab results. At this visit, Mr. Clanton's blood pressure was relatively good—140/60—but he was complaining of dizziness, which can be a symptom of high blood pressure. Nurse Jordan instructed Mr. Clanton to continue his medication and return to the clinic in one month. She ordered lab work again, and fortunately, this time she received the results a few days later.

---

[10] Kidney damage or disease can result in the kidneys leaking protein into the urine. A urinalysis is used to test the level of protein in urine. A trace amount of protein in addition to another abnormality (such as elevated creatinine), or a significant amount of protein by itself, is indicative of kidney dysfunction.

A creatinine test is one of the main tests used to evaluate kidney function. Creatinine is a waste product that the kidneys should be filtering out of an individual's blood. As kidney function declines due to disease or damage, the level of creatinine in the blood will rise. A normal level of creatinine in adult males is approximately 0.6 to 1.2 milligrams per deciliter (mg/dL).

Creatinine levels can also be used to calculate the estimated glomerular filtration rate ("eGFR" or "GFR"). GFR is used to assess the stage of kidney disease. Normal GFR is above 90. In Stage I kidney disease, the GFR is normal, but there is other evidence of kidney damage, such as protein or blood in the urine or a structural abnormality of the kidney. In Stage II, the GFR is between 89 and 60. In Stage III, the GFR is between 59 and 30. In Stage IV, the GFR is between 29 and 15. And in Stage V, the GFR is below 15.

The October 2012 lab results showed extensive kidney damage, which had worsened since the 2011 results. Mr. Clanton's creatinine level was now up to 3.32 mg/dL (from 1.4 mg/dl), his BUN level was high at 29 mg/DL,[11] and his GFR had decreased to 27 (from 77). At this point, Mr. Clanton suffered from Stage IV chronic kidney disease. Even Nurse Jordan admits the 2012 lab results reflected a serious problem with Mr. Clanton's kidneys. But, unfortunately, neither Nurse Jordan nor anyone at Windsor or SIHF told Mr. Clanton what these lab tests showed. And, just like every visit before this, Dr. Albarcha was not consulted, and a referral to a specialist was not made.

*Treatment After Nurse Jordan*

On December 22, 2012, Mr. Clanton began to feel extremely ill after dropping Sheena off for her early morning work shift at Lambert St. Louis International Airport. He was taken by ambulance to Barnes-Jewish Hospital ("Barnes") in St. Louis, Missouri, and presented with shortness of breath. His blood pressure was 275/180, and his serum Creatinine was 5.75 mg/dl. Determined to be in hypertensive crisis, Mr. Clanton was immediately admitted to the hospital. Fortunately, the treatment providers at Barnes were able to stabilize his condition. During that visit, however, Mr. Clanton learned for the first time from his providers at Barnes that "high blood pressure" is the same thing as "hypertension," and that he had kidney damage as a result of his uncontrolled

---

[11] Blood urea nitrogen (BUN) is another test used to evaluate kidney function. Urea is a waste product that the kidneys should be filtering out of an individual's blood. As kidney function declines due to disease or damage, the level of urea in the blood will rise. A normal level of BUN in an adult is approximately 6 to 20 mg/dL.

hypertension. He was later discharged with prescribed medications and with instructions to follow up with the Barnes-Jewish Hospital/Washington University ("BJH/WU") Medicine Clinic and Renal Clinic.

On February 3, 2013, Mr. Clanton developed shortness of breath and was again admitted to Barnes. In early February 2013, Dr. Timothy Yau, a nephrologist at Barnes, diagnosed Mr. Clanton with Stage V chronic kidney disease due to poorly controlled hypertension. A few months later, in March 2013, Mr. Clanton had a fistula surgically inserted to accommodate hemodialysis, and in early April, he began receiving hemodialysis under the care and direction of Dr. Rashid Dalal. Mr. Clanton attended dialysis treatments three times a week at DaVita Dialysis, and the sessions generally lasted between three and a half and four hours. Mr. Clanton was a good patient; he was compliant with and involved in his dialysis treatments, and he followed the advice of Dr. Dalal. As a result, Mr. Clanton was eventually able to do his dialysis treatments at home.[12]

Within months of beginning dialysis, Dr. Dalal recommended Mr. Clanton for a kidney transplant evaluation. Dr. Dalal completed a form for the federal government (Form CMS-2728) attesting that Mr. Clanton was in need of dialysis and/or transplant because he suffered from end-stage renal disease caused by hypertension. Mr. Clanton was evaluated at BJH/WU and, on November 4, 2013, he was placed on the Kidney Transplant Waiting List and added to the United Network for Organ Sharing (UNOS) waiting list. Mr. Clanton remained on hemodialysis while on the transplant waiting list.

---

[12] Mr. Clanton underwent training to perform dialysis at home, and in November 2014, he began doing home hemodialysis, four days per week, until he received a kidney transplant in November 2015.

During this time, Mr. Clanton's kidneys were in end-stage disease, and control of his blood pressure to target levels was difficult to obtain because his kidneys were no longer participating in managing fluid and electrolyte balance in his body.

In mid-November 2015, Mr. Clanton received the call that he and Sheena had been waiting and praying for. They traveled to Barnes for kidney transplant surgery but, after pre-transplant testing and preparation, Mr. Clanton was told he was only the backup candidate, and the kidney was going to another patient. He was sent home without a transplant.

Fortunately, however, another call came later that night, and on November 17, 2015, at age 35, Mr. Clanton underwent a deceased-donor kidney transplantation by Dr. Jason Wellen at Barnes. While the transplant surgery went well, Mr. Clanton's post-transplant course was complicated by wound dehiscence requiring wound vac treatment through January 12, 2016.

Following the transplant surgery and through today, Mr. Clanton requires multiple anti-rejection and immunosuppressive medications and follow-up medical care. He has taken the prescribed medications and followed the advice of his doctors. Mr. Clanton himself admits things are going well, all things considered.

Currently, Mr. Clanton takes and logs his blood pressure readings at home. His blood pressure is well-controlled with anti-hypertensive medications, with readings around 120/130 over 80/70. Moreover, post-transplant follow-up renal clinic visits through May 18, 2016, indicate that the transplanted kidney's function is excellent. Fortunately, he was able to resume many of his former activities, including working out

at the gym, helping around the house, and playing with his daughters. Overall, he feels pretty good and is thankful for his "second chance."

Mr. Clanton will continue to require future medical and surgical care, such as immunosuppression medications, various follow-up medical visits and diagnostic testing, home healthcare services, counseling services, medical equipment, one or more future kidney transplants, and dialysis while on the waiting list for those kidneys.

### FACT WITNESSES AT TRIAL

In addition to Mr. Clanton, his wife Sheena, and Nurse Jordan, the Court heard from a number of other witnesses, whose testimony is very briefly summarized here but discussed in greater detail as needed throughout this Order.

### *Dr. Rashid Dalal*

As indicated above, Dr. Dalal was Kevin Clanton's treating nephrologist while he was on hemodialysis from April 2013 to November 2015. Dr. Dalal is board certified in nephrology and internal medicine and practices medicine in Belleville, Illinois. He also serves as the Medical Director of the Davita Metro East Dialysis Unit.

Dr. Dalal did a nice job explaining the dialysis process generally, as well as the impact of the dialysis treatments on Mr. Clanton's ability to work and the consequences of shortening some of his dialysis treatments. Another noteworthy aspect of Dr. Dalal's testimony was his opinion that Mr. Clanton's end-stage renal disease was caused by uncontrolled hypertension.[13]

---

[13] The Government initially objected to Dr. Dalal offering any opinion regarding causation because he did not submit a written report pursuant to Rule 26(a)(2)(C). The Government ultimately withdrew its objection. Nonetheless, the Court notes that the form Dr. Dalal completed regarding Mr. Clanton's need for a kidney transplant indicates that the primary cause of Clanton's renal failure is hypertension (Code

*Dr. Bassam Albarcha*

Dr. Albarcha is an internist who, as indicated above, was employed by SIHF at Windsor and was Nurse Jordan's collaborating physician while Mr. Clanton was a patient at Windsor. Dr. Albarcha testified that Nurse Jordan never consulted with or talked to him about Kevin Clanton; in fact, Dr. Albarcha did not know Mr. Clanton existed until he filed this lawsuit.

