# IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF ILLINOIS

| | | |
|---|---|---|
| KEVIN CLANTON, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | Case No. 15-CV-124-NJR-RJD |
| | ) | |
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Defendant. | ) | |

## MEMORANDUM AND ORDER

**ROSENSTENGEL, District Judge:**

Plaintiff Kevin Clanton filed this medical malpractice action under the Federal Tort Claims Act ("FTCA") in February 2015. Following a five-day bench trial in October 2016, the Court issued an Order setting forth its findings of fact and conclusions of law and awarding Clanton over $29 million in damages (Doc. 134). That figure was later amended to over $31 million (Doc. 150). Before final judgment was entered, the parties reached a tentative settlement for a lesser amount, and the case was stayed pending approval of the settlement by the United States Attorney General (Doc. 151). In an unexpected and puzzling turn of events, however, the settlement was rejected by the Attorney General. So the stay was lifted, and the parties were ordered to submit their calculations and proposed judgments by November 8, 2017 (Doc. 155). But two days before that deadline, the Government filed a Motion for Reconsideration (Doc. 156), which is currently before the Court.

In the motion, the Government asks the Court to reconsider Clanton's award for noneconomic damages because the Court did not analyze the awards in comparable

cases, and those awards demonstrate that Clanton's award is excessive. Second, the Government asks the Court to reconsider its ruling that Medicare Part B benefits are a collateral source and should not be deducted from Clanton's award. Finally, the Government asks the Court to amend its Order regarding the entry of a judgment under the Illinois periodic payment provisions to eliminate any continuing payment obligations on the Government and to address the manner in which the Government can satisfy and discharge the judgment.

Clanton filed a response to the Government's motion (Doc. 160), as well as a request for a hearing (Doc. 161). The Government then filed a reply in support of its motion (Doc. 162). The Court has carefully considered the parties' submissions, and for the reasons explained in this Order, Clanton's motion for a hearing and the Government's motion for reconsideration are both denied.

## LEGAL STANDARD

The Court has the inherent power to modify and revise interlocutory orders at any time before it enters final judgment. FED. R. CIV. P. 54(b) (providing that non-final orders "may be revised at any time before the entry of a judgment adjudicating all the claims and all the parties' rights and liabilities."); *Peterson v. Lindner,* 765 F.2d 698, 704 (7th Cir. 1985) ("Of course, if the order was interlocutory, [the district judge] had the power to reconsider it at any time before final judgment."). The Court's authority "to reconsider a previous ruling in the same litigation . . . is governed by [the law of the case doctrine]." *Santamarina v. Sears, Roebuck & Co.*, 466 F.3d 570, 571–72 (7th Cir. 2006). "Among other things, the law of the case doctrine embodies the notion that a court ought not to re-visit an earlier ruling in a case absent a compelling reason, such as

manifest error or a change in the law, that warrants re-examination." *Minch v. City of Chicago*, 486 F.3d 294, 301 (7th Cir. 2007) (citing *Santamarina*, 466 F.3d at 572). The doctrine is intended to further consistency, to avoid constantly revisiting rulings, and to conserve judicial resources. *Sharp Elecs. Corp. v. Metro. Life Ins. Co.*, 578 F.3d 505, 510 (7th Cir. 2009) (citing *Minch*, 486 F.3d at 301).

## DAMAGE AWARDS IN COMPARABLE CASES

The Court awarded Clanton $13.75 million in noneconomic damages (Docs. 134, 150). The Government asks the Court to reconsider this award because the Court did not analyze the noneconomic damages awards handed down in other cases, and those awards demonstrate that Clanton's award is excessive (Doc. 156, p. 4).

"Federal Rule of Civil Procedure 52(a) requires judges, when they are the triers of fact, to make written findings in support of their conclusions." *Jutzi–Johnson v. United States,* 263 F.3d 753, 758 (7th Cir.2001). "This means, when the issue is the amount of damages, that the judge must indicate the reasoning process that connects the evidence to the conclusion." *Arpin v. United States*, 521 F.3d 769, 776 (7th Cir. 2008) (quoting *Jutzi–Johnson v. United States,* 263 F.3d 753, 758 (7th Cir. 2001)). To that end, the Court should consider awards made in similar cases, both in Illinois and elsewhere. *Arpin*, 521 F.3d at 776. The Court admits that it failed to discuss comparable cases in determining an appropriate award for noneconomic damages. Thus, the Court will provide here what it omitted from its previous Orders (Docs. 134, 150).

Assessing noneconomic damages is a difficult task for which there is no formula. *See, e.g., Arpin*, 521 F.3d at 776; *Jutzi-Johnson*, 263 F.3d at 758. The purpose of consulting the damages awards in other cases is to facilitate "a more thoughtful, disciplined, and

informed award." *Jutzi-Johnson*, 263 F.3d at 760. "[B]ut caution should be the byword when looking at past awards" because they offer "at best, a rough approximation of damage awards." *Adams v. City of Chi.*, 798 F.3d 539, 545 (7th Cir. 2015). "[T]hey do not establish a range beyond which awards are necessarily excessive." *Farfaras v. Citizens Bank & Tr. of Chicago*, 433 F.3d 558, 566 (7th Cir. 2006). *See also Adams*, 798 F.3d at 545 ("There must be room for [an] award to exceed the relevant range of cases when the facts warrant."). Instead, they merely provide "a reference point that assists the court in assessing reasonableness[.]" *Farfaras*, 433 F.3d at 566. Consequently, the Court's role is not to find an exact analogy between Clanton's case and another case with either a similar or dissimilar verdict. *Id.* It is also not the Court's responsibility to fit this case "into a perfect continuum of past harms and past awards." *Id.* at 567. Rather, the Court's role in reviewing awards in other cases is to determine if the award in the case before it "[is] roughly comparable to similar cases such that the instant award was not so beyond the pale as to constitute an abuse of discretion." *Id.*[1]

The Court begins by noting that, during the bench trial in this case, the Government was of little help when it came to determining an appropriate award for noneconomic damages. Clanton requested $15.25 million in noneconomic damages.[2] In

---

[1] The language in this paragraph reflects the guidelines that district courts use in reviewing a jury verdict and that the Seventh Circuit uses in reviewing a district court's denial of a motion for remittitur or a new trial on damages. The Court sees no reason why those guidelines would not also apply in an instance, such as this, where the district court is considering awards made in similar cases for the purpose of satisfying Rule 52(a).

[2] Clanton requested $8.5 million for past and future pain and suffering, $4 million for past and future emotional distress, $2.5 million for past and future loss of normal life, and $250,000 for disfigurement. These figures were set forth in Clanton's proposed findings of fact and conclusions of law, which was submitted via email to the Court and not filed in the case. They vary slightly from the figures his counsel set forth in the Final Pretrial Order and in closing arguments (*see* Doc. 96; Doc. 124).

response, the Government went for broke and argued that Clanton should not receive any damages at all (*see* Doc. 124, p. 152). In the alternative, the Government suggested that Clanton should receive no more than $300,000 in noneconomic damages—$100,000 for past pain and suffering, $100,000 for future pain and suffering, and $100,000 for shortened life expectancy, but nothing for emotional distress, loss of a normal life, or disfigurement.[3]

The Government followed up its request for minimal noneconomic damages by citing to verdict summaries from six cases that it deemed comparable.[4] Unfortunately, however, the Government's cursory one-sentence explanation and misguided selection of cases were of little to no help. Two of the cases ended with verdicts for the defense and were therefore completely useless.[5] Two other cases were similarly useless because they ended in settlements.[6] *See Maldonado v. Sinai Med. Grp., Inc.*, 706 F. Supp. 2d 882, 887 n.6 (N.D. Ill. 2010) (declining to give substantial consideration to cases that ended in settlement because "many factors that influence settlement are unrelated to the damages the plaintiff has suffered," such as the parties' interest in an expeditious resolution and the strength of the plaintiff's liability evidence); *Hardnick v. United States*, No. 07 C 1330, 2009 WL 1810106, at *14 (N.D. Ill. June 25, 2009) ("[S]ettlements are 'less useful than

---

[3] These figures were set forth in the Government's proposed findings of fact and conclusions of law, which was submitted via email to the Court and not filed in the case.

[4] These cases likewise were set forth in the Government's proposed findings of fact and conclusions of law, which was submitted via email to the Court and not filed in the case.

[5] *Campillo v. Kind, et al*, Case No. 01-L-14771, unknown Illinois state court (2005), verdict summary at JVR No. 440983, 2005 WL 4040824; *Bauer v. Lerch, et al.*, Case No. 92-L-6905, Circuit Court of Cook County, Illinois (1997), verdict summary at JVR No. 200465, 1997 WL 1403327.

[6] *Estate of Wayne v. Christ Hospital, et al.*, Case No. 95L-1967, Circuit Court of Cook County, Illinois (1995), verdict summary at JVR No. 2004492, 1997 WL 463372; *Modersohn v. Osco Drug, Inc.*, Case No. 98 L 367, unknown Illinois state court (2002), verdict summary at JVR No. 431450, 2002 WL 33840214.

consideration of verdicts' because '[p]arties settle claims to avoid the uncertainty and expense of trial; and the amount settled for may bear little relation to the amount a jury might award upon finding a defendant liable.'" (quoting *Kasongo v. United States*, 523 F. Supp. 2d 759, 804 n.39 (N.D. Ill. 2007))). The remaining two cases resulted in verdicts for the plaintiffs, but the information contained in the verdict summaries was so scant that it was impossible for the Court to draw a valid comparison with this case.[7]

Simply put, both of the Government's suggested awards for noneconomic damages were wholly unreasonable given Nurse Jordan's glaring malpractice and Kevin Clanton's permanent and life-altering injuries that necessitated millions of dollars of past and future medical treatment. The undersigned put a great deal of thought into assessing how much Clanton should receive for noneconomic damages. In the absence of any plausible alternative from the Government, the Court ultimately awarded Clanton an amount close to what he asked for (Docs. 134, 150). More specifically, the Court awarded Clanton a total of $13.75 million in noneconomic damages, which the Court broke down into the following categories in order to satisfy the requirements of the Illinois periodic payment statute:

| | |
|---|---|
| Past Pain and Suffering | $1,500,000 |
| Past Emotional Distress | $ 1,500,000 |
| Past Loss of Normal Life | $ 1,500,000 |
| Disfigurement | $250,000 |
| Future Pain and Suffering | $3,500,000 |
| Future Emotional Distress | $ 1,000,000 |

---

[7] *Perry v. Garchitorena*, Case No. 03-L-40, Circuit Court of St. Clair County, Illinois (2007), verdict summary at JVR No. 505612, 2007 WL 6969608; *Puerta v. Chavez*, Case No. 2011-l-004011, Circuit Court of Cook County Illinois (2015), verdict summary at JVR No. 1506100036, 2015 WL 3777217. Clanton later submitted a different verdict summary for *Puerta* as part of his response to the Government's Motion to Reconsider (Doc. 160-1, pp. 29–32). Clanton's verdict summary had far more information than the one initially provided by the Government.

| | |
|---|---|
| Future Loss of Normal Life | $ 2,500,000 |
| Shortened Life Expectancy | $2,000,000 |
| **Total Noneconomic Damages** | **$13,750,000** |

(Docs. 134, 150).

How does this damages award stack up to awards in similar cases? The parties submitted a total of nineteen cases that they deemed to be comparable to Clanton's case (Doc. 156-1; Doc. 160-1; Doc. 160-2; Doc. 160-3). For its part, the Government provided a list of eight cases that all involve kidney damage, kidney disease, dialysis, and/or kidney transplants, most of which was the result of negligent medical care (Doc. 156-1; Doc. 160-2). The awards for noneconomic damages in these cases are, predictably, relatively low. They range from $171,000 to $2.7 million, with an average award of just over $1 million.

In response, Clanton argues that cases involving kidney injury are not the only proper comparators; he argues that the Court should also look at cases that involve the transplant of any major organ (Doc. 160, pp. 8–9). Clanton also argues that in assessing the reasonableness of the noneconomic damages award, the Court should not take a gross award-comparison approach, but should use a ratio-comparison approach (Doc. 160, pp. 3–9). That is, Clanton wants the Court to look at the ratio of noneconomic damages to economic damages in the comparable cases. Clanton provided a list of eleven cases, eight of which involve kidney damage from negligent medical care, one that involves kidney damage from chemical exposure, one that involves lung damage from exposure to toxic fumes, and one that involves liver damage caused by medication

(*see* Docs. 160-1, 160-3).[8] Unsurprisingly, the awards for noneconomic damages in these cases are, for the most part, much higher than the awards in the Government's cases. They range from $975,000 to approximately $28.3 million, with an average award of over $7 million.

For all but one case, the parties provided the Court with verdict summaries (*see* Docs. 160-1, 160-2) which, generally speaking, contain only bare-bones information. For example, most of the verdict summaries do not discuss the status of the plaintiff's health or what his or her daily life looked like before the injury. Some do not indicate the plaintiff's age, employment status, or the composition of the plaintiff's family. Most do not describe the precise nature of the injury, and some do not indicate whether the plaintiff underwent dialysis. Even when dialysis is mentioned, there is virtually no discussion of the effect the dialysis had on the plaintiff's life. The verdict summaries do not review the evidence presented regarding the plaintiff's pain and suffering, emotional distress, or loss of enjoyment of life. And most of the verdict summaries do not discuss the plaintiff's prognosis, what future medical treatment he or she will need, or the plaintiff's life expectancy.