Dr. Albarcha testified, however, that there are a number of occasions on which he would have expected Nurse Jordan to consult him. Specifically, Dr. Albarcha expected to be consulted after the third visit in August 2010, when Nurse Jordan sent Mr. Clanton to the emergency room. He also expected to be consulted after the fifth visit on September 20, 2010, when Nurse Jordan diagnosed Mr. Clanton with uncontrolled hypertension. Dr. Albarcha testified that he should have been consulted, or Mr. Clanton should have been referred to a specialist, after the sixth visit on September 27, 2010. And he testified that Mr. Clanton should have been referred to a nephrologist after the October 2012 lab results, which showed worsening kidney damage, were received.

Dr. Albarcha opined that with appropriate treatment and care, and assuming he was compliant with his treatment, Mr. Clanton's hypertension could have been

---

40391). That form is certainly relevant and admissible. Additionally, that form makes clear that Dr. Dalal's expert opinion regarding causation was made during the course of providing treatment, rather than at the request of counsel in anticipation of litigation. As such, he was not required to submit an expert report under Rule 26(a)(2), and his general opinions regarding the cause of Mr. Clanton's kidney disease were admissible because they were disclosed in accordance with the Rule. FED. R. CIV. P 26(a)(2)(c); *see also id.* at 26(a)(2)(B). *Contra Meyers v. Nat'l R.R. Passenger Corp.*, 619 F.3d 729, 734–35 (7th Cir. 2010) ("[A] treating physician who is offered to provide expert testimony as to the cause of the plaintiff's injury, but who did not make that determination in the course of providing treatment, should be deemed to be one 'retained or specially employed to provide expert testimony in the case,' and thus is required to submit an expert report in accordance with Rule 26(a)(2).").

controlled, and he could have avoided kidney damage—or at least halted its progression.

### Dr. Theodore Ross

Dr. Theodore Ross is a physician who was, at all relevant times, employed by SIHF and served as its Medical Director. He testified at trial and discussed in very general terms the requirements of SIHF for a collaborative relationship between a physician and a nurse practitioner.

### PLAINTIFF'S EXPERT WITNESSES

### Kristen Harris

Kristen Harris was retained by Mr. Clanton as an expert witness. She is a board certified Family Nurse Practitioner and has been providing primary care services as a nurse practitioner for almost twenty years. Harris was unavailable to testify live at trial, so her testimony was presented via deposition.

Harris testified that treating hypertension is a regular and routine part of her practice, and she considers herself an expert in the care and treatment required to properly manage hypertension from a nurse practitioner's standpoint. Harris provided opinions as to the standard of care applicable to Nurse Jordan's care and treatment of Mr. Clanton and Nurse Jordan's deviations from the standard of care, which is fully laid out below in the Discussion section of this Order. For present purposes, however, her testimony in a nutshell is that Nurse Jordan breached the standard of care when she failed to provide appropriate patient education to Kevin Clanton at every visit and to document exactly what education was provided; when she failed to recommend home blood pressure monitoring; when she failed to order annual labs and to respond

appropriately to lab results; and when she failed to consult with her collaborating physician about Mr. Clanton or refer him to a specialist.

***Dr. David Yablonsky***

Dr. Yablonsky is a board-certified internist who testified as a retained expert for Mr. Clanton. He practices in nearby Edwardsville, Illinois; treating patients with hypertension is a regular part of his daily practice.

Dr. Yablonsky provided general information about hypertension and the risks associated with it. He testified about treating hypertension from the perspective of a primary care provider and the aspects of an appropriate treatment plan, such as significant patient education, proper medication, home blood pressure monitoring, lifestyle modifications, careful and close follow-up, and routine lab work to monitor for end-organ damage. Dr. Yablonsky also testified about his experience in working with nurse practitioners and when he expects them to consult with him about hypertensive patients.

With respect to Mr. Clanton, Dr. Yablonsky noted that Clanton's blood pressure readings while under Nurse Jordan's care were some the highest ones he's seen in clinical practice. He further noted that Mr. Clanton was a particularly high-risk patient because of his young age, extremely high blood pressures, and his race. The gaps in treatment and the abnormal lab results further added to Mr. Clanton's risk for a bad outcome. Dr. Yablonsky indicated that, based on all of these risk factors, he considered Mr. Clanton to be a "very complicated" case for a nurse practitioner to manage. Dr. Yablonsky also offered his opinion that Mr. Clanton was not a noncompliant patient.

Specifically, Dr. Yablonsky was unconvinced that Mr. Clanton fully understood the gravity of the situation or understood what compliance was supposed to look like—"I would call him a patient that has not been educated on the condition."

Of particular note, Dr. Yablonsky testified that, based on his medical experience, he believes Mr. Clanton's hypertension was controllable with an appropriate treatment regimen. Dr. Yablonsky also offered his opinion that, based on his medical experience, there was a window of time during the course of Mr. Clanton's treatment where his kidney disease could have been avoided altogether had he been given appropriate treatment to bring his blood pressure under control. After the labs showed mild kidney damage, there was another window of time during which the disease could have been reversed or, at least stopped from getting any worse, had Mr. Clanton's blood pressure been brought under control. And even after the labs showed Stage IV kidney disease, the progression of the disease could have been slowed, which could have delayed or avoided Mr. Clanton's need for dialysis.

### Dr. Jonathan Tolins

Dr. Tolins is a board certified internist and nephrologist who testified as a retained expert for Mr. Clanton. He has been a practicing nephrologist in Minneapolis-St. Paul, Minnesota, for the past thirty years, where he treats patients who have developed kidney disease, as well as pre-disease patients who have hypertension that is severe or difficult to control. In addition to caring for patients, he is also the medical director at three dialysis units and manages the overall operation of those units.

Dr. Tolins noted that Mr. Clanton's blood pressure readings while under Nurse

Jordan's care were "scary." Dr. Tolins opined that Mr. Clanton's severe hypertension, coupled with his other risk factors, created a complicated clinical case for a nurse practitioner to manage. Consequently, a case like Mr. Clanton's needed to be managed, at a minimum, by a physician—but more likely by a specialist—in order to achieve control of the blood pressure and to avoid the development and progression of kidney disease. Dr. Tolins discussed the aspects of a treatment plan that were needed to achieve control of Mr. Clanton's blood pressure, including patient education, life-long medication, life-long follow-up visits at frequent intervals, home blood pressure monitoring, lifestyle modifications, and laboratory testing every three months. Dr. Tolins also discussed why, in his opinion, it was not fair to label Kevin Clanton as "non-compliant."

Dr. Tolins opined that as a result of Nurse Jordan's violations of the standard of care, Mr. Clanton's blood pressure remained uncontrolled, which in turn caused his kidney damage. He also explained that there was a significant delay in timely diagnosis and appropriate management of his kidney damage, which allowed the disease to rapidly progress. Dr. Tolins agreed with Dr. Yablonsky about possible interventions that could have been taken at certain times in the progression of Mr. Clanton's disease and the positive effect those interventions were likely to have.

Dr. Tolins went on to opine that Kevin Clanton's life expectancy is 73 years old, and he detailed the medical care that Clanton will require in the future. In particular, Dr. Tolins testified that the half-life of a transplanted kidney is ten years, and he believes Mr. Clanton will require two more kidney transplants.

*Jan Klosterman, R.N.*

Jan Klosterman testified live on behalf of Mr. Clanton. She is a Certified Nurse Life Care Planner and has maintained that certification since 1999. Until recently, she served on the Certification Board of the American Association of Nurse Life Care Planners, which is the board that decides whether life care planners qualify for certification. As a Certified Nurse Life Care Planner, she is required to utilize and follow a set of standards and methodology in preparing a life care plan that has been reviewed and approved by other Nurse Life Care Planners.

Ms. Klosterman reviewed all of Mr. Clanton's medical records and also conducted an on-site assessment of Mr. Clanton at his home. She collaborated with Mr. Clanton's expert nephrologist, Dr. Tolins, concerning the reasonable and necessary care for end-stage renal disease, as well as Mr. Clanton's reasonable life expectancy. She also consulted with staff at DaVita Dialysis and individuals at the Barnes transplant program. In formulating her opinions regarding the cost of Mr. Clanton's future medical care, Ms. Klosterman assumed that Mr. Clanton would live to age 73, his donor kidneys would last ten years, and he would need two additional transplants, three years of dialysis prior to second transplant, and five years of dialysis prior to third transplant. As detailed in her written report, Ms. Klosterman ultimately opined that Mr. Clanton's future medical costs will be somewhere between $14,006,000 and $17,395,665 (Exhibit 104).