Additionally, a number of the verdict summaries indicate only that the noneconomic award was for "pain and suffering." The Court was unable to discern if that meant *past* pain and suffering, or if that meant both *past and future*. The Court also could not tell if the juries considered but decided not to award other categories of noneconomic damages, such as emotional distress, loss of a normal life,

---

[8] One of Clanton's cases was also submitted by the Government. Although the parties used different names for the case—the Government cited to *Graham ex rel. Graham v. Snyder,* while Clanton cited to *Graham v. Children's Hospital, et al.*—and provided different verdict summaries, the content of the verdict summaries makes clear that the parties are citing to the same case.

disfigurement, and shortened life expectancy. Finally, twelve of the nineteen cases cited

by the parties have verdicts that were awarded at least a full decade before the bench

trial in this case (*see* Doc. 160-3). In fact, four of those awards are close to twenty years

old (*see* Doc. 160-3). These awards would undoubtedly be worth substantially more

today due to inflation.

Simply put, the lack of details and the age of some of the verdicts made it difficult,

if not impossible, for the Court to assess how comparable the cases really are to

Clanton's. The Court exhaustively searched Westlaw, Lexis, and the internet in an effort

to find more information to make the cases more useful comparators. These efforts were

met with mixed results, but the Court was generally able to piece together the basic facts

of each case. The Court also consulted an online inflation calculator to get a general idea

of what some of the older verdicts would be worth in today's dollars. *See EEOC v. AIC*

*Sec. Investigations, Ltd.*, 55 F.3d 1276, 1286 (7th Cir. 1995) ("Comparability of awards must

be adjusted for the changing value of money over time."); *Tullis v. Townley Eng'g & Mfg.*

*Co.*, 243 F.3d 1058, 1069 (7th Cir. 2001) (converting older verdict to current dollars before

assessing the verdict for comparison purposes).[9] Finally, the Court searched for

reported cases that the parties had overlooked or that had been published after the

parties submitted their briefs; the Court was able to identify two additional cases that it

deemed comparable: *Campano v. United States*, Case No. 15-00439 KSC, 2018 WL 1182571

---

[9] The Court used the United States Bureau of Labor Statistics' inflation calculator based on the Consumer Price Index. U.S. Bureau of Labor Statistics, *CPI Inflation Calculator*, https://www.bls.gov/data/inflation_calculator.htm (last visited June 22, 2018). The Court input the dollar amount of the noneconomic damages award in the comparable case, the month and year in which the trial occurred in the comparable case, and the month and year of Clanton's bench trial (October 2016). Each time the Court references an inflation calculator in this Order, it is this Bureau of Labor Statistics calculator that was used. In the interest of brevity, the Court does not repeat the citation for the calculator.

(D. Haw. Mar. 7, 2018) and *Kunz v. Little Co. of Mary Hosp.*, 869 N.E.2d 328 (Ill. App. Ct. 2007).

The Court was left with a total of twenty comparator cases.[10] It is readily apparent, however, that many of those cases provide little to no guidance regarding an appropriate award for Clanton and/or skew the Court's sense of what an appropriate award might be. Thus, the Court will begin its discussion of the comparable cases by identifying which cases can be excluded from its consideration.

## A. CASES EXCLUDED FROM THE COURT'S CONSIDERATION

To begin with, the Court disagrees with Clanton that it should look beyond cases that involve kidney injuries to cases that involve a transplant of any major organ. Clanton obviously wants the Court to consider *Solis v. BASF* (which involved lung failure) and *Sanchez v. Parke-Davis* (which involved liver failure) because the plaintiffs received extremely large awards for noneconomic damages: $28.3 million and $19 million, respectively. Awards of that size certainly make Clanton's own award appear well within the realm of reasonableness. In support of his position, Clanton argues that "[i]t is not the specific injury that makes a case similar, but rather the impact the injury had and will have on the plaintiff's life" (Doc. 160, pp. 6–7). He claims the impact on the plaintiff is similar, regardless of whether a kidney, lung, or other organ is being transplanted, because

> [e]ach plaintiff endures the risks and fear of not receiving a future
> transplant; the uncertainty about how long the transplanted organ will
> last; the physical pain, scarring, and emotional distress associated with

---

[10] A table of all the cases identified by the parties and the Court can be found at the end of this Order. The table provides the case names along with citations to all of the materials the Court consulted for information about the cases. For the sake of brevity, the Court will not repeat the citations throughout the body of this Order whenever a case is mentioned.

medical treatment (surgeries, a lifetime of anti-rejection medicines, hospital stays, doctor visits); the knowledge of a shortened life; and the life-altering impact of living with a constant sense of impending doom.

(*Id.* at p. 9).

Even assuming these general similarities exist, it seems to the Court that there are significant differences between kidneys and other transplantable organs. As one law journal article stated:

> [K]idneys are unique among the solid organs due to the combination of the low risk of living donation, the feasibility of extended waiting times while on dialysis, and Medicare coverage of dialysis and transplantation for kidney patients. . . . [B]ecause humans are born with two kidneys but need only one to survive, living donation is feasible. Although living donation is possible for other organs as well, the donor risks are higher than with kidney donation. In addition, extended waiting times for those in need of kidney transplantation are medically feasible, due to dialysis, and financially feasible, due to Medicare coverage of end-stage renal disease (ESRD) treatment, which includes dialysis and kidney transplantation. In contrast, Medicare covers the treatment (including transplantation) of other organ diseases only if the patient already has Medicare due to age or disability.

Philip J. Cook & Kimberly D. Krawiec, *A Primer on Kidney Transplantation: Anatomy of the Shortage*, 77 LAW & CONTEMP. PROBS. 1, at *3 (2014).

The Court believes that the availability of dialysis for patients suffering from kidney failure is a distinction that cannot be overstated. Dialysis can prolong and potentially save the lives of patients who would otherwise have died waiting for a kidney transplant.[11] But while dialysis is "life-extending," it is not "life-bettering"—it inflicts a multitude of physical, psychological, financial, professional, and social

---

[11] Life expectancy on dialysis can vary depending on the patient's other medical conditions and how well he or she follows the treatment plan. Average life expectancy on dialysis is 5–10 years, however, many patients have lived well on dialysis for 20 or even 30 years. *Dialysis*, NAT'L KIDNEY FOUNDATION, https://www.kidney.org/atoz/content/dialysisinfo (last visited May 25, 2018).

consequences. Lara Rosen, et al., *Addressing the Shortage of Kidneys for Transplantation: Purchase and Allocation Through Chain Auctions*, 36 J. HEALTH POLITICS, POLICY, & LAW 717, 718 (2011).[12] In this instance, a significant portion of the noneconomic damages awarded to Clanton was intended to compensate him for his pain and suffering, emotional distress, loss of a normal life, and disfigurement associated with dialysis treatments.

Patients suffering from lung or liver failure do not receive dialysis treatments, and the Court is unsure whether they nonetheless face consequences that are similar in kind and degree to those faced by dialysis patients (*see* Doc. 160). Consequently, the Court is unable to say that the physical pain and emotional distress associated with kidney failure is sufficiently akin to liver failure or lung failure to justify using *Solis* and *Sanchez* as reference points for assessing the reasonableness of Clanton's noneconomic damages.

Even if the Court reached the opposite conclusion, the Court would not consider the verdicts in *Solis* and *Sanchez*, because both cases ultimately ended in settlements.[13]

---

[12] *See id.* ("While dialysis extends patients' lives, their condition often prevents them from being fully engaged in their community and career."); Evelyn M. Tenenbaum, *Bartering for A Compatible Kidney Using Your Incompatible, Live Kidney Donor*, 42 AM. J. L. & MED. 129, 137 (2016) (dialysis is "both physically and emotionally taxing. [It] requires patients to tether themselves to dialysis machines for approximately four hours, three times each week. The process is not only time-consuming, but also leaves many too drained to work. Even worse, only half of dialysis patients survive more than three years.") (citation and internal quotation marks omitted); Kevin Sack, *60 Lives, 30 Kidneys, All Linked*, N.Y. TIMES (Feb. 18, 2012), https://www.nytimes.com/2012/02/19/health/lives-forever-linked-through-kidney-transplant-chain-124.html (describing "the burning and bloating and dismal tedium of dialysis" and stating that "[m]any of the 400,000 [patients] tethered to dialysis dream of a transplant as a way back to normal"); Laura G. Dooley & Robert S. Gaston, *Stumbling Toward Equity: The Role of Government in Kidney Transplantation*, 1998 U. ILL. L. REV. 703, 718 (1998) ("Life on dialysis is, to put it mildly, onerous. To exist is possible, to thrive unusual, and to prosper almost unheard of. The dialysis patient must keep a strict diet: because excess protein, potassium, sodium, phosphorus, and water have no place to go, their intake must be severely restricted. . . . The dialysis patient is subjected to a daily, never-ending procession of needles, tubes, blood work, and injections. Even the relatively humane regimens of home dialysis require the presence of a floppy tube protruding from the midabdomen and the constant attention to cumbersome details.")

[13] In *Solis*, the verdict was reversed due to errors made by the trial court, and the case was remanded for a new trial. According to the Cook County, Illinois court records, the case was dismissed on remand in

As previously indicated in this Order, settlements are of little help in determining an appropriate noneconomic damages award. *See supra* pp. 5–6. *See also Bravo v. United States*, 532 F.3d 1154, 1166 (11th Cir. 2008) (explaining "[t]here are a number of reasons that a verdict or award entered at the trial stage may not realistically reflect what is actually going on in the world of damage awards," including that "the parties will settle after the verdict or award is announced for a more realistic amount which is not disclosed" but the "phantom awards that might well have been set aside as excessive on appeal, or even in further proceedings at the trial stage, are left to haunt the judgment books.")

The Court now turns to the eighteen comparable cases that involved kidney injuries. First and foremost, cases that provide only a total verdict amount but do not break down the award into noneconomic and economic components are useless. A case that does not specify the amount of noneconomic damages awarded to the plaintiff cannot possibly provide any guidance to the Court regarding an appropriate award in this case. There are two cases that fall into this category: the *Graham* case, which was cited by both parties,[14] and *Talbot v. Nissanka*, which was cited by the Government.

---

August 2013 "by stipulation or agreement." This disposition suggests to the undersigned that the parties reached a settlement, but the amount of the settlement was not disclosed. In *Sanchez*, the jury returned a $43 million verdict for the plaintiff's family, including $19 million for noneconomic damages, and while the jury was deliberating punitive damages, the parties reached a confidential settlement.

[14] The Government's sources indicate that the jury found for Graham in the amount of $15 million, but do not provide a breakdown between economic and noneconomic damages (*see* Doc. 156-1). The sources also indicate that Graham's post-trial motion for "delay damages" was granted but do not provide the amount of additional damages the plaintiff was awarded (*see* Doc. 156-1). The verdict summary submitted by Clanton, however, indicates that Graham was awarded damages totaling $18,633,595, which suggests Graham was awarded approximately $3.6 million in delay damages (Doc. 160-1, pp. 13–15). That verdict summary also indicates that $15 million of the total damages—meaning the entirety of the jury's original verdict—was for pain and suffering (*Id.*). The Court strongly suspects the breakdown is inaccurate. *See Graham ex rel. Graham v. Snyder*, 1999 WL 33486460, at *4 (Pa. Com. Pl. Oct. 20, 1999), *aff'd sub nom. M.G. v. Children's Hosp. of Philadelphia*, 767 A.2d 1117 (Pa. Super. Ct. 2000) (indicating that "[t]he high end of the

Second, cases in which the award for noneconomic damages is confined, either in whole or in part, by a statutory cap are not particularly useful because Clanton's award is not limited by any cap. There is no way to tell whether an award at the statutory cap reflects the fact finder's assessment of the value of the noneconomic injury or whether it simply reflects the legislatively-imposed limit on damages for that injury. There are three kidney cases that involve statutory caps: *Gutierrez v. Vargas*, *Mamea v. United States*, and *Campano v. United States*. In *Gutierrez*, the plaintiff was awarded a total of $500,000 for past and future pain and suffering,[15] which was the statutory cap on noneconomic damages imposed by Florida law at the time of the verdict. FLA. STAT. § 766.118(2) (2011).[16] In *Mamea* and *Campano*, which are FTCA cases out of Hawaii, the awards for physical pain and suffering were statutorily capped at $375,000. HAW. REV. STAT. § 663–8.7. In *Mamea*, the district judge simply awarded the plaintiff a total of $1.25 million "for physical pain and suffering, emotional distress, scarring and disfigurement, loss of enjoyment of life, and loss of life expectancy," without mentioning the cap on pain and suffering. *See* 781 F. Supp. 2d 1025, 1055 (D. Haw. 2011). In *Campano*, the judge awarded the plaintiff $1.875 million for noneconomic damages, and explicitly indicated that $375,000 was for "pain and suffering" and the remainder was for "mental anguish, disfigurement, loss of enjoyment of life, and loss of consortium." *See* No. CV 15-00439

---

range of projected medical expenses" was $13 million). Consequently, the Court cannot determine with any degree of certainty how much Graham was awarded in economic and noneconomic damages.