*Karen Tabak, PhD*

Dr. Tabak testified as Plaintiff's expert economist regarding the present value of the future medical costs presented in Jan Klosterman's second life care plan (*See* Exhibits 104, 106-108). Using a discount rate of 0.66 percent, Dr. Tabak reduced the total amounts from $14,006,000 to $12,235,533 on the low end and from $17,395,665 to $15,195,759 on the high end.[14]

### DEFENDANT'S EXPERT WITNESSES

*Dr. John Daniels*

Dr. Daniels is an internist who testified as a retained expert for the Government. He is board certified in internal medicine and endocrinology and metabolism, and he works in a local primary care practice in St. Louis, Missouri. As an internist, hypertension and kidney disease are common problems among his patients.

Like his counterpart Dr. Yablonsky, Dr. Daniels testified about treating hypertension from the perspective of a primary care provider and the aspects of an appropriate treatment plan. With respect to Kevin Clanton, Dr. Daniels testified that he had extraordinarily high blood pressures that are rarely seen. Dr. Daniels agreed with Mr. Clanton's retained experts that Clanton's uncontrolled hypertension caused his kidney disease. He further agreed that Mr. Clanton's blood pressure was capable of being controlled. Dr. Daniels, however, believes that Mr. Clanton's blood pressure remained uncontrolled, and the progression of his kidney disease was hastened because he was non-compliant. Specifically, Dr. Daniels testified that Mr. Clanton had to know

---

[14] These numbers vary slightly from the figures in Dr. Tabak's report ($12,235,000 and $15,000,197), as she updated her calculations through the date of trial (*see* Exhibits 107, 108).

he had a serious condition given that it stopped him from working on two occasions and once sent him to the emergency room, yet he went for large periods of time in which he did not take any medication or return to see Nurse Jordan as instructed.

Dr. Daniels also testified about his experience in working with nurse practitioners and when he expects them to consult with him about hypertensive patients. He opined there was no need for Nurse Jordan to consult with her collaborating physician because the physician "was not going to improve Mr. Clanton's compliance, and that was really the main issue." (Doc. 122, p. 91). Dr. Daniels also offered testimony regarding his experience, and defended Nurse Jordan's actions, in obtaining lab results and in documenting what was discussed with patients at visits.

### Dr. Brian Swirsky

Dr. Swirsky is a cardiologist who testified as a retained expert for the Government. He is board certified in internal medicine, cardiology, and clinical lipidology. He practiced for over twenty years in New Haven, Connecticut, and now practices in Baton Rouge, Louisiana. As a cardiologist, treating hypertension is a routine part of his daily practice.

Dr. Swirsky testified about treating hypertension from the perspective of a specialist. Like the other expert physicians mentioned thus far, Dr. Swirsky testified that severe, uncontrolled hypertension is the only identifiable cause of Kevin Clanton's kidney disease. Dr. Swirsky believes, however, that given Mr. Clanton's race, the severity of his hypertension, and the early age of onset, Mr. Clanton was never going to be able to obtain persistent and optimal control over his blood pressure, and it was

"certain" that Mr. Clanton was going to develop chronic kidney disease and require a kidney transplant. Dr. Swirsky also believes that Mr. Clanton's timeline for needing a transplant was "significantly shortened" because he was a non-compliant, African-American patient who didn't seek treatment and stopped taking his medications for large gaps of time.

### Dr. Mohamed Atta

Dr. Atta testified as the Government's expert nephrologist. He is board certified in nephrology and has practiced and conducted research at Johns Hopkins University in Baltimore, Maryland, for approximately the past twenty years. Dr. Atta estimated that all of his patients have hypertension and kidney disease, and a vast majority of them are African-American.

Contrary to all of the other physicians who testified in this matter, Dr. Atta believes that hypertension was *not* the cause Mr. Clanton's kidney disease. In fact, Dr. Atta does not believe that hypertension causes kidney disease in African-Americans. He also believes that even if Mr. Clanton's hypertension was well-controlled by medication, it would not have delayed the progression of his kidney disease, much less prevented it. Dr. Atta's ultimate opinion was that no matter what Nurse Jordan did or didn't do, Mr. Clanton was going to progress to end-stage kidney disease.

Dr. Atta opined that Kevin Clanton would live 29.7 years after his first kidney transplant, or until he is approximately 65 years old. Unlike Mr. Clanton's treating physicians and expert nephrologist, Dr. Atta opined that the half-life of a transplanted kidney is twelve years, and he believes Mr. Clanton will need only one more kidney

transplant.

*Cathlin Vinett-Mitchell*

Cathlin Vinett-Mitchell was retained by the Government to develop a life care plan for Kevin Clanton. She is a registered nurse with a specialty in rehabilitation nursing and case management. Unlike Jan Klosterman, she is not a Certified Nurse Life Care Planner, and thus she did not follow the same methodology.

Ms. Vinett-Mitchell collaborated with the Government's expert nephrologist, Dr. Atta, in developing her life care plan. In formulating her opinions regarding the cost of Mr. Clanton's future medical care, Ms. Vinett-Mitchell assumed that Mr. Clanton would live to roughly age 65, his donor kidneys would last twelve years, and he would need one additional transplant, three years of dialysis prior to second transplant, and three years of dialysis at the end of his life. As detailed in her written report, Ms. Vinett-Mitchell ultimately opined that Mr. Clanton's future medical costs would be approximately $3,005,556.88 (Exhibit 227). But her opinion relied on Medicaid and Medicare reimbursement rates for hemodialysis—the most costly element of future care—which the Court has found to be inappropriate (*see* Doc. 73).[15]

---

[15] The Court ruled before trial that any past or future payments made by Medicaid or Medicaid were collateral source payments and that the Government was precluded from arguing that Mr. Clanton's damages, if any, were limited to the Medicare/Medicaid reimbursement rate (*see* Doc. 73). After the Court's ruling, Ms. Vinett-Mitchell never attempted to amend her report to offer a total cost of future care utilizing non-Medicare costs for future hemodialysis. At trial, subject to Plaintiff's objection, Ms. Vinett-Mitchell made edits to her report and calculations and then, utilizing non-Medicare costs for hemodialysis, offered, for the first time, her opinion that the cost of Mr. Clanton's future medical care was approximately $9,500,000. Plaintiff objected to Ms. Vinett-Mitchell's testimony and opinions at trial regarding the cost of his future medical care on the grounds that the proposed new total cost opinion was not timely or appropriately disclosed. The Court sustains this objection; Ms. Vinett-Mitchell's undisclosed opinion is inadmissible, because her opinion, and the facts and data used to support the opinion, were not timely disclosed as required by Rule 26(a)(2).

<u>DISCUSSION</u>

**A.** *Evidentiary Rulings Re: Deposition Testimony*

During his case in chief, Mr. Clanton offered portions of deposition testimony from Nurse Jordan, Dr. Albarcha, and Dr. Swirsky. The Government objected to counsel reading these "admissions" into the record.

The Court finds Nurse Jordan and Dr. Bassam Albarcha are government actors in the context of this FTCA case and are considered party opponents, whose deposition testimony may be admitted under Federal Rule of Evidence 801(d)(2). *E.g., Anestis v. United States*, 52 F. Supp. 3d 854, 859 (E.D. Ky. 2014) (holding that statement about deceased veteran made by VA intake clerk during an interview with VA legal counsel was admissible under Rule 801(d)(2)(D) when offered against the Government in FTCA medical malpractice case); *Carter v. United States*, Case No. 3:11-CV-1669, 2013 WL 1149247, at *3 (M.D. Pa. Mar. 19, 2013) (holding that nurse's statement made during the course of treating the plaintiff was admissible under Rule 801(d)(2)(D) when offered against the Government in FTCA case); *Orenstein v. United States*, Case No. 2:10CV348 DAK, 2013 WL 595766, at *1 (D. Utah Feb. 15, 2013) (holding that physician's statement during the course of treating the plaintiff was admissible under Rule 801(d)(2)(D) when offered against the Government in FTCA medical malpractice case); *Duque v. United States,* Case No. 05-1417, 2006 WL 2348533, at *10 n.7 (N.D. Ga. Aug. 9, 2006) (suggesting that statement by doctor working at federal prison medical facility might be admissible under Rule 801(d)(2)(D) against the Government in FTCA medical malpractice case); *Hurd v. United States,* 134 F.Supp.2d 745, 749 (D.S.C. 2001) (finding that testimony about boating accident given by United States Coast Guard personnel

before the National Transportation Safety Board was admissible under Rule 801(d)(2) when offered against the Government in FTCA case).