[15] The verdict summary submitted by the Government indicates that the jury awarded Gutierrez $230,000 in past and future pain and suffering (Doc. 156, pp. 5–6). The Court's additional research, however, revealed that the trial court increased the jury's award for noneconomic damages by $270,000. Thus, Gutierrez's award for noneconomic damages was the statutory cap of $500,000.

[16] The cap was later struck down by the Florida Supreme Court in *N. Broward Hosp. Dist. v. Kalitan*, 219 So. 3d 49 (Fla. 2017).

KSC, 2018 WL 1182571, at *28 (D. Haw. Mar. 7, 2018).

The Court has no way to know the extent to which the statutory caps influenced the noneconomic damages awards in *Gutierrez*, *Mamea*, and *Campano* and whether those plaintiffs would have received larger awards absent the caps. Consequently, these three cases are of limited value when it comes to calculating an appropriate award for Clanton. *See Hardnick v. United States*, No. 07 C 1330, 2009 WL 1810106, at *14 (N.D. Ill. June 25, 2009), *as amended* (July 1, 2009) (FTCA case in which the court declined to consider comparable case involving a statutory cap on damages).

Another case that does not seem to realistically reflect what is going on in the world of damage awards is *Gonzales v. Pla*. This verdict summary indicates that the defendant doctor was covered by an insurance policy that had a $1 million limit. At trial, plaintiff's counsel demanded the policy limit of $1 million for noneconomic damages, plus his client's medical expenses. While the jury was deliberating, the parties entered into a $150,000–$950,000 high-low agreement within the policy limit. The jury awarded Gonzales the amount he asked for, which was reduced to $950,000 in accordance with the parties' agreement. Based on these facts, the Court believes the award in *Gonzales* quite obviously reflects the limits of the insurance policy rather than what the jury truly believed Gonzales's injuries were worth. Consequently, this case is not particularly instructive when it comes to calculating an appropriate award for Clanton. *See Bravo*, 532 F.3d at 1166 ("Sometimes the limits of the defendant's assets or of its insurance policy make most of an award meaningless . . . .").

The third category of cases that are of little help to the Court are cases in which the facts materially differ from this case. As the Court sees it, two cases fall into this

category: *Phillips v. Eckerd* and *Davis v. Forsyth Chiropractic Center*.

In *Phillips*, the plaintiff was born with a single kidney and had a transplant in her early twenties. She began experiencing mild acute rejection several years after the transplant and was prescribed a steroid to reverse the rejection. The pharmacist mistakenly instructed her to take five times the amount prescribed by the doctor, and the overdose caused her kidney to fail. She was forced to undergo two additional transplants within four years of the overdose. The overdose also clotted off her superior vena cava and made it unusable, which meant she could not go on dialysis. She also could not have another transplant. So when her third kidney transplant inevitably fails, Phillips will die. Given that Phillips had serious kidney problems before the events that gave rise to her lawsuit, and that she faced a prognosis far more dire than Clanton's, it seems that her noneconomic damages are of a flavor quite different than Clanton's. Therefore, Phillips's noneconomic damages award is not a particularly strong reference point for determining an appropriate award in this case.

As for *Davis*, this case involved major medical conditions aside from renal failure. The plaintiff used Chinese herbal supplements that contained aristolochic acid, which led to renal failure and a kidney transplant, as well as bladder cancer that required the plaintiff to have her bladder, ureters, uterus, ovaries, and fallopian tubes removed. The plaintiff also was subsequently diagnosed with and died from metastatic cancer, which she attributed to the immunosuppressive medication regimen necessitated by the kidney transplant. Based on these facts, Davis's noneconomic damage award presumably compensated her, at least in part, for physical pain and emotional distress suffered as a result of medical conditions that Clanton did not have. It is impossible to

say what, if any, portion of the award was related solely to her renal failure. Thus, this award is of limited value when it comes to calculating an appropriate award for Clanton.

## B. CASES DEEMED COMPARABLE BY THE COURT

The Court is left with ten cases: *Brown v. Werther*, *Canterino v. Kumar*, *Plasencia v. Echnique*, *Kunz v. Little Co. of Mary Hosp.*, *Maynard v. Reich*, *Meyer v. Ackerman*, *Barker v. Union Pacific R.R. Co.*, *Puerta v. Chavez*, *Perry v. Garchitorena*, and *King v. Goldschmidt.* A brief summary of the facts of each case follows, with the cases listed in order of award size for noneconomic damages.

### 1. *Brown v. Werther*

A 52-year-old barber was diagnosed with salmonella septicemia, which is a bacterial infection in the bloodstream. He was hospitalized for several weeks while he received treatment for the salmonella infection, viral hepatitis B, and sarcoidosis. Following his discharge and the completion of his antibiotics, his doctors failed to follow up with blood and stool cultures to confirm the salmonella had been eradicated. The continuing infection caused a ruptured mycotic aneurysm that required Brown to undergo emergency surgery to revascularize his major blood vessels, as well as, "loss of kidney, renal failure, [and] probable need for dialysis."

The jury awarded Brown $7 million in noneconomic damages ($3 million for past pain and suffering, $3 million for future pain and suffering, $500,000 for past loss of consortium, and $500,000 for future loss of consortium). The trial was in June 1998, and according to an online inflation calculator, the verdict would have been worth approximately $10.4 million at the time of Clanton's trial in October 2016.

### 2. *Canterino v. Kumar*

After suffering a heart attack, a 76-year old male was brought to the hospital where he underwent testing that entailed the use of contrast material, which caused his creatinine levels to rise. Although the cardiologist agreed not to perform surgery before Canterino's creatinine levels had returned to baseline, he did not stick to the agreement. Immediately after surgery, Canterino's kidney function started to decline, and the kidneys eventually failed. He also developed residual sepsis. He spent nearly four months in the hospital after the surgery. Afterwards, he required dialysis treatments three times a week for the final three and a half years of his life. His widow testified that his condition and the dialysis

process greatly diminished the quality of his life; he no longer enjoyed drawing, singing, or recreational walking, and he relinquished most of his independence. The jury awarded the plaintiff $9,100,000, including $7,000,000 for past pain and suffering, $2,000,000 for medical bills, and $100,000 for pecuniary loss.

3. *Plasencia v. Echnique*

A 38-year-old man with two young children had a urinalysis that showed significant blood and protein in his urine, which are common signs of kidney disease. His disease went undiagnosed by his doctor and two urologists. Two and a half years after the abnormal urinalysis, Plasencia went to the emergency room where he was diagnosed with end stage kidney disease. He received a kidney transplant at some point thereafter. The jury found Plasencia 1% negligent and awarded him $5,248,514, including $3 million for *past* pain and suffering, $1,727,514 for past and future medical expenses, and $521,000 for past and future lost earnings. An appeal was filed, and Plasencia settled with the defendants. The total of all the settlements came to more than $2.1 million.

The Court does not know if Plasencia's kidney failure could have been avoided, or at least delayed, if his conditions had been diagnosed and treated sooner. The Court also doesn't know if Plasencia received any dialysis treatments, and if so, the specifics of the pain and suffering that he endured or how his life was affected. What future medical treatment Plasencia will need, his prognosis, or his life expectancy are also unknown.

Notably, it does not appear that any damages for future pain and suffering were awarded, and the Court does not know if they were even considered. Finally, this verdict was handed down in May 2003, and according to an online inflation calculator, the award for past pain and suffering would have been worth approximately $3.95 million at the time of Clanton's trial in October 2016.

4. *Kunz v. Little Co. of Mary Hosp.*

A 75-year old woman mistakenly received a prolonged course of gentamicin due to medical negligence, and her kidneys failed as a result. At the time of trial, she was 81-years-old and had spent five years on dialysis. There was expert testimony at trial that her life expectancy was 9.1 years and she would require dialysis treatments for the rest of her life. The jury awarded Kunz $3.2 million in noneconomic damages ($1.9 million for past and future pain and suffering, $1 million for loss of a normal life, and $300,000 for disfigurement). The trial court refused to permit the jury to award damages for past and future medical bills. This ruling was reversed on appeal, and the case was remanded for a new trial as to those expenses only. The parties settled the case on remand for approximately $6.8

million.

The Court does not know the specifics of the pain and suffering that Kunz endured or how her life was affected by dialysis. Additionally, this verdict was handed down in September 2005, and according to an online inflation calculator, the award for noneconomic damages would have been worth approximately $3.9 million at the time of Clanton's trial.

5. *Maynard v. Reich*
A 45-year-old woman underwent laparoscopic surgery to remove uterine fibroids, and the surgeon mistakenly removed her right kidney believing it was fibroid. Maynard contended that the removal *might* cause her remaining kidney to fail in the future. The jury awarded Maynard $2,811,000 ($111,000 for past pain and suffering and $2.7 million for future pain and suffering). This verdict was awarded in October 2003, and according to an online inflation calculator, the award for noneconomic damages would have been worth approximately $3.7 million at the time of Clanton's trial.

6. *Meyer v. Ackerman*
A 72-year-old homemaker underwent surgery to remove ovarian cysts and her ureters were accidentally clipped. After an unsuccessful emergency surgery to reattach her ureters, Meyer went into septic shock and was placed on a ventilator for several days. She had a nephrostomy bag for three months, and one of her kidneys was eventually removed. In total, she was hospitalized for approximately one month and made twelve more visits to the hospital between the initial surgery and the kidney removal. Her remaining kidney was well-functioning. Following the kidney removal, she resumed most of the same activities as before her initial surgery, including household chores, driving, and weekly bowling.

The jury awarded Meyer a total of $2,552,339, including $2.5 million for noneconomic damages ($1.5 million for past pain and suffering and $1 million for future pain and suffering) and $52,339 was for past medical expenses. This verdict was awarded in June 2004, and according to an online inflation calculator, the award for noneconomic damages would have been worth approximately $3.2 million at the time of Clanton's trial.

7. *Barker v. Union Pacific R.R. Co.*
A 46-year-old male suffered acute kidney failure after severely overexerting himself at work. Barker underwent dialysis treatment on an in-patient and later out-patient basis, and he was off work a total of three and a half months. Several years later, Barker suffered kidney failure a second time, and he was admitted to the hospital for six days. His kidney function returned on its own without dialysis.

The jury awarded Barker $3,543,716 in damages, including $1,963,000 in noneconomic damages ($400,000 for past pain and suffering, $1.25 million for future pain and suffering, and $313,000 for loss of household services) and $1,580,716 in economic damages ($24,975 in past lost earnings, $178,050 in future lost earnings, and $1,377,691 in future medical expenses).

While we know that Barker was on dialysis, we do not know the specifics of the pain and suffering that he endured or how his life was affected. We also do not know what future medical treatment Barker will need, his prognosis, or his life expectancy.

8. *Puerta v. Chavez*
A 54-year-old janitor was started on a medication regimen to treat his high blood pressure but he claimed his doctor failed to regularly monitor his kidney function. As a result, his kidney disease went undiagnosed until it was too late, and he was diagnosed with end-stage renal disease five years after he began the medication. Puerta was dependent on dialysis for a little over four years and ultimately underwent a kidney transplant. Following the transplant, Puerta took a total of 22 different medications to prevent rejection of his new kidneys. Along with the potential for the rejection of his new kidneys, he is also at an increased risk for different infections and cancers. He claimed he requires periodic checkups with his doctor, but that his overall condition and quality of life has improved noticeably since the transplant.

Puerta claimed $3,252,757 in past medical bills and asked the jury for $860,000 for pain and suffering and $950,000 for loss of normal life. The jury awarded him a total of $1,650,500 in damages (which was approximately one-third of what he asked for), including $675,500 in medical expenses and $975,000 in noneconomic damages ($375,000 for pain and suffering and $600,000 for loss of a normal life). While we know that Puerta was on dialysis, we do not know the specifics of the pain and suffering he endured or how his life was affected. We also do not know what future medical treatment Puerta will need, his prognosis, or his life expectancy.

9. *Perry v. Garchitorena*
A 24-year-old black male presented to the emergency room following an auto accident. A lab test demonstrated that he had an elevated creatinine level and slightly elevated blood pressure. The defendant doctor claimed that he told Perry about the abnormal test results and urged him to follow-up with a family doctor, and Perry signed discharge instructions to that effect. Perry alleged, however, that he was not adequately informed

about the abnormal test results or the fact that he was at risk-for kidney failure. He did not follow up with the doctor because he felt fine from the injuries as he understood them to be, namely a head injury from the auto accident. Approximately two and a half years after the car accident, Perry went into acute renal failure, at which time it was discovered that he only had one kidney. He was placed on dialysis, and was still on dialysis at the time of trial in August 2007.