Similarly, the Court finds the deposition testimony of Dr. Swirsky, one of the Government's retained expert witnesses, to be admissible under Rule 801(d)(2)(C) as a statement "made by a person whom the [opposing] party authorized to make a statement on the subject." *E.g.*, *Bone Care Int'l, LLC v. Pentech Pharm., Inc.*, Case No. 08-CV-1083, 2010 WL 3894444, at *10 (N.D. Ill. Sept. 30, 2010) (permitting use of deposition testimony of defendants' experts during Plaintiffs' case-in-chief under Rule 801(d)(2)(C)), *citing Glendale Fed. Bank, FSB v. United States,* 39 Fed. Cl. 422, 425 (Fed. Ct. Cl. 1997) ("When an expert witness is put forward as a testifying expert at the beginning of trial, the prior deposition testimony of that expert in the same case is an admission against the party that retained him.") *and In re Hanford Nuclear Reservation Litig.,* 534 F.3d 986, 1016 (9th Cir. 2008) (explaining that party could not exclude prior expert testimony that she herself proffered but later determined "was more harmful than helpful" because expert's prior testimony "was an admission of a party opponent under Federal Rule of Evidence 801(d)(2)(C)); *Bianco v. Hultsteg AB*, Case No. 05 C 0538, 2009 WL 347002, at *12 (N.D. Ill. Feb. 5, 2009) (following *Dean v. Watson* and allowing defendant to offer into evidence the deposition testimony of plaintiff's expert under Rule 801(d)(2)); *Dean v. Watson*, Case No. 93 C 1846, 1996 WL 88861, at *3 (N.D. Ill. Feb. 28, 1996) (permitting plaintiff to read portions of defense expert's deposition testimony as admissions under Rule 801(d)(2)(C)); *In re Chicago Flood Litig.*, No. 93 C 1214, 1995 WL 437501, at *11 (N.D. Ill. July 21, 1995) ("A party's . . . expert reports often constitute

party admissions pursuant to Fed. R. Evid. 801(d)(2).").

**B.  *Applicable Legal Standards***

The FTCA provides, in pertinent part, that the United States is liable for personal injuries caused by the negligent or wrongful acts of federal employees acting within the scope of their employment "in the same manner and to the same extent as a private individual under like circumstances." 28 U.S.C. § 2674. As an initial matter, the Court finds that Nurse Jordan was an employee of the United States Public Health Service pursuant to 42 U.S.C. § 233(g)(1)(A) and acting within the scope and course of her employment while she was providing medical care and treatment to Mr. Clanton at Windsor (*see* Doc. 29, para 10), and consequently, the United States can be held liable for her negligence.

Because Nurse Jordan provided her care to Mr. Clanton in East St. Louis, this medical malpractice action is governed by the law of the State of Illinois. 28 U.S.C. § 1346(b); *see also Gil v. Reed*, 381 F.3d 649, 658 (7th Cir. 2004); *Campbell v. United States*, 904 F.2d 1188, 1191 (7th Cir. 1990). Under Illinois law, to prove a claim of medical malpractice a plaintiff must show: (1) the applicable standard of care against which the professional's conduct must be measured; (2) an unskilled or negligent deviation from the standard; and (3) an injury proximately caused by the deviation. *Sullivan v. Edward Hosp.*, 806 N.E.2d 645, 653 (Ill. 2004) (citing *Purtill v. Hess*, 489 N.E.2d 867, 872 (Ill. 1986)).

For the first two elements—the standard of care and any deviations—expert medical testimony is typically required. *See Massey v. United States*, 312 F.3d 272, 280 (7th Cir. 2002); *Donais v. United States*, 232 F.3d 595, 598 (7th Cir. 2000); *Bernyk v. United*

*States*, 1 F.3d 1244 (7th Cir. 1993); *Sullivan*, 806 N.E.2d at 653 ("Unless the physician's negligence is so grossly apparent or the treatment so common as to be within the everyday knowledge of a layperson, expert medical testimony is required to establish the standard of care and the defendant physician's deviation from that standard.") (citing *Purtill*, 489 N.E.2d at 872)).

More specifically, both parties agree that a nurse practitioner's testimony is required to establish the standard of care applicable to Nurse Jordan and any deviations from that standard by Nurse Jordan. (Trial p. 809: 12-18); *see also Sullivan*, 806 N.E.2d at 655 ("the health-care expert witness must be a licensed member of the school of medicine about which the expert proposes to testify." (citing *Dolan v. Galluzzo*, 396 N.E.2d 13, 16 (Ill. 1979)). In other words, a physician who is not a licensed member of the nursing profession is not competent to testify as to the standard of care applicable to nurse practitioners or any deviations from that standard. *See, e.g., Sullivan*, 806 N.E.2d at 657–58, 660.

To the extent that the expert physicians for either party offered their opinions, either at trial and/or in their written reports, on the standard of care for Nurse Jordan and the ways in which she breached that standard, those opinions were not considered by the Court. To be clear, the Court is relying only on the testimony and written statements of Plaintiff's expert nurse practitioner Kristen Harris and the testimony of Nurse Jordan herself to establish the applicable standard of care and any breaches of that standard.

## C. *Standard of Care*

Based on the testimony of Kristen Harris, much of which Nurse Jordan explicitly agreed with, the Court finds that the standard of care applicable to Nurse Jordan when treating and managing Mr. Clanton's hypertension condition required:

- Patient education and consistent re-education as necessary at every visit, and documentation of exactly what education was provided, regarding (1) the basic nature of hypertension; (2) the risks of uncontrolled hypertension, including that uncontrolled hypertension can cause blindness, stroke, heart attack, and kidney damage; (3) the fact that Mr. Clanton was at heightened risk of kidney damage from uncontrolled hypertension because he was a young, African-American male; (4) required lifestyle modifications, such as healthy eating, exercise, losing weight, and avoiding tobacco and alcohol; (5) the necessity of taking medications daily and attending follow-up appointments, even when he was feeling well; and (6) the importance and need for laboratory data to monitor for end-organ damage from high blood pressure;[16]

- Recommendation and instruction for home blood pressure monitoring;

- Ordering laboratory tests at least one to two times per year, but possibly more, in order to monitor for end-organ damage;

- Appropriate action in response to lab results;

- Collaboration and consultation with a physician when she was having problems or concerns with the patient or difficulty controlling blood pressure; and

- Referral to a hypertension specialist when she was unable to control the blood pressure.

---

[16] Notably, SIHF policy also requires all adult patients to be evaluated for and educated about risk factors for cardiovascular disease, including hypertension, and requires the education provided and the patient's understanding of the education to be documented at every visit. Similarly, Nurse Jordan's Employment Agreement requires her to prepare medical records that reflect the medical services rendered and the patient's instructions given. In fact, the form that Nurse Jordan filled out at every visit with Mr. Clanton includes a line titled "Education" for her to specify what topics she discussed with him.

**D.** *Deviations from the Standard of Care*

Notably, with the exception of Nurse Jordan herself, the United States failed to offer any admissible expert testimony at trial disputing Kristen Harris's opinions about Nurse Jordan's deviations from the standard of care. As explained more fully below, the Court finds Nurse Jordan's testimony that she met the standard of care unreliable, unpersuasive, and entitled to little weight. After weighing all the evidence, the Court finds that the United States, acting by and through its employee Nurse Jordan, deviated from the applicable standard of care in numerous ways.