The jury awarded Perry $8.48 million in damages, including $360,000 for noneconomic damages ($25,000 for disfigurement, $125,000 for loss of a normal life, $10,000 for past and future pain and suffering, and $200,000 for past and future emotional distress) and $8.12 million in economic damages ($500,000 for past medical, $7.2 million in future medical, and $420,000 in lost wages). This verdict was handed down in August 2007, and according to an online inflation calculator, the noneconomic damage award would have been worth approximately $419,000 at the time of Clanton's trial.

The Court does not know if Perry's kidney failure could have been avoided, or at least delayed, if his conditions had been diagnosed and treated sooner. While we know that Perry was on dialysis, we don't know the specifics of the pain and suffering that he endured or how his life was affected. We also do not know if Perry ever received a transplant or if he is even a candidate for a transplant. We don't know what future medical treatment Perry will need, his prognosis, or his life expectancy.

10. *King v. Goldschmidt*
A woman in her mid-seventies had a severely shrunken left kidney, most likely due to renal artery insufficiency. She also had previously suffered a stroke and been diagnosed with coronary artery disease and high blood pressure. In August 2005, King was prescribed an ACE inhibitor for treatment of her high blood pressure. Although ACE inhibitors can actually help patients who suffer from kidney disease, they can cause acute kidney failure when initially prescribed, and so close monitoring of kidney function is mandated. King was instructed to return in three months for labs. Within eight days of the first dose of the medication, however, she was admitted to the hospital in end-stage renal failure. She was left dependent on dialysis.

King was awarded $340,000 in damages, including $171,000 in noneconomic damages ($71,000 for past pain and suffering and $100,000 for future pain and suffering), and $169,000 for past and future medical expenses. This verdict was awarded in May 2008, and according to an online inflation calculator, the noneconomic damage award would have been worth approximately $191,000 at the time of Clanton's trial.

The Court does not know the specifics of the pain and suffering that King endured or how her life was affected by dialysis. The Court also does not know what future medical treatment King will need, her prognosis, or her life expectancy.

## C.  GROSS AWARD COMPARISON

In looking at the ten comparable cases, the Court was mindful of the inherent limitations in relying on a bare comparison with other cases to determine an appropriate award. As Judge Kennelly from the Northern District of Illinois noted, the only materials reasonably available to litigants are reported decisions from district and appellate courts and summaries from jury verdict reporters. *Zurba v. United States,* 247 F.Supp.2d 951, 961 (N.D. Ill. 2001), *aff'd*, 318 F.3d 736 (7th Cir. 2003). The cases that are reported, however, "are but a fraction, and maybe a small fraction, of the universe of jury awards." *Deloughery v. City of Chicago*, No. 02 C 2722, 2004 WL 1125897, at *5 (N.D. Ill. May 20, 2004), *aff'd*, 422 F.3d 611 (7th Cir. 2005).

Additionally, the cases do not form "a perfect continuum of past harms and past awards" because "some of the cases . . . appear more egregious with lower damages, while some of the cases . . . appear less egregious with higher damages." *Farfaras v. Citizens Bank & Tr. of Chicago*, 433 F.3d 558, 567 (7th Cir. 2006). For example, the plaintiff in *Meyer* was left with one well-functioning kidney and received $3.2 million (after adjusting for inflation) in noneconomic damages while the plaintiff in *King* suffered end-stage renal disease and was left dependent on dialysis and received only $191,000 (after adjusting for inflation) in noneconomic damages.

Furthermore, determining the degree of comparability is a difficult task. "[T]he description of the evidence found in reported [decisions] typically does not permit a

realistic determination of whether the case is truly comparable to the one being evaluated." *Deloughery*, 2004 WL 1125897, at *5. Simply put, "[a] reported decision concerning a trial cannot possibly relate the course of a trial with the same detail and flavor in which it was presented to the fact finder." *Zurba,* 247 F.Supp.2d at 961. When it comes to verdict summaries, the descriptions are typically even less detailed. *See id.* Verdict summary reporters "tend to operate by asking lawyers to respond to a series of pre-formatted questions about various particulars of the case." *Id.* "This fill-in-the-blanks approach, though certainly useful in helping lawyers evaluate cases, it at best a blunt instrument in helping a fact finder determine what damage award is appropriate." *Id.*

Judge Kennelly further noted that "[t]he problems are compounded when the information that one is seeking concerns awards for pain and suffering, whether physical or emotional or both." *Zurba*, 247 F.Supp.2d at 961. That's because "[t]here is no exact standard for fixing damages for pain and [suffering—Courts] routinely tell juries exactly this when instructing them." *Id.* at 961–62.

It is also "impossible to know all of the factors that led a jury or judge to make a particular award for pain and suffering in a particular case." *Zurba*, 247 F.Supp.2d at 962. "The fact finder's observation and assessment of the plaintiff at trial, for example, may be a significant factor affecting the award upward or downward[.]" *Id.* The strength of the plaintiff's evidence, the perceived degree of negligence by the defendant, the amount of damages requested by the plaintiff and the manner in which the request was presented, unconscious biases and demographic characteristics of the fact finder, and the appearance of the lawyers and how they argued the case are also known to affect the assessment of damages. *See* Valerie P. Hans, *What's It Worth? Jury Damage Awards As*

*Community Judgments*, 55 WM. & MARY L. REV. 935, 951 (2014); Valerie P. Hans & Valerie

F. Reyna, *To Dollars from Sense: Qualitative to Quantitative Translation in Jury Damage*

*Awards*, 8 J. EMPIRICAL LEGAL STUD. (Special Issue), 144 (2011); M. Neil Browne et. al., *The*

*Shared Assumptions of the Jury System and the Market System*, 50 ST. LOUIS U. L.J. 425, 458–

59, 461 (2006). However, these factors are "unlikely to be assessed in any source to which

a court would look in attempting to determine comparability." *Zurba*, 247 F.Supp.2d at

962. Finally, and just as importantly, different plaintiffs can experience different levels of

pain and suffering from similar incidents." *Zurba*, 247 F.Supp.2d at 962. "Thus two cases

arising from similar incidents may not be all that similar at all." *Id.*

 With these cautionary notes in mind, the Court read and reread the materials for

the ten comparable cases and looked at the cases from all possible angles. The Court also

took considerable time to weigh and balance the arguments and positions taken by the

parties. While Clanton's award for noneconomic damages is admittedly higher than any

of the verdicts in the comparable cases, that by itself does not make the award

excessive. *See Farfaras*, 433 F.3d at 566 ("Awards in other cases . . . do not establish a

range beyond which awards are necessarily excessive.") *Deloughery*, 2004 WL 1125897, at

*7 ("There is no rule that the highest reported verdict that can be found sets a cap for

future awards."). It was difficult for the Court to assess the degree of comparability

between the other cases and Clanton's given the lack of key details in the other cases. But

the Court was nevertheless able to extract two general principles from some of the

comparable cases regarding the severity of injuries and the age of the plaintiff.

 The Court arrived at the first principle by looking at *Barker*, *Meyer*, and *Maynard*,

which are cases that involve kidney injuries far less severe than Clanton's. Barker

retained both of his kidneys, while Meyer and Maynard were each left with one functioning kidney. In contrast, Clanton suffered complete and irreversible failure of *both* kidneys. Barker was on dialysis for three and a half months, but there is no indication that either Meyer or Maynard required any dialysis treatments. By comparison, Clanton was dependent on dialysis for approximately 31 months before he received a kidney transplant. Barker is reasonably expected to require approximately $1.4 million in future medical care, but there is no indication that Meyer or Maynard are reasonably expected to require any future medical care related to their kidneys. Clanton, on the other hand, is reasonably expected to require $14.5 million in future medical care. He has a life expectancy of 70 years and will undoubtedly require kidney-related medical care until he dies. For example, it is reasonably expected that Clanton will spend at least two decades on an extensive daily regimen of anti-rejection and immunosuppressive medications, he will endure two additional rounds of dialysis that will last at least three to five years each, and he will undergo one, perhaps two more kidney transplants, not to mention periodic hospitalizations, counseling services, and a dizzying array of medications, doctor appointments, and lab tests (*see* Doc. 150; Plaintiff's Exhibit 104).

In short, Clanton's injury was far worse than the injury to Barker, Meyer, or Maynard, his past medical treatment was more extensive, and by all appearances his future medical treatment will greatly surpass what Barker, Meyer, or Maynard will require. Given the severity of Clanton's injury and the extent of his medical care, it is reasonable to conclude that the pain and suffering, emotional distress, and loss of a normal life that he has and will continue to experience is significantly greater than what

Barker, Meyer, or Maynard endured.[17] Consequently, in the Court's view, Clanton is entitled to a recovery for his noneconomic injuries several times larger than the awards Barker ($1.963 million), Meyer ($3.2 million after adjusting for inflation), and Maynard ($3.7 million after adjusting for inflation) received.

The Court arrived at the second principle by looking at *Kunz* and *Canterino*, which are cases that involved plaintiffs who were far older than Clanton was at the time their kidneys failed. Kunz was 75-years-old when her kidneys failed, and she spent five years on dialysis by the time of trial. She was expected to live another nine years and would need to undergo dialysis until the end of her life. That means she was reasonably expected to spend a total of approximately fourteen years on dialysis. Kunz was awarded $3.2 million in past and future noneconomic damages. Canterino was 76-years-old when he suffered kidney failure, and he spent three and a half years on dialysis before he died. He was awarded $7 million for pain and suffering.

By comparison, Clanton was only 32-years-old when his kidneys failed. That means Clanton will have to live with the ramifications of his injury for decades longer than Kunz and Canterino. In fact, Clanton will spend over half of his lifetime receiving treatment for his kidney injury. Thus it can be easily assumed that the pain and suffering, emotional distress, and loss of a normal life that Clanton will experience is

---

[17] *See, e.g.,* Randall R. Bovbjerg James, *Valuing Life and Limb in Tort: Scheduling "Pain and Suffering"*, 83 Nw. U. L. Rev. 908, 939–41 (1989) ("Permanent injuries are bound to cause greater pain and suffering than temporary ones; similarly, major injuries are expected to cause greater emotional trauma than minor ones.); Ronen Avraham, *A Price on Pain-and-Suffering Damages: A Critique of the Current Approaches and A Preliminary Proposal for Change*, 100 Nw. U. L. Rev. 87, 112 (2006) ("[S]everal studies have shown positive correlation between pain-and-suffering damages and economic damages . . . . The reason seems to be that larger economic losses are correlated with higher severity of injury, which in turn is what pain and suffering is all about.").

greater than what Kunz and Canterino endured.[18] Clanton is, in the Court's view, entitled to an award for noneconomic damages larger than the awards received by Kunz and Canterino.

But what is that amount? The Court notes that Clanton's $4.75 million award for *past* noneconomic damages is closely consistent with the awards in *Brown* and *Plasencia*. The plaintiff in *Plasencia* was close in age to Clanton, suffered kidney failure, and underwent a transplant, but it's unclear if the plaintiff in that case underwent any dialysis treatments. He received roughly $3.95 million for past noneconomic damages (after adjusting for inflation). The plaintiff in *Brown* was about twenty years older than Clanton and suffered kidney failure, but again, it's unclear if the plaintiff in that case underwent any dialysis treatments. He received roughly $5.2 million for past noneconomic damages (after adjusting for inflation). These awards suggest that Clanton's $4.75 million award for past noneconomic damages is certainly reasonable.

As for Clanton's future noneconomic damages, Clanton is expected to suffer two additional rounds of kidney failure that leave him dependent on dialysis and in need of a transplant. The Court believes the pain and suffering that Clanton will endure during the second and third rounds of kidney failure will probably be similar to what he experienced the first time around—if not slightly worse—because he will be older and physically less resilient than his younger self. But his emotional distress and loss of a normal life are likely to be somewhat less because he won't have to contend with the

---

[18] *See, e.g.,* Ronen Avraham, *Putting A Price on Pain-and-Suffering Damages: A Critique of the Current Approaches and A Preliminary Proposal for Change*, 100 Nw. U. L. Rev. 87, 94–95 (2006) (explaining that the age of the plaintiff may account for the variance among awards for pain and suffering because "[t]he total pain and suffering of a sixty-year-old who is assumed to suffer twenty more years of pain and suffering is different than that of a twenty-year-old who would suffer sixty more years.").

shock and devastation that he dealt with the first time around, and his life will be different as it relates to work and raising his children. All in all, the Court believes that Clanton's noneconomic damages for pain and suffering, emotional distress, and loss of a normal life related to the second round of failure kidney should be significant but less than what he received for the first round. The same goes for the third round. But Clanton also deserves compensation for his shortened life expectancy. Based on all of this, the Court awarded Clanton $9 million for his future noneconomic damages, or $4.5 million for the second round of kidney failure and $4.5 million for the third round.

The Court believes the evidence presented at trial supports a total noneconomic damage award of $13.75 million. The undersigned observed Clanton and his wife, Sheena, as they testified. Their testimony was often succinct and to-the-point, but the undersigned found it to be sincere and powerful, particularly when it was considered in the context of other evidence presented at trial. To be clear, the Court's damages analysis took into account Clanton's young age at the onset of his kidney problems; his wife Sheena and their relationship that began when they were teenagers; their two minor daughters; Clanton's long employment history that stretched all the way back to high school; the role that work has played in shaping his identity; and the importance of Clanton's income to his family.