### 1. Failure to Provide Proper Education

Nurse Jordan failed to properly educate Kevin Clanton about his disease and the risks that came with it. Starting at the time of her first contact with him, Nurse Jordan did not provide Mr. Clanton with appropriate education and instruction, as required by the standard of care, as well as her employment agreement and SIHF policy. Mr. Clanton testified that Nurse Jordan never explained hypertension to him, including the risk of developing kidney damage if he didn't take his medication daily (even when he was feeling fine), the need for regular monitoring and follow-up medical care, and the fact that he was at increased risk of complications because his is African-American. The Court found Mr. Clanton's testimony highly credible. For example, he testified that there was "no way" he would have ignored Nurse Jordan's instructions to take his medicine and check his blood pressure every day if he'd been told that by ignoring her instructions he could end up on dialysis or even die—leaving his daughters without a father. (Tr. 928). And in one of the most memorable moments of trial, Mr. Clanton was asked on direct examination whether Nurse Jordan ever explained that uncontrolled

hypertension could cause him to be unable to get an erection. (Tr. 843). Mr. Clanton said he certainly would have paid attention to such news, and the Court has absolutely no difficulty believing that a 28-year old man would remember being told something like that by a medical provider.

The medical records, which are nearly silent regarding patient education, certainly seem to corroborate Mr. Clanton's testimony. The only documentation in Kevin Clanton's entire chart is a notation about "[h]ealthy eating habits" at the initial visit in June 2008. Nurse Jordan saw Mr. Clanton ten more times during a four year period following that initial visit, but there is not a single indication that she provided any education to him during those visits. She should have provided education at *every* visit and engaged in an interactive discussion with Mr. Clanton to ensure he understood what she was saying. She also should have provided literature about the disease and its risks, but there is no credible evidence she did any of these things. The Court finds that the lack of documentation of patient education is consistent and further proof that the necessary education was not provided.

Nurse Jordan testified that she gave all of the required education to Mr. Clanton. But the Court finds Nurse Jordan's testimony regarding her specific actions and interactions concerning her care of Mr. Clanton, other than those described explicitly within the written medical chart, is not credible and entitled to little weight. Nurse Jordan consistently testified that she had no memory or recollection of Mr. Clanton at all (she couldn't even pick him out in the courtroom, despite the fact that he was the only African-American man present at trial), and she had no specific recollection of any

actions or interactions associated with Mr. Clanton's care and treatment. Yet she wants the Court to believe her testimony that she took actions beyond what is memorialized within the Windsor medical chart. This testimony is simply not believable.

The Government suggests that Mr. Clanton should have known about the risks of the disease because his wife, Sheena, for a period of time before (and possibly during) Mr. Clanton's treatment with Nurse Jordan was taking high blood pressure medication for herself. But what Mrs. Clanton was doing and what her medical provider told her does not in any way excuse Nurse Jordan from her responsibility to educate and instruct her patient and to try to ensure that the patient understands and appreciates the importance of her instructions.

The Government is also quick to blame Mr. Clanton for not returning to the clinic for long periods of time, but there is nothing in the record that suggests he understood the need for ongoing medical care and medication. Mr. Clanton testified quite credibly that he did not return on a regular basis because he was feeling well between visits, and he did not believe he needed to go to the clinic when he was feeling well. Furthermore, Nurse Jordan admitted that she should have anticipated (and did anticipate) as early as Mr. Clanton's second visit that compliance might be a problem for him as a hypertensive patient, yet the record does not reflect that she did *anything* to educate him about the seriousness of his disease or address the issue of real or anticipated noncompliance. In fact, Kevin Clanton testified that Nurse Jordan never actually said the word "noncompliant" to him, much less explained what it meant, nor did she tell him what she thought he was doing wrong or why the gaps in his office visits were

problematic. Even the Government's expert, Dr. Swirsky, acknowledged that there is no documentation in any of Nurse Jordan's records that she addressed or was trying to remedy noncompliance concerns with Mr. Clanton.

It is clear to the Court that Mr. Clanton did not understand the seriousness of his blood pressure levels, the chronic nature of his condition, or the consequences of not controlling it. It's not as though Mr. Clanton was reticent to seek out medical treatment. He willingly made multiple trips to Nurse Jordan when he felt ill and needed medication. In other words, he went about treating his hypertension as one would treat an acute or episodic condition, like a headache or a sinus infection; he sought treatment only when he felt poorly. The Court finds Mr. Clanton's behavior to be consistent with a person who does not understand or appreciate hypertension and the significant risk associated with failing to keep it controlled. All things considered, the weight of the evidence leads the Court to conclude that proper and necessary education was not provided and that the standard of care was violated in this respect on numerous occasions.

### 2. Failure to Recommend Home Blood Pressure Monitoring

In addition to the lack of proper education about Mr. Clanton's disease and the risks it presented, Nurse Jordan deviated from the standard of care when she failed to recommend regular home blood pressure monitoring as part of her treatment plan. The medical professionals who testified in this case, including Nurse Jordan, unanimously agreed that Mr. Clanton was a particularly high risk patient because he was an African-American male in his twenties with greatly elevated blood pressure. Consequently,

Nurse Jordan should have recommended home blood pressure monitoring at the very first visit (and every one that followed). The Court finds, based upon the evidence at trial, including Mr. Clanton's testimony and the Windsor medical chart, that Nurse Jordan *never* recommended or instructed Mr. Clanton to perform home blood pressure monitoring as required by the standard of care. This allowed his blood pressure to remain uncontrolled, and it is further evidence that Mr. Clanton was not properly educated about the nature of the disease and the importance of ongoing treatment.

### 3.  Failure to Order Lab or Respond to Lab Results

Nurse Jordan also deviated from the standard of care by not ordering appropriate laboratory tests or, when she did order tests, by not taking appropriate action in response to the results. Nurse Jordan acknowledged that the standard of care requires lab work to be ordered, at a minimum, once or twice a year when a patient suffers from severe hypertension. Yet it is undisputed that Nurse Jordan never ordered or obtained lab work in 2010, despite multiple opportunities to do so.[17] By the time she finally ordered lab work in July 2011, the last lab results she had seen for Mr. Clanton were from when she first treated him in June 2008, more than three years earlier.

It is also undisputed that Nurse Jordan never obtained the results from the labs she finally ordered in July 2011, which resulted in what is perhaps the most egregious

---

[17] In the five months from July 21, 2010, to December 13, 2010, Mr. Clanton saw Nurse Jordan *eight times* yet she never once obtained or ordered labs to evaluate for end-organ damage. Abnormal test results during this time period would have been another opportunity for Nurse Jordan to consult with her collaborative physician, get control of Mr. Clanton's blood pressure, and refer him to a specialist. Certainly labs should have been ordered when Mr. Clanton showed up on July 21, 2010, and Nurse Jordan knew he had been absent for two years and still had extremely high blood pressure readings (again, it was at this visit that she noted he was "non compliant").

deviation from the standard of care.[18] The July 2011 labs showed the first indication of mild kidney damage, which Nurse Jordan agreed required referral to a specialist. But since she never tracked down the lab results, the referral never happened, and she never informed Mr. Clanton of the abnormalities. For his part, Mr. Clanton reasonably expected that if the lab results showed anything abnormal, he would have been contacted. The Government's suggestion that he is to blame for not calling the clinic to get them is ridiculous.

Similarly, Nurse Jordan did not make a referral or take any action upon receiving Mr. Clanton's lab results in October 2012. These labs showed Mr. Clanton's kidney damage had worsened even further, and he had progressed to Stage IV kidney disease. All of the medical witnesses, including Nurse Jordan, agreed the labs required an urgent referral to a specialist. But, once again, the referral never happened, and Kevin Clanton was never informed of his extremely critical lab results.

Nurse Jordan claims that someone from the clinic would have tried to call Mr. Clanton to inform him of the lab results, and if they couldn't reach him by phone, they would have mailed a letter to him. But once again, there is no documentation, and Nurse Jordan has no specific recollection, of *any* efforts to contact Mr. Clanton immediately following the receipt of the lab results. The evidence only shows that a missed appointment card was mailed to Mr. Clanton over a month later, on November 26, 2012, and again on December 21, 2012. But neither of those cards indicated that a "test results consultation" was needed, even though that's an option provided on the

---

[18] Nurse Jordan blames her office staff for not following up to get these lab results. But of course her office staff is also employed by SIHF, so even if it was the fault of her staff (which the Court does not accept), the Government is not off the hook for this deviation from the standard of care.

card. Furthermore, simply telling Mr. Clanton that he had missed an appointment is woefully insufficient when the message that actually needs to be communicated is a dire warning that his kidneys are failing.