The Court also considered Clanton's obvious risk factors for kidney disease and Nurse Jordan's glaring malpractice, as well as the nature of his injury—a serious, permanent, life-altering condition that he must contend with in some form and fashion every day for the rest of his life. The Court considered Clanton's fear and uncertainty during the hypertensive emergencies; his utter shock and devastation at being

diagnosed with end stage renal disease; the difficulty he had processing and accepting the diagnosis; his despair and depression as he grappled with his new normal; and the strain on his marriage and his relationship with his daughters.

The Court took into account the hospitalizations, the myriad doctor visits and tests, the extensive medication regimen, and the physical symptoms, including anemia, shortness of breath, nausea, vomiting, swollen legs, weight gain, and nosebleeds. The Court considered the dialysis treatments, the time spent driving to and from treatments and being hooked up to the machine, the cramping, the exhaustion, the disfiguring fistula, and the stress of being unable to work and financially contribute to his family.

The Court considered the formidable process of becoming a transplant candidate, the stress of waiting for a donor kidney, Clanton's disappointment and despair when the first kidney fell through, his apprehension and the risks associated with the transplant surgery, his subsequent complications and the significant and disfiguring abdominal scarring, the strict adherence to immunosuppression medications, and lastly, Clanton's dread of knowing that he will have to endure the dialysis and transplant process again in the future.

Based on all of these considerations, the evidence presented at trial, and the comparable cases, the Court still believes that an award of $13.75 million in noneconomic damages is justified and not beyond the pale. A ratio comparison confirms the Court's valuation of Clanton's noneconomic damages.

## D.  RATIO OF NONECONOMIC DAMAGES TO MEDICAL EXPENSES

In *Arpin v. United States*, the Seventh Circuit suggested in dictum that district courts could consider the ratio of non-economic damages to economic damages in

determining a reasonable noneconomic damage award for loss of consortium. 521 F.3d

769, 777 (7th Cir. 2008). But as far as the Court can tell from its research, the Seventh

Circuit has never again discussed the ratio approach, and several courts have criticized

the approach and declined to use it.[19] In spite of the criticisms, however, at least one

court has employed the approach in assessing the reasonableness of its noneconomic

damage award in a medical malpractice case. *See Maldonado v. Sinai Med. Grp., Inc.*, 706 F.

Supp. 2d 882, 890 (N.D. Ill. 2010) ("Whatever the merits of this criticism, the ratio

approach is merely a *suggested* method of analysis. It is not required.").

Here, the ratio approach is useful given the difficulties already discussed with

drawing any meaningful comparisons between the comparable cases and Clanton's and

the fact that none of the comparable cases had noneconomic damages as high as what

the Court believes Clanton deserves. The ratio approach is further advisable in the

Court's view because empirical research suggests that there is a strong, positive

correlation between noneconomic damages and economic damages, specifically medical

expenses.[20] This correlation certainly seems to be borne out when it comes to cases

---

[19] *See Cason v. Holmes Transport, Inc.,* No. 08 C 617, 2009 WL 4730959, at *3 (S.D. Ill. Dec. 8, 2009) ("The inevitable result of such a plug and chug approach will be a body of law which establishes a Blue Book value on grief and emotional trauma and which will certainly stand for the proposition that higher income people have more valuable relationships with loved ones than lower earners."); *Arpin v. United States*, No. 04 C 128, 2009 WL 3816844, at *1 (S.D. Ill. Nov. 13, 2009) (explaining that the ratio approach was not feasible given the unique nature of the case as well as the lack of adequate comparative cases); *Phillips v. United States*, No. CIV. 05-760-PMF, 2008 WL 5082973, at *6 (S.D. Ill. Nov. 25, 2008) (finding ratio analysis did not apply in medical malpractice case because the Seventh Circuit "consistently referred to 'damages for loss of consortium' in its opinion as it related to the ratio approach. Had the appellate court intended the ratio analysis to apply more broadly, it surely would have indicated that notion by referring to the damage not as for "loss of consortium," but for "noneconomic damages."). *See also* Robert L. Rabin, *The Pervasive Role of Uncertainty in Tort Law: Rights and Remedies*, 60 DEPAUL L. REV. 431, 446 (2011) (questioning how to apply the ratio approach suggested in *Arpin* to a personal injury case).

[20] *See* Valerie P. Hans, *What's It Worth? Jury Damage Awards As Community Judgments*, 55 WM. & MARY L. REV. 935, 950 (2014) ("[S]tatistical analyses of jury damage awards in personal injury cases regularly find that injury severity is strongly and positively correlated with damage awards. More serious injuries result

involving kidney injuries.

Of the eighteen kidney cases identified by the parties and the Court, a ratio of noneconomic damages to medical expenses could be calculated in thirteen of them.

| Case | Noneconomic Damages | Medical Expenses | Ratio |
|---|---|---|---|
| *Perry v. Garchitorena* | $360,000 | $7,700,000 | 0.05 to 1 |
| *Campano v. United States* | $1,875,000 | $20,030,576 | 0.09 to 1 |
| *Gutierrez v. Vargas* | $500,000 | $2,901,476 | 0.17 to 1 |
| *Mamea v. United States* | $1,250,000 | $5,672,205 | 0.22 to 1 |
| *Kunz v. Little Co. of Mary Hosp.*[21] | $3,200,000 | $3,600,000 | 0.89 to 1 |
| *King v. Goldschmidt* | $171,000 | $169,000 | 1.01 to 1 |
| *Barker v. Union Pacific R.R.* | $1,963,000 | $1,377,691 | 1.43 to 1 |
| *Puerta v. Chavez* | $975,000 | $675,500 | 1.44 to 1 |
| *Plasencia v. Echnique* | $3,000,000 | $1,727,514 | 1.74 to 1 |
| *Canterino v. Kumar* | $7,000,000 | $2,000,000 | 3.5 to 1 |
| *Davis v. Forsyth Chiropractic Center* | $3,075,000 | $682,228 | 4.5 to 1 |
| *Gonzales v. Pla* | $1,050,000 | $141,256 | 7.43 to 1 |
| *Meyer v. Ackerman* | $2,500,000 | $52,339 | 48 to 1 |

A ratio could not be calculated in the *Graham* case or in *Talbot v. Nissanka* because there was no breakdown between noneconomic and economic damages. A ratio also could not be calculated in *Brown v. Werther*, *Phillips v. Eckerd*, or *Maynard v. Reich* because

---

in larger awards. Noneconomic damages such as for pain and suffering are strongly related to economic damages[.]") (citations omitted); Ronen Avraham, *A Price on Pain-and-Suffering Damages: A Critique of the Current Approaches and A Preliminary Proposal for Change*, 100 Nw. U. L. Rev. 87, 112 (2006) ("[S]everal studies have shown positive correlation between pain-and-suffering damages and economic damages . . . . The reason seems to be that larger economic losses are correlated with higher severity of injury, which in turn is what pain and suffering is all about."). *See generally* Dan B. Dobbs, et al., The Law of Torts § 479 (2d ed.) ("[F]requently the physical injury itself and the kind of medical attention needed permit or require an inference that the plaintiff suffered physically or emotionally.").

[21] Kunz was not awarded any damages for past and future medical expenses because the trial court refused to permit the jury to do so. However, the Court believes the amount of her medical expenses is nevertheless ascertainable. At trial, Kunz put forth evidence that her past medical bills totaled $1,321,104 and that she would incur $2,275,000 in future medical bills (9.1 years x $250,000 a year in medical treatment), which totals $3,596,104. After the case was remanded for a new trial on medical expenses, the parties settled for approximately $6.8 million. The difference between the settlement amount and Kunz's jury award for noneconomic damages approximately equals the amount of her medical bills that she proved at trial ($6,800,000 - $3,200,000 = $3,600,000). Because all signs point to medical expenses in the amount of approximately $3,600,000, the Court will use that amount in determining a damages ratio for Kunz.

the verdicts were entirely for noneconomic damages. It is not lost on the Court, however, that the plaintiffs in *Brown, Phillips*, and *Maynard* each received substantial noneconomic damages despite not receiving any economic damages at all. (The plaintiff in *Brown* received approximately $10.4 million, after adjusting for inflation; the plaintiff in *Phillips* received approximately $3.2 million, after adjusting for inflation;[22] and the plaintiff in *Maynard* received approximately $3.7 million, after adjusting for inflation.)

Of the thirteen cases for which a damages ratio could be calculated, three involved a statutory cap of some sort (*Gutierrez*, *Mamea*, and *Campano*). It makes little sense to consider the ratio in these cases because the cap restricted noneconomic damages to a relatively low figure, even though the medical expenses were substantial—which predictably results in a very small ratio that is not representative of what is going on in the world of damage awards.

Nine of the ten remaining cases reflect a strong, positive relationship between noneconomic damages and medical expenses. Two plaintiffs received noneconomic damages nearly equal to their medical expenses, while the other seven plaintiffs received noneconomic damages that exceeded their medical expenses. The one exception is *Perry*, which reflects the weakest relationship of all—even weaker than the cases involving a statutory cap. The jury's reasons for awarding minimal noneconomic damages to the plaintiff in *Perry* are completely unknown to the Court. *See Zurba*, 247 F. Supp. 2d at 961 ("It is impossible to know all of the factors that led a jury or judge to make a particular award for pain and suffering in a particular case.")

---

[22] The jury in *Phillips* awarded the plaintiff $2.7 million for pain and suffering. The trial occurred in December 2006, and according to an online inflation calculator, the verdict would have been worth approximately $3.23 million at the time of Clanton's trial in October 2016.

In comparison, Clanton's award for noneconomic damages ($13,750,000) was smaller than his reasonable medical expenses ($17,279,296). The resulting ratio of 0.80 to 1 is smaller than the ratio in the nine cases that reflect a strong, positive relationship between the noneconomic damages and medical expenses. Accordingly, a ratio comparison confirms that Clanton's noneconomic damage award is consistent with comparative cases and thus reasonable.

The portion of the Government's motion requesting reconsideration of Clanton's noneconomic damage award is denied. The award will not be reduced.

## PARTIAL SET-OFF FOR MEDICARE PART B BENEFITS

Clanton's past medical expenses for end stage renal disease ("ESRD") were paid by Medicare, and it is expected that his future medical expenses for ESRD also will be paid by Medicare. The Court previously determined these Medicare payments, under both Part A and Part B, were collateral source payments (Doc. 73).[23] The Government nevertheless continues to seek a set-off for the Medicare benefits that Clanton received in the past and may receive in the future. This time the Government zeroes in on the benefits for hemodialysis treatment (Doc. 156, pp. 7–13).

Dialysis treatments are covered by Medicare Part B, and Part B benefits are paid out of the Supplementary Medical Insurance Trust Fund, which is funded primarily through general tax revenues together with monthly premiums paid by enrollees.[24]

---

[23] The ruling came in the context of a motion *in limine* to prohibit the Government from introducing any evidence that part of Clanton's losses were covered by Medicare (Doc. 73). But the ruling also necessarily meant that Clanton's FTCA award for medical expenses would not be reduced by the amount of the Medicare payments. *See Wills v. Foster*, 892 N.E.2d 1018, 1023 (Ill. 2008) (explaining collateral source rule has both evidentiary component and substantive damages component).

[24]MEDICARE.GOV, *How is Medicare Funded*,

According to the Government, general tax revenues account for 54% of Clanton's Medicare benefits for dialysis treatments (Doc. 156, pp. 10–11). An FTCA award is also funded by general treasury revenues. *See Titchnell v. United States*, 681 F.2d 165, 175 (3d Cir. 1982) ("FTCA recoveries come out of general revenues[.]" (quoting *Smith v. United States*, 587 F.2d 1013, 1016 (3d Cir. 1978))). Consequently, the Government argues that the portion of Clanton's Medicare benefits attributable to the Government should be considered non-collateral and should be deducted from the FTCA award (Doc. 156, pp. 7–13). Absent the deduction, the Government contends that it will be forced to pay twice for the same injury (Doc. 156).

As an initial matter, the Court wishes to clarify the scope of this analysis. Clanton received, and will receive in the future, an array of kidney-related medical care, but the Government's current motion speaks only to his dialysis treatments, which, as previously mentioned, are covered by Medicare Part B. Therefore, the Court will not reevaluate its previous conclusion that Medicare Part A benefits (e.g., inpatient hospital services, post-hospital extended care services, and hospice care) are collateral source payments. Furthermore, the Court will not address the portion of the dialysis treatments that is funded by enrollee premiums; the Government appears to concede that portion is

https://www.medicare.gov/about-us/how-medicare-is-funded/medicare-funding.html (last visited January 16, 2018) (The Supplementary Medical Insurance Trust Fund is funded through "funds authorized by Congress," "premiums from people enrolled in Medicare Part B (Medical Insurance) and Medicare prescription drug coverage (Part D)," and "other sources, like interest earned on the trust fund investments."); JULIETTE CUBANSKI, ET AL., THE HENRY J. KAISER FAMILY FOUNDATION, *How is Medicare Financed and What are Medicare's Future Financing Challenges?, in* A PRIMER ON MEDICARE: KEY FACTS ABOUT THE MEDICARE PROGRAM AND THE PEOPLE IT COVERS (2015), *available at* https://www.kff.org/report-section/a-primer-on-medicare-how-is-medicare-financed-and-what-are-me dicares-future-financing-challenges/ ("Supplementary Medical Insurance (SMI) trust fund, is financed through a combination of general revenues, premiums paid by beneficiaries, and interest and other sources. Premiums are automatically set to cover 25 percent of spending in the aggregate, while general revenues subsidize 73 percent.")

a collateral source (*see* Doc. 156).