### 4. Failure to Consult Collaborating Physician or to Refer to a Specialist

The Court also finds that Nurse Jordan deviated from the standard of care when she failed to consult with her collaborating physician, Dr. Albarcha, and when she failed to refer Mr. Clanton to a specialist. The standard of care required Nurse Jordan to consult with Dr. Albarcha as early as Mr. Clanton's second office visit in July 2010, by which time he had a two year interruption in any care or medication for his hypertension, and his blood pressure was still at an emergent level. The standard of care also required referral to a hypertensive specialist as early as the third office visit when Mr. Clanton complained of blurred vision and Nurse Jordan sent him to the emergency room. But neither of those things occurred.

In fact, Nurse Jordan *never* went to Dr. Albarcha or referred Mr. Clanton to a specialist, which the Court finds utterly shocking. Nurse Jordan testified that she knew, at all times, that as a young, African-American man, Mr. Clanton was at high risk for kidney damage. She further testified that she believed the gaps in his medical care elevated his risk even further. Nonetheless, Nurse Jordan chose not to reach out to Dr. Albarcha about Mr. Clanton, even in the face of crisis-level blood pressures at five of the first six visits, documented noncompliance concerns at the second visit, a need for emergency room treatment as of the third visit, documented "uncontrolled" blood pressure as of the fifth visit, and undisputed laboratory evidence of kidney damage.

As an internal medicine doctor, Dr. Albarcha had more experience and expertise in managing hypertension than Nurse Jordan. And he worked in the same building; presumably all Nurse Jordan had to do was walk down the hall. But for some reason, Nurse Jordan did not think that her inability to control Mr. Clanton's blood pressure, her concerns that he was noncompliant, his abnormal laboratory results, or any other aspect of his care necessitated so much as a conversation with Dr. Albarcha, let alone a referral to a specialist. Even Dr. Albarcha testified that under the circumstances, he would have expected Nurse Jordan to consult with him regarding Mr. Clanton's care. And Nurse Jordan admitted at trial that the abnormal lab results in 2011 and 2012 necessitated a referral to a specialist.

### 5.  Medications Prescribed by Nurse Jordan

Finally, the Court notes that there was some discussion at trial concerning whether Mr. Clanton was given the appropriate medications. For instance, Plaintiff's nurse practitioner expert, Kristen Harris, was critical of Nurse Jordan's decision to give Mr. Clanton Clonidine in the office on multiple occasions because it can result in a rapid decrease of blood pressure and, for that reason, Harris believed it should only be administered in an emergency room setting. And Dr. Yablonsky was critical of the types of medications given to Mr. Clanton to take at home.

The Court recognizes that Nurse Jordan was attempting to treat Mr. Clanton by providing free samples available at the clinic and appreciates the challenges imposed by treating the demographic of the patients Windsor serves. But the bottom line is simply that the treatment provided to Mr. Clanton never resulted in "normal" blood pressure.

Even Dr. Swirsky, the Government's expert, acknowledged that Mr. Clanton's blood pressure was not controlled, and he suffered from severe hypertension throughout Nurse Jordan's care. In other words, even if the medication regimen provided by Nurse Jordan was appropriate, it didn't work, and it needed to be changed. Nurse Jordan should have realized this on her own and at least conferred with Dr. Albarcha on the topic, but possibly referred Mr. Clanton to a specialist. Given the many other deviations from the standard of care during Nurse Jordan's care of Mr. Clanton, the Court does not find it necessary to engage in an in-depth discussion of the medical opinions concerning what was and was not proper medication to treat Mr. Clanton's hypertension.

**E.** *Causation*

Under Illinois law, to establish proximate cause in a medical malpractice case, the plaintiff must show "cause in fact and legal cause." *Morisch v. United States*, 653 F.3d 522, 531 (7th Cir. 2011) (quoting *Bergman v. Kelsey,* 873 N.E.2d 486, 500 (Ill. App. Ct. 2007)). "Cause in fact exists when there is a reasonable certainty that a defendant's acts caused the injury or damage." *Morisch*, 653 F.3d at 531 (quoting *Coole v. Cent. Area Recycling,* 893 N.E.2d 303, 310 (Ill. App. Ct. 2008)). Legal cause exists when "an injury was foreseeable as the type of harm that a reasonable person would expect to see as a likely result of his or her conduct." *Morisch*, 653 F.3d at 531 (quoting *LaSalle Bank, N.A. v. C/HCA Devel. Corp.*, 893 N.E.2d 949, 970 (Ill. App. Ct. 2008)).

Expert testimony at trial firmly established that uncontrolled hypertension causes kidney disease. In fact, for African-Americans, hypertension is the second leading cause of kidney disease (behind diabetes), according to the American Heart

Association, the Centers for Disease Control, and the National Institutes of Health. Thus, it is critically important to control hypertension, particularly in African-American patients, which Nurse Jordan knew. The rate of progression to end-stage kidney disease due to uncontrolled hypertension depends on the severity of the blood pressure. According to the expert testimony in this case, with mild elevation in the range of 160/90, progression to end-stage kidney disease can take five to ten years or longer. If the blood pressure is severe, however, the progression can be quite rapid.

With respect to Mr. Clanton, the Court finds that he suffered from severe hypertension that went uncontrolled, which caused him to develop kidney damage that rapidly progressed to kidney failure.[19] This was the opinion of Mr. Clanton's treating physicians,[20] as well as all of the physicians who offered a causation opinion at trial, with the exception of the Government's expert, Dr. Atta. The Court finds Dr. Atta's

---

[19] Because of an issue that arose during the discovery phase in this case, the Court finds it important to touch briefly on the APOL1 genetic variant. The evidence and scientific research currently available indicate that the presence of the genetic APOL1 variant in an individual does not, in and of itself, cause kidney disease. Nor does the presence or absence of the APOL1 variant in an individual reveal or confirm the underlying cause of that person's kidney disease. Instead, scientific studies indicate the presence of the APOL1 variant is simply indicative of or associated with an increased risk for progression of chronic kidney disease among black patients once the disease is present, regardless of the disease's cause. In other words, the APOL1 variant alone is not a cause of kidney disease; an individual needs another factor to combine with the genetic variant to cause the kidney disease. Mr. Clanton may have been more susceptible to kidney damage from uncontrolled hypertension due to genetics or his race, but that was not the cause of his kidney disease.

[20] According to Mr. Clanton's treating physicians at BJH/WU, his hypertension caused his end-stage renal disease. These physicians did an evaluation for other possible causes of Mr. Clanton's kidney disease, other than high blood pressure. Specifically, they did a complete work-up, including an ultrasound of the kidney, examination of the renal arteries, and serological evaluations. The kidney ultrasound reflects renal parenchymal disease and no evidence of renal stenosis, which are common findings in patients with hypertensive nephrosclerosis. Thus, the ultrasound findings rule out a number of other causes of the kidney damage and are consistent with and support the diagnosis of hypertension as the cause of the kidney damage. Moreover, the BJH/WU doctors opted not to conduct a kidney biopsy, which was an option in the event they had any question that something other than hypertension caused Mr. Clanton's kidney disease.

opinion that hypertension did not cause Mr. Clanton's kidney damage unpersuasive and against the great weight of the evidence at trial.

The Court further finds that Nurse Jordan's multiple and ongoing deviations from the standard of care were the proximate cause of Mr. Clanton's uncontrolled hypertension and kidney disease. The Government theorizes that Mr. Clanton's blood pressure was simply uncontrollable and that he was destined for end-stage renal disease no matter what, which the Court rejects as preposterous. Dr. Albarcha, Dr. Daniels, Dr. Atta, Dr. Tolins, and Dr. Yablonsky all testified that with appropriate care and management, Mr. Clanton's blood pressure was capable of being controlled while he was in the care of Nurse Jordan. The only physician with a contrary opinion was Dr. Swirsky, but the Court is unpersuaded by his opinion, in light of the weight of contrary evidence. Moreover, the facts and evidence show that Mr. Clanton's blood pressure has been and remains well-controlled with appropriate treatment following his kidney transplant.