The specific issue the Court must determine is how the Illinois collateral source rule applies in this FTCA action to the benefits Clanton received under Medicare Part B. *See* 28 U.S.C. § 1346(b)(1) (the United States is liable for the torts of its employees "if a private person, would be liable to the claimant in accordance with the law of the place where the act or omission occurred."); *Molzof v. United States*, 6 F.3d 461, 466 (7th Cir. 1993) (applying state collateral source law in FTCA action); J. STEIN, STEIN ON PERSONAL INJURY DAMAGES § 13:6 (3d. ed.) ("In cases under the FTCA, the courts have concluded that the collateral source rule is to be applied or disregarded in accordance with the law of the state in which the accident occurred."). Illinois law provides that the amount of damages to which a plaintiff is entitled from a tortfeasor will not be decreased by benefits the plaintiff received "from a source wholly independent of, and collateral to, the tortfeasor." *Wills v. Foster*, 892 N.E.2d 1018, 1022 (Ill. 2008) (citing *Arthur v. Catour*, 803 N.E.2d 647, 649 (Ill. App. Ct. 2004)). Put differently, "[p]ayments made to or benefits conferred on the [plaintiff] from other sources are not credited against the tortfeasor's liability, although they cover all or a part of the harm for which the tortfeasor is liable." *Wills*, 892 N.E.2d at 1022 (citing RESTATEMENT (SECOND) OF TORTS § 920A(2), at p. 513 (1979)).

As stated in the previous Order, courts have long held that state collateral source rules apply against the Government in FTCA cases when the payments at issue were Medicare payments and the plaintiff contributed to the funding of the Medicare-covered services. *See Molzof*, 6 F.3d at 466, n.6 (citing cases). *Titchnell v. United States*, 681 F.2d 165, 176 (3d Cir. 1982) (holding Medicare Part A and Part B benefits were collateral to the

Government in FTCA action); *Manko v. United States*, 636 F. Supp. 1419, 1451 (W.D. Mo. 1986), *aff'd*, 830 F.2d 831 (8th Cir. 1987) (same). The Government attempts to circumvent this precedent by citing to a string of cases and arguing that "courts have repeatedly applied the distinction between general revenues and special funds to conclude that, if the United States, can establish the percentage of a plaintiff's federal benefits that are funded from general Treasury revenues, it is entitled to a pro rata off-set against an FTCA judgment compensating him for the same injury." (Doc. 156, pp. 8-10).

The Government cites five cases in support of its argument: *Steckler v. United States*, 549 F.2d 1372 (10th Cir. 1977); *Smith v. United States*, 587 F.2d 1013 (3d Cir. 1978); *Titchnell v. United States*, 681 F.2d 165 (3d Cir. 1982); *Siverson v. United States*, 710 F.2d 557 (9th Cir. 1983); and *Berg v. United States*, 806 F.2d 978 (10th Cir. 1986). The Court has reviewed these cases and does not believe any of them stand for the proposition the Government claims. The cases simply show that when it comes to Social Security disability benefits and Medicare Part A benefits, the possibility of a partial set-off for the government was raised but later nixed because it is impossible to determine what portion of the benefits is attributable to government contributions. The Government did not cite to, and the Court did not come across, any case that definitively held when benefits are funded by both the plaintiff and the government, the portion attributable to the government's contributions is non-collateral and should be deducted from the plaintiff's FTCA award. The Government also did not cite to, and the Court did not come across, any case law that discussed the proof necessary to determine the amount of the government's contribution or that actually adjusted the plaintiff's FTCA award to account for the government's contributions. In other words, a partial set-off is an idea

that was brought up in theory forty years ago but, as best the Court can tell, has never been explicitly approved of, much less implemented in practice.

Also, the Government's focus on the source of funding for Clanton's Medicare Part B benefits is misguided. The Government argues that "where benefit payments are made from the same general revenue source as a judgment paid by the United States under the FTCA, the benefit payments are non-collateral" (Doc. 156, p. 8). Because general revenues fund both the FTCA award in the case and 54% of the cost of Clanton's dialysis treatments, the Government contends the portion of the dialysis treatments attributable to general revenues is non-collateral and should be deducted from Clanton's FTCA award (*Id.*). But both the Illinois state courts and the Seventh Circuit have held that in determining whether the collateral source rule applies to certain benefit payments, courts should not look just at the source of the payments. *Molzof*, 6 F.3d at 465, 466 ("[C]ourts applying the collateral source rule in FTCA suits have looked to the source and nature of the payments received by the plaintiff, even though both payments were made by the government."); *Laird v. Illinois Cent. Gulf R. Co.*, 566 N.E.2d 944, 955–956 (Ill. App. Ct. 1991) ("[C]ourts must look to the purpose and nature of the fund and of the payments and not merely at their source."). *See also United States v. Price*, 288 F.2d 448, 450–51 (4th Cir. 1961) ("The plaintiff may receive benefits from the defendant himself which, because of their nature, are not considered double compensation for the same injury but deemed collateral.")

The Eighth Circuit previously explained the problem with looking at only the source of the benefits when it comes to determining whether Medicare payments are a collateral source. *Overton v. United States*, 619 F.2d 1299, 1308 (8th Cir. 1980). In *Overton*,

the court was looking at Medicare Part A benefits, which are funded by the Federal Hospital Insurance Trust Fund. *Id.* The court explained that although the trust fund "is a bookkeeping entity conceptually collateral to the unfunded general revenues out of which FTCA damage awards are made, the trust fund consists of appropriations from those general revenues, and is in any case the creation of the government's taxing and spending power." *Id.* Consequently, the trust fund cannot possibly be considered wholly independent of the government itself unless one "ignores the substantial governmental involvement in the creation and administration of social security programs." *Id.* The same rationale applies to the trust fund at issue here: the Supplementary Medical Insurance Trust Fund, which funds Medicare Part B. *See* 42 U.S.C. § 1395t.

Instead of looking at just the source of the benefits, courts also look at the nature of the benefits, that is whether the federal program operates like a form of insurance and whether the plaintiff contributed to the benefits' source of funding. *See Molzof*, 6 F.3d at 466; *Overton*, 619 F.2d at 1308–09; *Laird*, 556 N.E.2d at 955. If the plaintiff contributed to the benefits he received by paying taxes or a premium, then the plaintiff is "entitled to the payments irrespective of the damages award"—meaning the benefits are collateral and cannot be deducted from the damages award. *Molzof*, 6 F.3d at 466–47. *See also Overton*, 619 F.2d at 1308, 1309 (holding that because the plaintiff made no contribution toward Part A of Medicare, her Medicare benefits were not in the nature of insurance to her and should have been deducted from the FTCA damages award).

Some courts also look at the reason the benefit payments are being made. If the benefits are mere gratuities conferred at no cost to the plaintiff, or if the benefits are designed to compensate the plaintiff for his injuries or indemnify the government

against possible liability, then the benefits are considered non-collateral.[25] But if the benefits are conferred for a reason completely independent of liability, they are considered collateral and cannot be deducted from the damages award.[26] As the Fifth Circuit once explained in an oft-quoted passage:

> [A]n employer-tortfeasor who voluntarily undertakes to indemnify itself against liability by payment into a fund for that purpose, should not be penalized by permitting the plaintiff a double recovery of his benefits under the fund as well as his full measure of damages. On the other hand, where the employer-tortfeasor makes payment directly or indirectly into a fund established for an independent reason . . . the employer should not be entitled to benefit by setting off such income in mitigation of his responsibility as a tortfeasor.

*Haughton v. Blackships, Inc.*, 462 F.2d 788, 791 (5th Cir. 1972) (cited by *Laird*, 556 N.E.2d at 956).

For example, in *Laird v. Illinois Central Gulf R. Co.*, the plaintiff suffered a back injury while working for the defendant railroad and began receiving disability payments under the Railroad Retirement Act. 566 N.E.2d 944, 947, 949 (Ill. App. Ct. 1991). Approximately two-thirds of his disability benefits were attributable to contributions from the railroad; the other one-third was attributable to contributions from the plaintiff himself. *Id.* at 955. The plaintiff then filed suit against the railroad under the Federal

---

[25] *See Molzof*, 6 F.3d at 465 ("[W]hen the tortfeasor makes advance payments toward a judgment to the victim, and the victim then attempts to recover the full amount of the judgment irrespective of the advance payments, there seems to be little justification for making the tortfeasor pay again for the same wrong."); *Price*, 288 F.2d at 449 ("[T]he broad rule seems to be that where the plaintiff receives from the tortfeasor payments specifically to compensate him for his injury, the tortfeasor need not pay twice for the same damage, and therefore such compensation payments should be taken into account in fixing tort damages."). *See Mays v. United States*, 806 F.2d 976, 977 (10th Cir. 1986) (holding CHAMPUS program, which provides medical benefits to the dependents of certain retired members of the armed services, was a non-collateral source because the plaintiff "received CHAMPUS benefits because of her husband's status [as a retired serviceman], not because of a monetary contribution.").

[26] *See Price*, 288 F.2d at 450 (finding benefits received under the Civil Service Retirement Act were collateral because they "are retirement benefits, payable because of age or disability, and from a special fund derived in large measure from the contributions of the employees. Such benefits are obviously not mere gratuities to injured persons paid on account of their injuries.")

Employers' Liability Act (FELA). *Id.* at 946–47. The railroad argued that the disability payments were non-collateral and should be deducted from the FELA damages award because they both compensated the plaintiff for the same element of loss. *Id.* at 954. In the alternative, the railroad argued that the part of the disability benefits attributable to its direct contributions should be offset from the FELA damages award. *Id.* The court disagreed, holding that because the plaintiff contributed to the disability benefits he received, and because the disability benefits were intended to be pension benefits as opposed to benefits intended to indemnify the railroad against future liability, the benefits were collateral to the railroad. *Id.* at 956. The court also refused to grant the railroad a partial offset despite knowing the exact amount the railroad had contributed to the disability benefits. *See id.* at 955, 956. The court explained, "there is no double recovery as long as plaintiff has contributed to the original source of the payments received." *Id.* at 955. *See also Price*, 288 F.2d at 450–51 (disallowing any deduction from plaintiff's FTCA damage award even though half of plaintiff's benefits under the Civil Service Retirement Act were attributable to governmental contribution rather than plaintiff's own contribution).

   In other cases even more closely resembling this one, where the insurer is also the tortfeasor, courts have held that the injured plaintiff is entitled to receive all of his insurance benefits in addition to the full damages award. As one district court explained,

> [I]t is possible for a defendant to simultaneously wear two hats. The necessity for multiple payments arises not because the defendant is being doubly-penalized, but because the defendant-tortfeasor and defendant-insurer owe the plaintiff multiple legal obligations. . . . The first payment of medical bills by the defendant was in its capacity as plaintiff's insurer, pursuant to the insurance agreement entered into between the plaintiff and defendant, for which the plaintiff personally contributed

valuable consideration by way of a deduction taken out of each of her paychecks. . . . The defendant is now being asked to pay these same medical expenses as compensatory damages. Even though the same defendant is being asked to pay the same damages twice, it is patent that the nature of the two payments is different. The nature of the first is as a payment from defendant as insurer to the plaintiff as the insured. The nature of the second is as a payment from defendant as tortfeasor to the plaintiff as the party injured by the defendant's negligence. It is axiomatic that the plaintiff is entitled to receive the benefit of her bargain under the insurance contract, irrespective of the fact that the carrier servicing that contract may also be the tortfeasor.

*Karsten v. Kaiser Found. Health Plan of Mid-Atl. States, Inc.*, 808 F. Supp. 1253, 1256 (E.D. Va. 1992), *aff'd*, 36 F.3d 8 (4th Cir. 1994) (cited with approval by *Molzof*, 6 F.3d at 465). *See also Overton,* 619 F.2d at 1307 (explaining that under Missouri law "if plaintiff happens to be wronged by the same insurance company that has insured against plaintiff's loss . . . the plaintiff is entitled to a 'double recovery' even though the liable party (the insurance company) and the collateral source (the policy issued by the company) cannot be said to be wholly separate") (internal parentheticals in original).