Expert testimony from Dr. Tolins and Dr. Yablonsky established that if Nurse Jordan had consulted with Dr. Albarcha or referred Mr. Clanton to a specialist with expertise in managing hypertension, such as a nephrologist or cardiologist, in 2008 or 2010, the development of his kidney disease would have been completely prevented. If consultation or referral to a specialist had occurred after the lab results in 2011 showed that mild kidney disease had developed, Mr. Clanton's blood pressure would have been controlled, progression of the disease would have been halted, and further damage to the kidney would have been prevented, avoiding the need for dialysis and transplant.

Certainly there should have been consultation and referral by the time the October 2012 laboratory results showed kidney damage. If Nurse Jordan had done so, the progression of Mr. Clanton's kidney disease could have been slowed to the extent he likely could have received a transplant before ever needing dialysis. As we know, however, there was no consultation or referral at *any* point, and without appropriate medical care, Mr. Clanton's kidney disease progressed to the point that dialysis and transplant were his only options.

**F.  *Contributory Negligence***

In light of all the evidence in the case, the Court finds that Mr. Clanton was not in any way contributorily negligent. The Government argued at length that Mr. Clanton caused or at least contributed to cause his kidney disease and related damages because he was "noncompliant." But in order to be considered negligent for noncompliance, an individual must first be properly informed and educated about the disease, its risks, the necessity of the treatment regimen, and the likely health consequences of failing to follow the treatment regimen. In other words, a patient must be adequately educated so that he can understand and appreciate the importance of compliance and the dangers of noncompliance. As set forth above, Nurse Jordan failed to provide any education at all. As a result, Mr. Clanton did not understand his disease, the need for daily medication and regular follow-up visits, or the significant risk of failing to adhere to the treatment plan.

While the medical record reflects several significant gaps in Mr. Clanton's visits to Nurse Jordan and two notes by Nurse Jordan that he was "non-compliant," there is

nothing in the record that indicates she ever talked to Mr. Clanton when he did show up about what he was doing wrong, why it was important for him to be continuously medicated and to keep all appointments, or the potential consequences of sporadic treatment.[21] She likewise never consulted with Dr. Albarcha about how to address Mr. Clanton's alleged noncompliance. As previously discussed, the Court finds Mr. Clanton's visits to the clinic consistent with someone treating a problem similar to a headache and seeking treatment as needed, as opposed to someone addressing and trying to control a chronic medical condition.

The Government wants to point the finger at Mr. Clanton because during one visit, on September 20, 2010, he signed a "Refusal of Treatment" form saying that he refused blood pressure medication treatment. But that's not entirely true. It appears that Mr. Clanton thought one of the medications was causing him neck pain, and he simply wanted to discontinue that particular medication. He accepted in-office treatment that day, however, and he left with a different medication to take at home. Therefore, the existence of this form is confusing at best and certainly not indicative of contributory negligence.

The Court also notes that during the course of Dr. Dalal's care, Mr. Clanton was a

---

[21] The only thing anyone at Windsor or SIHF appears to have done to address Mr. Clanton's gaps in treatment was to mail him "missed appointment" reminder cards. There is no documentation of discussions when he did show up as to why it was important for him to keep all appointments and what the potential consequences were for not seeking ongoing treatment for a chronic condition. Likewise, there is no written correspondence that urges Mr. Clanton to return to the clinic because the laboratory tests showed abnormal critical results which required immediate action. The response by personnel at Barnes is in stark contrast to Windsor's weak and lackadaisical approach to missed appointments. When Mr. Clanton missed an appointment after he started treatment at Barnes, extensive efforts were made to get in contact with him to reschedule. The Government also blames Mr. Clanton because he sometimes lived at 84 Circle Drive in Cahokia and other times at 87 Circle Drive with his mother. This issue is nothing but a red herring and does not excuse Nurse Jordan's failure to follow up with Mr. Clanton as required by the standard of care.

compliant patient who was concerned with, and involved in, his care and treatment. Dr. Dalal testified that he referred Mr. Clanton for evaluation to become a kidney transplant candidate because he believed Mr. Clanton was a good patient who would comply with the treatment regimen. And a patient cannot make the kidney transplant list without first passing an extensive medical evaluation, which includes consideration of a patient's compliance. Obviously, Mr. Clanton successfully met these requirements in the opinion of independent, objective observers. Similarly, in order to be approved to perform home dialysis, there is a vetting and education process, and the patient must be a responsible and reliable patient. A noncompliant patient would not be a candidate for home dialysis.

The Government also blames Mr. Clanton for some of his kidney damage by pointing out that, while he was in Dr. Dalal's care, he sometimes shortened the dialysis treatments he received. But this occurred only on occasion; Mr. Clanton completed approximately 94% of his dialysis sessions as prescribed.[22] Furthermore, Dr. Dalal clearly was not concerned by Mr. Clanton's decision to shorten his treatments on fifteen occasions, because Dr. Dalal considered Mr. Clanton to be a good, compliant patient worthy of consideration for a kidney transplant.

In light of all the evidence, Mr. Clanton simply cannot be blamed for

---

[22] During the time period of April 2013 through November 2014, Mr. Clanton had approximately 228 dialysis sessions, which he shortened on fifteen occasions. In total, he shorted himself approximately fifteen hours of dialysis. Dr. Dalal testified that it is not uncommon for dialysis patients to sometimes leave early, and the harm to Mr. Clanton from shortened treatments would have been acute effects, such as swelling or other discomfort. In other words, shortened treatments do not cause any further damage to the kidneys. Dr. Dalal did not consider these shortened treatments to be evidence of noncompliance, and he noted that the Barnes transplant team had access to the records reflecting the shortened treatment sessions when they evaluated Mr. Clanton, and the team nevertheless determined that Mr. Clanton was a good candidate for transplant.

contributing to cause his kidney disease and resulting damages.

### G. *Damages*[23]

Nurse Jordan's deviations from the standard of care proximately caused Mr. Clanton to experience ongoing, uncontrolled severe hypertension during the time period of 2008 through 2012 and to suffer kidney damage beginning in 2011, which progressed to end-stage renal disease. As a result of his kidney damage and end-stage renal disease, Mr. Clanton has sustained significant damages.

#### 1. Pain and Suffering, Emotional Distress, and Loss of a Normal Life

First, as mentioned above, Mr. Clanton was on dialysis for approximately two and a half years. When he received dialysis in the clinic, his treatments were three days a week, for four hours a day. When he did dialysis at home, his treatments were four days a week, but the treatment periods were shorter.

Regardless of where dialysis is received, it is known to cause fatigue, cramping, and pain in patients, and Mr. Clanton's experience was no different—the treatments caused cramps in his legs, back, and side. He rated the pain an 8 or 9 out of 10. Dialysis also caused Mr. Clanton to feel drained, tired, lethargic, and dehydrated.

Mr. Clanton and his wife testified that for the two and a half years while he was undergoing dialysis, he was depressed, sad, hopeless, and lost. He did not want to be around others in the way he had before; he was a "totally different person." Even after he made the transplant list, Mr. Clanton and his family knew that there was no guarantee that he would get a kidney. He also knew that he could not stay on dialysis

---

[23] Mr. Clanton made a claim for damages of $35,000,000, for personal injury, in his administrative tort claim submission (Form 95). (Exhibit 116).

forever. During this two and a half year waiting period, every time the phone would ring, Mr. Clanton and his family were hoping and wishing that maybe it was a call about the transplant.

As mentioned above, in November 2015, after receiving a phone call that a kidney was available, reporting to the hospital, and undergoing pre-transplant tests, Mr. Clanton was told by the Barnes providers that he was only the backup recipient, and the kidney was going to someone else. Mr. Clanton testified that he re-experienced the same shock and disbelief he felt when he first learned his kidneys were failing. Although angry and disappointed, he tried to remain positive and to not show too much emotion around his daughters, particularly his youngest, who was very upset.

Mr. Clanton knows that, after his current kidney fails, he will likely require at least one more kidney transplant and two additional rounds of dialysis, lasting approximately three to five years each. He has not, however, told his daughters that he will need another transplant in the future because he is not ready to have that conversation. Of course, if he is not fortunate enough to receive a second or third transplant, he faces dialysis for the rest of his lifetime, along with the pain and inconveniences that come with it. Mr. Clanton is entitled to past and future damages for pain and suffering, emotional distress, and loss of a normal life, as set forth below.