With these principles in mind, the Court has little trouble concluding that Clanton's Medicare Part B benefits are a collateral source, and the Government is not entitled to a partial set-off for its contribution to those benefits. The Medicare program was established in order to provide federally subsidized health insurance to the elderly and disabled.[27] It was later expanded to provide coverage to people under age 65 who suffer from end stage renal disease or amyotrophic lateral sclerosis (ALS) disease. Part B covers certain medical expenses that are excluded from the Part A program. It is

---

[27] All information in this paragraph was taken from the following sources: 42 U.S.C. §§ 426(h), 1395c (2006); *United States v. Erika, Inc.*, 456 U.S. 201, 202–03 (1982); MEDICARE.GOV, *What's Medicare*, https://www.medicare.gov/sign-up-change-plans/decide-how-to-get-medicare/whats-medicare/what-is-medicare.html (last visited January 25, 2018). *United States v. Erika, Inc.*, 456 U.S. 201, 202–03 (1982).

therefore evident that Medicare Part B was established by the federal government with a different purpose in mind than for the compensation of injuries suffered as a result of the government's negligence. It is also clear that Part B benefits are not mere gratuities. Clanton is entitled to Part B benefits only because he enrolled in the program and pays the necessary monthly premium (Doc. 66-2; Doc. 67-1). For these reasons, Clanton is entitled to receive his full Medicare Part B benefits as well as his full FTCA award. *See Titchnell*, 681 F.2d at 176 (holding Medicare Part B benefits are a collateral source *so long as the plaintiff* contributed to the Medicare trust fund); *Manko*, 636 F. Supp. at 1451 (same); *Amlotte v. United States*, 292 F. Supp. 2d 922, 929 (E.D. Mich. 2003) (same).

Although this conclusion may make it seem like the federal government is being forced to pay twice for the same injury, that is not the case. As the Government has already acknowledged, there is a well-established process by which Medicare can seek reimbursement for the costs it has paid for Clanton's care (Doc. 65, p. 7).

The Court also notes that even if it had reached the opposite conclusion (that the Government was entitled to a partial set-off for the portion of Clanton's Medicare Part B benefits that are attributable to general government revenues), that conclusion would apply only to the benefits that Clanton has already received. It would not apply to any benefits that Clanton is expected to receive in the future. *Alvis v. Henderson Obstetrics, S.C.*, 592 N.E.2d 678, 685 (Ill. App. Ct. 1992), *appeal denied*, 602 N.E.2d 445 (Ill. 2002) (holding trial court did not err in refusing to allow evidence that Medicare benefits would pay 80 percent of cost of future kidney treatment and dialysis, since availability and level of such future payments is speculative).

For these reasons, the portion of the Government's motion concerning a partial

set-off for Medicare Part B benefits is denied.

## ILLINOIS PERIODIC PAYMENT PROVISIONS

The Government's third argument concerns the application of the Illinois periodic payment provisions. These provisions permit a private defendant in a medical malpractice action to elect to pay the plaintiff's past damages and a portion of the future damages with an immediate lump-sum payment (the Present Award) and to pay the remainder of the future damages with periodic payments (the Periodic Award). *See* 735 ILL. COMP. STAT. 5/2-1705, *et seq.* The Government previously elected to invoke the periodic payment provisions, (Doc. 74), and Clanton did not object. This statutory scheme, however, has been nothing but a thorn in the Court's side. What should be a routine and straightforward process for entering judgment has become difficult and convoluted.

The periodic payment provisions were enacted in August 1985 "in response to what was perceived to be a crisis in the area of medical malpractice." *Bernier v. Burris*, 497 N.E.2d 763, 768 (Ill. 1986). But they have seldom been used in the thirty-plus years since their enactment. So seldom, in fact, that the Court was unable to find a single reported case in which judgment was entered pursuant to the provisions, let alone a case that provided any discussion or guidance on applying the provisions. Some guidance is sorely needed and would be much appreciated, because the provisions are clear as mud, and the parties disagree about how to interpret them (*compare* Doc. 140-2 *with* Doc. 160-4; *see also* Doc. 149). At this point, the Court has reviewed a 14-page brief from the Government and a proposed judgment from Clanton, sorted through competing worksheets from the parties, spent an hour and half in a hearing discussing the

application of the periodic payment provisions, and amended the bench trial decision to include certain findings that are necessary to enter a judgment pursuant to the provisions. The Court believed, perhaps naively, that it was simply waiting on some additional numbers from the parties before judgment could finally be entered. But the Government now asserts there is still more work to do in determining "how a judgment for periodic payments is discharged and satisfied" (Doc. 156, p. 14).

The Government first argues that, despite the fact that it elected to invoke the periodic payment provisions, the Court can't actually require it to make any periodic payments (Doc. 156, p. 14). According to the Government, the FTCA's limited waiver of sovereign immunity authorizes only a lump-sum money judgment (*Id.*). The Government proposes that the Court craft a judgment that approximates the periodic payment scheme but allows the Government to discharge its obligation with a lump-sum payment (*see* Doc. 156). Clanton has no objection to this proposal (Doc. 160, p. 15).[28]

---

[28] The Seventh Circuit has not spoken on whether a court can *only* award money damages under the FTCA in the form of a lump-sum payment. Other circuit courts seem to be somewhat inconsistent on the issue. *See Nutt v. United States*, 837 F.3d 1292, 1296 (Fed. Cir. 2016) (holding that periodic damage awards under the FTCA may be permissible in lieu of lump-sum payments with one of the recognized exceptions, including by agreement of the parties or if a controlling statute permits); *Vanhoy v. United States*, 514 F.3d 447, 455 n.34 (5th Cir. 2008) (acknowledging the same); *Reilly v. United States*, 863 F.2d 149, 169 n.16 (1st Cir. 1988) (acknowledging the same); *But see Askew v. United States*, 786 F.3d 1091, 1093 (8th Cir. 2015) (holding district court "could not strictly apply" Missouri's periodic payment scheme because "the waiver for 'money damages' granted by the Federal Tort Claims Act allows only lump-sum money judgments."); *Cibula v. United States*, 664 F.3d 428, 433 (4th Cir. 2012) ("[D]ue to the Government's inability to shoulder continuing obligations . . . the FTCA permits courts to craft remedies that "approximate" state periodic payment statutes."); *Hull by Hull v. United States*, 971 F.2d 1499, 1505 (10th Cir. 1992) ("We agree that courts cannot subject the government to ongoing obligations . . . . However, provided that the government satisfies its *obligation* up front in one lump sum, nothing in the FTCA prohibits courts from exercising their inherent authority to structure awards or to impose trusts or reverter conditions to ensure that the damage recovery is in the best interest of the victim.") Here, the Court need not wade into the debate because Clanton does not object to the Government's request to craft a judgment that can be satisfied with a lump-sum payment.

The parties disagree, however, about the manner in which the lump-sum payment will be made. The Government seems to propose placing the lump-sum payment in a trust (Doc. 156, 16). The Government didn't provide any further specifics about the trust (*see id*. at pp. 15–18), but the Court presumes that the trust account would be at a bank, and the bank would act as trustee. Clanton would presumably receive an immediate payment from the trust in an amount that represents his past damages, a portion of his future damages, and the costs and fees his attorneys are entitled to receive (the Present Award). *See* 735 ILCS 5/2-1708(5). The corpus of the trust would then presumably be used to provide Clanton with periodic payments for his future medical expenses and lost wages according to a court-ordered schedule (the Periodic Award). *See id*. Clanton appears to believe, however, that the Government should immediately pay the Present Award and simultaneously purchase a qualified annuity contract that guarantees all the future payments required by the Periodic Award (*see* Doc. 160, p. 16).

The parties also disagree as to the amount of the Government's lump-sum payment. The Government wants the Court to follow the periodic payment provisions as they are written, meaning that the Government can satisfy and discharge the judgment "by posting adequate security in a single, lump-sum amount equal to the equivalent lump sum value of the total judgment" (Doc. 156, p. 14). 735 ILCS 5/2-1711(a), 1718. The equivalent lump sum value of the total judgment is calculated by adding Clanton's (1) past damages, (2) undiscounted future noneconomic damages, and (3) future economic damages, discounted to present value using a 6% discount rate, compounded annually (Doc. 156, pp. 15–19). 735 ILCS 5/2-1708, 1711(a), 1712.

Clanton objects, arguing that the Government's method would deprive him of the

full measure of damages because the periodic payment provisions allow judgment debtors to post security in an amount too low to pay the full amount of the judgment over time (Doc. 160, p. 17). Clanton points out that the statute requires the use of a 6% discount factor, which is "unrealistically high given current market conditions" and therefore results in an amount of security that is artificially low and unable to generate enough revenue to fund all future periodic payments (*Id.*).

Clanton provided the Court with some numbers to illustrate his argument. Clanton estimates that the Present Award to be paid immediately in lump-sum form will total $13,740,513, while the Periodic Award to be paid in future periodic installments will total $17,330,554 (Doc. 160, p. 15). Using the Government's methodology as outlined in the periodic payment provisions, the Government would make a lump-sum payment equal to "the equivalent lump sum value of the judgment," comprised of (1) $7,592,296 in past damages, (2) $9,000,000 in undiscounted future noneconomic damages, and (3) $5,235,544 in future economic damages, discounted to present value using a 6% discount rate, compounded annually (*Id.* at p. 16). That results in a total payment of $21,827,840. On the other hand, if the Government were to follow Clanton's method and purchase a qualified annuity contract that guarantees funding for all of his future medical expenses and lost wages, the annuity would cost approximately $11,319,423 (Doc. 160, p. 16).[29] The cost of the annuity combined with the amount of the Present Award Judgment ($13,740,513) results in a total payment of $25,059,936 (*Id.*). So the Government's method means its out-of-pocket payment to Clanton would be over $3 million less than it would be using his method. But it also means, according to Clanton,

---

[29] This figure is based upon information that Clanton's attorneys received from a structured settlement company named Millenium Settlement Consulting (Doc. 160, p. 16 n.8).

that he would ultimately be deprived of more than $6.5 million of his awarded damages (Doc. 160, p. 16).

The Government does not deny that its methodology as outlined in the Illinois periodic payment statutes would result in a payment that is inadequate to pay Clanton the full amount of his future economic damages (*see* Doc. 162). Instead, the Government contends that "[a] defendant's obligation is to post security only for the equivalent lump-sum value of the judgment, not the full expected amount of the judgment over time" (Doc. 156, p. 18). In other words, the Government's argument is that because the statute dictates that the judgment can be satisfied and discharged by paying the equivalent lump-sum value, that's all it has to pay (*see* Doc. 162, p. 5).

At this time, the Court finds it appropriate to reject the Government's election to invoke the Illinois periodic payment provisions. Section 1705(d) of the Illinois periodic payment provisions provides

> If an effective election is made prior to the commencement of trial, all actions, including third-party claims, counterclaims, and actions consolidated for trial, must be tried under Sections 2-1706 through 2-1718, unless the court finds that the purposes of these Sections would not be served by doing so or in the interest of justice a separate trial or proceeding should be held on some or all of the claims that are not subject of the election.

735 ILCS 5/2-1705(d) (emphasis added). The Court believes the phrase "all actions" includes not only third-party claims and counterclaims, but also the medical malpractice claim that triggered the potential application of the periodic payment provisions to begin with. Thus, a medical negligence claim should not be tried under the periodic payment provisions if the purposes of the provisions would not be served by doing so.

The Model Act, on which the Illinois periodic payment scheme is based, states that the purposes of such a scheme include "pay[ing] damages as the trier of fact finds the losses will accrue" and "assur[ing] that payments of damages more nearly serve the purposes for which they are awarded" (Doc. 156-2, p. 5). *Bernier v. Burris*, 497 N.E.2d 763, 773 (Ill. 1986) (indicating that the Illinois periodic payment provisions were modeled after the Model Periodic Payment of Judgments Act). Stated differently, one of the major goals of a periodic payment scheme is to ensure that money paid to an injured plaintiff for future expenses will in fact be available when those expenses are incurred. *Bernier*, 497 N.E.2d at 773 ("An additional concern is that large judgments for future damages may be spent before the damages are actually incurred. To help remedy the problem, the legislature could have believed that the periodic payment of future damages . . . would be an effective way of preserving large awards for future needs.") (internal citations omitted); Marcus L. Plant, *Periodic Payment of Damages for Personal Injury*, 44 LA. L. REV. 1327, 1331 (1984) ("Another important private and social benefit of a system of periodic payment of damages is the avoidance of the danger of dissipation of the award for purposes other than the maintenance and rehabilitation of the injured person."). Commentary to the Model Act further indicates that the stated purposes are "to be used by the court in interpreting the provisions of the Act in general" and "as criteria for preventing abuses in the invocation of the Act" (Doc. 156-2, p. 5).

Here, the Illinois legislature chose to employ a 6% discount rate without providing any mechanism for adjusting that rate. *See Bernier*, 497 N.E.2d at 772. It seems the 6% rate was ill-advised at the time the Illinois statutory scheme was enacted given that the Model Act employed a 3% discount rate while conceding that was "probably the

highest figure that should be adopted, and there is substantial evidence that it should be lower." (Doc. 156-2, pp. 23, 25). It is indisputable that a 6% rate was ill-advised by the time of Clanton's bench trial in October 2016, given that his expert economist used a discount rate of 0.66% for medical expenses and 2% for wages, while the Government's expert economist used a 0% discount rate for medical expenses and a 2% rate for wages (Plaintiff's Exhibit 107; Defendant's Exhibit 229).