### 2.  Disfigurement

Mr. Clanton has permanent scarring and disfigurement from the AV fistula installed on his arm to facilitate dialysis, which the Court personally observed at trial. The Court also observed considerable scarring on Mr. Clanton's abdomen, from the

transplant surgery and the post-transplant surgical site infection and dehiscence. For this disfigurement, Mr. Clanton is entitled to $250,000.

### 3. Past Medical Expenses

Mr. Clanton also has also required substantial medical and surgical care and treatment, including hemodialysis treatment and a kidney transplant. The parties stipulated that as of the date of trial, Mr. Clanton has incurred medical bills in the amount of $2,779,296 for treatment of his kidney damage and that these bills are fair, reasonable, and customary. (*See* Exhibit 27). The Court adopts the parties' stipulation and finds that all of the treatment and related charges set forth in Exhibit 27 was medically necessary and reasonable for Mr. Clanton's end-stage renal disease.

### 4. Future Medical Expenses

As a result of his kidney damage and end-stage renal disease, Mr. Clanton continues to incur significant damages and will require future medical and surgical care and treatment. The parties largely agree about the types of medical care that Mr. Clanton will require in the future; specifically, he will need immunosuppression medications, various follow-up medical visits and diagnostic testing, home healthcare services, counseling services, medical equipment, one or more future kidney transplants, and dialysis while on the waiting list for those kidneys. The parties disagree, however, about how long Mr. Clanton can be expected to live, how long each donor kidney will last, and how many additional transplants he will need.

The Government relied on United States Renal Data System ("USRDS") life expectancy table for *transplant patients* (Exhibit 111—USRDS Table H.13_TX), which indicates that the average life expectancy of a black male who undergoes a transplant at

age 35.5 (Clanton's precise age at the time of surgery) is 29.7 additional years. Thus, Mr. Clanton can be expected to live to age 65.2. As for how long his donor kidneys will last, the Government's expert nephrologist, Dr. Atta, opined that the half-life of a donor kidney is twelve years. Based on these two numbers, Dr. Atta believes that Mr. Clanton will need only one more kidney transplant.

On the other hand, Mr. Clanton relied on the USRDS life expectancy table for the *general population* (Exhibit 109—USRDS Table H.13_gen_Pop), which indicates that the average life expectancy for a 35.5 year old black male is 37.9 additional years. Thus, Mr. Clanton can be expected to live to age 73.4. His expert nephrologist, Dr. Tolins, opined that Mr. Clanton's donor kidney can be expected to last ten years. Based on these two numbers, Dr. Tolins believes that Mr. Clanton will need two more kidney transplants. Jan Klosterman used these numbers in developing Mr. Clanton's life care plan.

With respect to life expectancy, the Court does not believe that Mr. Clanton's life expectancy is 65; the table on which that figure is based (Exhibit 111), takes into account a number of "comorbidities" such as diabetes, heart disease, smoking history, drug abuse, lung disease, and liver disease, none of which Mr. Clanton has. Unfortunately, the Court also does not believe that Mr. Clanton is likely to live a normal life expectancy to age 73 given the severity of his health challenges and the early age of onset. As for the length of time his donor kidney will last, the Court credits Dr. Tolins's opinion of ten years because it is shared by Mr. Clanton's treating physicians at BJH-WU. Based on the ten-year life of a donor kidney, Mr. Clanton's age at the time of the initial transplant, and his life expectancy, he will certainly require another transplant in his lifetime,

possibly two. The harsh reality, however, is that Mr. Clanton will be lucky to find one more donor kidney and successfully undergo a second transplant, let alone a third.

Regardless of the fact that the Court cannot predict how long Mr. Clanton will live or how many future transplants he will need or receive, the Court found Ms. Klosterman to be highly credible and competent.[24] The assumptions in her Life Care Plan (Exhibit 104) regarding the nature, necessity, and timing of future medical treatment and costs are reasonable. The stated costs associated with future treatment are likewise fair and reasonable and represent the fair value of future treatments. Ms. Klosterman opined that Mr. Clanton's future medical costs will be somewhere between $14,006,000 and $17,395,665, which reduces to a present value of $12,235,533 to $15,195,759. Notably, if the Court credited the Government's assumptions that Mr. Clanton would get only one more transplant and have a reduced life expectancy of 65.2 years old, he would require dialysis following the failure of the second kidney (at around age 58, according to Ms. Klosterman's projections) through the end of his life, at a cost of somewhere between $1.4 and $1.6 million per year, making his damages equal to, but more like in excess of, Jan Klosterman's high end figure of $17,395,665.

In light of all the evidence and the Court's findings regarding Mr. Clanton's life expectancy, the expected duration of his donor kidneys, and the number of transplants Mr. Clanton will receive, the Court finds that Mr. Clanton is entitled to $13,000,000 for

---

[24] As previously indicated, the Court found Cathlin Vinett-Mitchell's initial numbers inappropriate and her revised numbers inadmissible. *See note 15, above.* Even if the Court were to allow her new calculations, the Court finds Ms. Vinett-Mitchell's new opinion unpersuasive compared to the testimony and opinions of Jan Klosterman. Ms. Klosterman, a certified life care planner, offered competent and persuasive testimony and opinions based upon actual cost of care information, research and the opinions of Dr. Tolins; she also utilized an accepted and reliable methodology to reach her opinions.

future medical care. Also, because the Court also finds that his normal life expectancy is likely reduced as a result of Nurse Jordan's negligence, Mr. Clanton is also entitled to damages in the amount of $2,000,000 for this shortened life expectancy.

### 5. Lost Wages

Mr. Clanton's dialysis treatments, from April 2013 through November 2015, impaired his ability to work due to the time consumed by the treatments, the fact that the treatments made him not feel well, and the time needed to recuperate between treatments. He was unable to work while on dialysis in the past, and he will be unable to work, while on dialysis, in the future. Nonetheless, Mr. Clanton intends to return to work, while his kidney is functioning, once he is cleared by his doctor to do so.

The parties stipulated before trial that Mr. Clanton sustained past lost wages in the amount of $63,000 and that he will incur future lost wages, reduced to present value, in the amount of $100,000. The Court accepts this stipulation as reasonable.

To summarize, the Court finds that as a proximate result of Nurse Jordan's deviations from the standard of care, Mr. Clanton has sustained, and will sustain in the future, the damages in the following amounts:

| | |
|---|---|
| Past Pain and Suffering | $ 1,500,000 |
| Future Pain and Suffering | $ 3,500,000 |
| Past Emotional Distress | $ 1,500,000 |
| Future Emotional Distress | $ 1,000,000 |
| Past Loss of Normal Life | $ 1,500,000 |
| Future Loss of Normal Life | $ 2,500,000 |
| Disfigurement | $250,000 |
| Past Medical Expenses (stipulated amount) | $2,779,296 |
| Future Medical Expenses (present value amount) | $13,000,000 |
| Past Lost Earnings (stipulated amount) | $63,000 |
| Future Lost Earnings (stipulated amount) | $100,000 |
| Shortened Life Expectancy | $2,000,000 |
| **TOTAL DAMAGES** | **$29,692,296** |

## H. *Elections*

On August 17, 2016, The Government filed a motion to elect and apply the Illinois statutory periodic payment provisions for any judgment in favor of Plaintiff for future damages (Doc. 75). Plaintiff did not file a response to this motion, but did request a conference to explore the logistics of this provision in the event the Court ruled in favor of Mr. Clanton (Doc. 130). The Court finds it appropriate to grant both motions and work out the details of future payments at a hearing to be held in the near future.

<u>CONCLUSION</u>

Judgment will be entered in favor of Plaintiff Kevin Clanton and against Defendant, the United States of America, in accordance with this Memorandum and Order. Plaintiff is further awarded his costs.

The Government's motion to elect and apply Illinois statutory periodic payment provisions (Doc. 75) is **GRANTED**, and Plaintiff's motion for conference regarding application of Illinois' periodic payment statutes (Doc. 130) is **GRANTED**. A hearing to address the method and manner for employing the periodic payment provisions will be set by separate notice.

**IT IS SO ORDERED.**

**DATED:  March 14, 2017**

_____
**NANCY J. ROSENSTENGEL**
**United States District Judge**