Consequently, as Clanton pointed out and the Government did not deny, using the predetermined 6% discount rate set forth in the Illinois periodic payment scheme will likely result in a substantially understated present value for Clanton's future economic losses and will expose him to the very real risk that he will run out of money before all of his future damages are actually incurred. Because applying the periodic payment provisions in this instance would run counter to one of the major purposes of those provisions, the Court rejects the Government's election to invoke the provisions pursuant to Section 2-1705(d). The portion of the Government's motion concerning the Illinois periodic payment provisions is denied.

Furthermore, the rejection of the Government's election means the modifications that were made to the original bench trial Order are no longer necessary, and the original damage calculations can stand. The Court accordingly reverts to those original calculations and finds that as a proximate result of Nurse Jordan's deviations from the standard of care, Clanton has sustained and will sustain in the future damages in the following amounts:

| | |
|---|---:|
| Past Pain and Suffering | $ 1,500,000 |
| Past Emotional Distress | $ 1,500,000 |
| Past Loss of Normal Life | $ 2,000,000 |
| Disfigurement | $250,000 |
| Past Medical Expenses (stipulated amount) | $2,779,296 |
| Past Lost Earnings (stipulated amount) | $63,000 |
| Future Pain and Suffering | $ 3,500,000 |
| Future Emotional Distress | $ 1,000,000 |
| Future Loss of Normal Life | $ 2,000,000 |
| Shortened Life Expectancy | $2,000,000 |
| Future Medical Expenses (present value amount) | $13,000,000 |
| Future Lost Earnings (stipulated amount) | $100,000 |
| **TOTAL DAMAGES** | **$29,692,296** |

## CONCLUSION

The Government's Motion for Reconsideration (Doc. 156) is **DENIED.** Clanton's motion for a hearing (Doc. 161) is **DENIED.** Judgment will be entered in favor of Plaintiff Kevin Clanton and against the United States of America in the amount of $29,962,296, in accordance with this Memorandum and Order and the original bench trial Order (Doc. 134). Clanton is further awarded costs pursuant to 28 U.S.C. § 2412(a).

**IT IS SO ORDERED.**

**DATED:   July 27, 2018**

_Nancy J. Rosenstengel_

_____
**NANCY J. ROSENSTENGEL**
**United States District Judge**

| | **Cases cited by the Government** (Doc. 156-1; Doc. 160-3) |
|---|---|
| 1. | *Mamea v. United States*, 781 F. Supp. 2d 1025 (D. Haw. 2011). |
| 2. | *Gutierrez v. Vargas*, No. SC15-1924, 2018 WL 1417553, at *1 (Fla. Mar. 22, 2018), *reversing Vargas v. Gutierrez*, 176 So. 3d 315 (Fla. Dist. Ct. App. 2015).<br><br>The verdict summary provided by the Government is available at 13 FJVR 7-17, 2013 WL 3654903, and Doc. 160-2, pp. 28–29. The Court also located two additional verdict summaries:  23 Fla. J.V.R.A. 10:C3, 2013 WL 6001093 and William Jordan, *$4.1 Million Judgment in Suit Alleging Failure to Diagnose Child's Renal Disease*, VERDICTS, SETTLEMENTS & TACTICS, March 2014, *available on Westlaw at* 34 No. 3 Verdicts, Settlements & Tactics art. 30. |
| 3. | *Barker v. Union Pacific R.R. Co.*, 889 N.W.2d 243 (Iowa Ct. App. 2016), *cert. dismissed sub nom.*, 138 S. Ct. 50 (2017).<br><br>The verdict summary provided by the Government is available at JVR No. 1503120019, 2015 WL 1195326, and Doc. 160-2, pp. 30–32. The Court found additional details in briefings available on Westlaw and a blog post on the website of the firm that represented the plaintiff. Petition for Writ of Certiorari, *Barker v. Union Pacific R.R. Co.*, No. 17-115 (U.S. July 19, 2017), 2017 WL 3141405; Brief for Defendant, *Barker v. Union Pacific R.R. Co.*, No. 15-0908 (Iowa Mar. 9, 2016), 2016 WL 8456727; Davis Bethune Jones, *Iowa Jury Awards Injured Railroad Conductor $3.5 Million*, http://dbjlaw.net/results/single/iowa-jury-awards-injured-railroad-conductor-3-5-million/ (last visited June 22, 2018). |
| 4. | *Graham ex rel. Graham v. Snyder*, 1999 WL 33486460, at *1 (Pa. Ct. Com. Pl. Oct. 20, 1999), *aff'd sub nom. M.G. v. Children's Hosp. of Phila.*, 767 A.2d 1117 (Pa. Super. Ct. 2000) (no opinion).<br><br>The verdict summary provided by the Government is available at 14 Nat. J.V.R.A. 4:C3, 1998 WL 35471344, and Doc. 160-2, pp. 33–34. Clanton also submitted this case under a different name—*Graham v. Children's Hospital, et al.*—and with a different verdict summary. The verdict summary provided by Clanton is available at JVR No. 463151, 1998 WL 35182822, and Doc. 106-1, pp. 13–15. |
| 5. | *Perry v. Garchitorena*, Case No. 03-L-40, Circuit Court of St. Clair County, Illinois (2007).<br><br>The verdict summary provided by the Government is available at JVR No. 505612, 2007 WL 6969608, and Doc. 160-2, pp. 35–37. The Court located an additional source**:** William Jordan, *$8,480,000 Verdict in Suit Alleging Failure to Warn Patient to Follow Up on Elevated Creatinine Level*, VERDICTS, SETTLEMENTS & TACTICS, September 2007, *available on Westlaw at* 27 No. 9 Verdicts, Settlements & Tactics art. 5. |
| 6. | *Phillips v. Eckerd*, Case No. unknown, unknown Pennsylvania state court (2006).<br><br>The verdict summary provided by the Government is available at JVR No. 486462, 2006 WL 5721996, and Doc. 160-2, pp. 38–39. The Court found additional details in briefings available on Westlaw and some online sources: Defendant's appellate brief, *Phillips v. Eckerd, et al.*, (S.C. Ct. App. Sept. 23, 2008), 2008 WL 5008754; *Pharmacy Error Nets $8 Million Jury Award*, https://www.oginski-law.com/news/pharmacy-error-nets-8-million-jury-award-20061221.cfm (last visited June 22, 2018); *Prescription Error Nets $8 Million Jury Verdict*, http://www.1personalinjurylawyers.com/pi/news/prescription_error_injury.html (last visited June 22, 2018). |
| 7. | *King v. Goldschmidt*, Case No. 05-14308, Supreme Court of Delaware County, New York (2008).<br><br>The verdict summary provided by the Government is available at 25 NY. J.V.R.A. 11:C2, 2008 WL 9356498, Doc. 160-1, pp. 41–42. |

| | **Cases cited by the Government** (Doc. 156-1; Doc. 160-3) **– Cont'd** |
|---|---|
| 8. | *Talbot v. Nissanka*, Case No. CV-97-0063527, Superior Court of Connecticut, Judicial District of Tolland (2000).<br><br>The verdict summary provided by the Government is available at 15 N. Eng. J.V.R.A. 12:C3, 2000 WL 36098681, and Doc. 160-2, pp. 44–45. |
| | **Cases cited by Plaintiff Kevin Clanton** (Doc. 160-1; Doc. 160-3) |
| 1. | *Sanchez v. Parke-Davis, et al.*, case No. 00-06523-00-0-F, 214th District Court of Nueces County, Texas (2001).<br><br>The verdict summary provided by Plaintiff is available at Doc. 160-1, pp. 2–5. Another verdict summary with additional details was found at 01 Tex. J.V.R.A. 302, 2001 WL 36521937. |
| 2. | *Solis v. BASF, et al.*, Case No. 2006-L-012105, Circuit Court of Cook County, Illinois (2010).<br><br>The verdict summary provided by Plaintiff is available at Doc. 160-1, pp. 6–10. Additional information was found in *Solis v. BASF Corp.*, 979 N.E.2d 419 (Ill. App. Ct. 2012) and by consulting the Cook County, Illinois electronic court records. |
| 3. | *Canterino v. Kumar, et al.*, Case No. 700086/13, Supreme Court of Westchester County, New York (2016).<br><br>The verdict summary provided by Plaintiff is available at 33 NY. J.V.R.A. 6:C2, 2016 WL 3970830, and Doc. 106-1, pp. 11–12. The Court also located an additional source with further details: William Jordan, *$9.1 Million Verdict in Suit Arising from Coronary Artery Bypass Grafting on Patient with Kidney Injury*, VERDICTS, SETTLEMENTS & TACTICS, May 2016, *available on Westlaw at* 36 No. 5 Verdicts, Settlements & Tactics NL 4. |
| 4. | *Graham v. Children's Hospital* — see above case #4 cited by the Government |
| 5. | *Brown v. Werther*, Case No. 14629/94, unknown New York state court (1998).<br><br>The verdict summary provided by Plaintiff is available at JVR No. 358254, 1998 WL 1019317, and Doc. 160-1, pp. 16–17. The Court also located an additional source with further details: William Jordan, *$7 Million Verdict in Suit Involving Failure to Follow Up on Patient's Salmonella Septicemia*, VERDICTS, SETTLEMENTS & TACTICS, May 2016, *available on Westlaw at* 18 NO. 11 Verdicts, Settlements and Tactics 494. |
| 6. | *Maynard, et al. v. Reich*, Case No. 2138/01, Supreme Court of Kings County, New York (2003).<br><br>The verdict summary provided by Plaintiff is available at Doc. 160-1, pp. 18–20. |
| 7. | *Meyer, et al. v. Ackerman, et al.*, Case No. 2123/01, Supreme Court of Rockland County, New York (2004).<br><br>The verdict summary provided by Plaintiff is available at Doc. 160-1, pp. 21–24. |
| 8. | *Davis v. Forsyth Chiropractic Center, et al*, Case No. 2008-L-014411, Circuit Court of Cook County, Illinois (2015).<br><br>The verdict summary provided by Plaintiff is available at Doc. 160-1, pp. 25–28. The Court located an internet source with further details: *Chinese Herbal Supplement Caused Woman's Kidney Failure*, American Association for Justice Products Liability Law Reporter E-Newsletter, January 12, 2016, https://www.justice.org/news-and-research/law-reporter-and-trial-news/january-12-2016-pllr-e-newsletter (last visited June 22, 2018). |
| 9. | *Puerta, et al. v. Chavez*, Case No. 2011-L-004011, Circuit Court of Cook County, Illinois (2015).<br><br>The verdict summary provided by Plaintiff is available at Doc. 160-1, pp. 29–32. |

| | Cases cited by Plaintiff Kevin Clanton (Doc. 160-1; Doc. 160-3) – Cont'd |
|---|---|
| 10. | *Plasencia v. Echnique, et al.*, Circuit Court of Miami-Dade County, Florida (2003).<br><br>The verdict summary provided by Plaintiff is available at 03 FJVR 9-48, 2003 WL 22742641, and Doc. 106-1, p. 33. The Court also located two online sources with further details: *Man Awarded $5.75M After Misdiagnosis*, MIAMI HERALD TRIBUNE, May 17, 2003, http://www.heraldtribune.com/news/20030517/man-awarded-575m-after-misdiagnosis (last visited June 22, 2018); Tony Doris, *Man Awarded $5.75 Million by Jury in Medical Malpractice Suit*, MIAMI DAILY BUSINESS REVIEW, December 15, 2003, *reprinted at* KURZBAN KURZBAN WEINGER TETZELI AND PRATT P.A., https://www.kkwtlaw.com/Resources/Articles/Man-Awarded-5-75-Million-by-Jury-in-Medical-Malpractice-Suit.shtml (last visited June 22, 2018). |
| 11. | *Gonzales v. Pla*, Case No. 97-L-9163, Circuit Court of Cook County, Illinois (2001).<br><br>The verdict summary provided by Plaintiff is available at Doc. 160-1, p. 35. |
| | **Cases identified by the Court** |
| 1. | *Campano v. United States*, Case No. 15-00439 KSC, 2018 WL 1182571 (D. Haw. Mar.ch 7, 2018).<br><br>This case is currently on appeal to the Ninth Circuit. *Campano v. United States*, Case No. 18-159-80 (9th Cir.), *appeal docketed* on May 30, 2018. |
| 2. | *Kunz v. Little Co. of Mary Hosp.*, 869 N.E.2d 328 (Ill. App. Ct. 2007).<br><br>More information on the case was found in appellate briefings and on the website of the law firm that represented the plaintiff. Brief of Plaintiff-Appellant Betty Kunz, *Kunz v. Little Co. of Mary Hosp.*, Case No. 1-06-1707 & 1-06-1814 (Ill. App. Ct. Oct. 28, 2006), 2006 WL 5761658; Hurley McKenna & Mertz, P.C., *Representing Claims of Kidney Damage from Gentamicin*, http://www.hurley-law.com/medical-malpractice/kidney-damage-from-gentamicin (last visited June 26, 2018). |