**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF ILLINOIS**

| | |
|---|---|
| **KEVIN CLANTON,** | |
| **Plaintiff,** | |
| **v.** | **Case No. 15-CV-124-NJR** |
| **UNITED STATES OF AMERICA,** | |
| **Defendant.** | |

## MEMORANDUM AND ORDER

**ROSENSTENGEL, Chief Judge:**

Earlier this year, the United States Court of Appeals for the Seventh Circuit vacated the judgment entered by the undersigned in this case and remanded the action. *Kevin Clanton v. United States*, 943 F.3d 319 (Jan. 3, 2020). The facts underlying Clanton's claims against the United States, brought pursuant to the Federal Tort Claims Act, 28 U.S.C. § 1346(b), are outlined in the Seventh Circuit's opinion and previous orders of this Court (Docs. 134, 150, 163, 165) and will be repeated here only as necessary.

In its decision, the Seventh Circuit found no reversible error with respect to the damages awarded to Plaintiff Kevin Clanton, but it found that the undersigned erred in its analysis of the comparative negligence, *i.e.*, the fault, if any, of Kevin Clanton. Specifically, although the undersigned found that Clanton "did not act negligently when he missed medical appointments or when he failed to take his medicine" because he "didn't understand the seriousness of his severe hypertension," the Seventh Circuit directed that this Court must "take the additional step of comparing Clanton's

Page 1 of 14

understanding of his condition to that of a reasonable person in his situation." *Clanton*, 943 F.3d at 323. The Seventh Circuit noted that "Clanton was in the position of a person whose caregiver had failed to provide information about the severity of his condition," but he also had a few external clues that he was "seriously unwell." *Id*. That is, for example, the detection of dangerously high blood pressure in two employment-related physicals. The Seventh Circuit directed the undersigned on remand to "determine how a reasonable person in the same position would have acted and compare Clanton's behavior to that objective standard of care." *Id.*

Upon receipt of the Seventh Circuit's mandate, the parties were directed to file briefs on this limited issue, *i.e.*, what the finding of comparative negligence should be based on the evidence admitted at trial. Each side filed a brief on January 28, 2020 (Docs. 199, 200).

### ILLINOIS LAW ON COMPARATIVE NEGLIGENCE

Illinois substantive law applies to this case because Clanton was treated in Illinois. Illinois recognizes comparative negligence as an affirmative defense in a medical malpractice action. *Krklus v. Stanley*, 833 N.E.2d 952, 962 (Ill. App. Ct. 2005). Illinois courts have held that comparative negligence applies when "'[t]he plaintiff's negligence is a legally contributing cause of his harm if, but only if, it is a substantial factor in bringing about his harm and there is no rule restricting his responsibility for it.'" *Malanowski v. Jabamoni*, 772 N.E.2d 967, 973 (Ill. App. Ct. 2002) (*quoting* Restatement (Second) of Torts § 465(1) (1965)).

As the Seventh Circuit noted, the proper standard to assess a plaintiff's comparative negligence under Illinois law is "the familiar reasonable-person standard, an objective test that asks 'whether plaintiff . . . used that degree of care which an ordinarily careful person would have used . . . under like circumstances.'" *Id.* at 323 (*citing McCarthy v. Kunicki*, 823 N.E.2d 1088, 1101 (Ill. App. Ct. 2005)).

Had this been a jury trial, the Court likely would have used Illinois Pattern Instruction ("I.P.I.") 10.01 which provides:

> 10.01 Negligence--Adult—Definition
>
> When I use the word "negligence" in these instructions, I mean the failure to do something which a reasonably careful person would do, or the doing of something which a reasonably careful person would not, under circumstances similar to those shown by the evidence. The law does not say how a reasonably careful person would act under those circumstances. That is for you to decide.

I.P.I. 10.01

Thus, the Court must analyze what a reasonably careful person would have done—or not done—had that reasonably careful person found himself in circumstances similar to Kevin Clanton's. In other words, the Court must consider both what Clanton actually knew and what he should have known (whether or not he actually did) because a reasonable person would be expected to have such knowledge in similar circumstances. *Tucker (Thomas) v. State*, 42 Ill. Ct. Cl. 72, 76 (Ill. Ct. Cl. 1989).

THE PARTIES' POSITIONS

*Kevin Clanton*

Clanton urges the Court to stand by its original bottom-line finding that Clanton was not in any way contributorily negligent. He notes that the Court made specific findings about what Clanton actually knew about his condition and specifically rejected the Government's argument that he was at fault for being "noncompliant." (*See* Doc. 150, pp. 42-43). Clanton argues that even after the Court takes the additional step of analyzing what a reasonable person in Clanton's situation would have known (and thus what Clanton should have known), nothing in the Court's findings should change because (1) Clanton was not negligent based upon the limited understanding of hypertension that is "common knowledge" among laypeople; (2) Clanton was not negligent based on any additional information about hypertension that a reasonable person would have acquired from Clanton's specific personal circumstances; and (3) Clanton was not negligent because his conduct was not the proximate cause of his injuries. He also urges the Court to find that his fault, if any, is minimal when compared to the fault of Nurse Denise Jordan.

*United States*

The Government urges the Court to find that Clanton's actions make him "more than 50% negligent" and to adjust damages accordingly. Under Illinois law, such a finding would serve as a complete bar to any recovery. 735 ILCS 5/2-1116(c).

According to the Government, Clanton is "no less than 50%" at fault because he knew from two work-related physicals that he had high blood pressure yet he failed to

keep appointments with Nurse Jordan and failed to refill his medications or seek new prescriptions when they ran out, when he was "fully aware" that he needed those medications. (Doc. 199, p. 4). The Government further points to Clanton's 2008 trip to the emergency room where he stated he had been out of his blood pressure medication for three months, but he failed to follow up as directed following his discharge. The Government then points to each of Clanton's missed appointments, failure to take his medicine, refusal of treatment on one occasion, lapses in treatment, shortened dialysis sessions, and so on. Notably, the Court discussed all of this evidence in its original Order following the bench trial (Doc. 134) and its Amended Order entered on June 17, 2017 (Doc. 150).

DISCUSSION

The only issue before the Court today is whether Kevin Clanton acted reasonably based both upon what he *knew* and *should have known* about hypertension, the treatment required for control of the condition, and the risk of harm if uncontrolled. Did he fail to do something a reasonably careful person would do—or did he do something a reasonably careful person would not do under circumstances similar to his? The Court has already explained in detail why it rejected the Government's argument at trial that Clanton was "noncompliant" and made specific findings about what he knew (or more accurately, didn't know) about his hypertension condition. The Court finds it unnecessary to go over those findings yet again, and nothing warrants a change to the previous conclusions.

So what *should* Kevin Clanton have known about hypertension? Although the Court failed to specifically analyze the testimony in terms of the comparative fault issue, there was evidence introduced at trial about what is generally known about hypertension. For instance, Clanton's retained nurse practitioner expert Kristen Harris testified in her deposition that her patients "often feel well when they have high blood pressure," which is "misinformation." (Trial Ex. 128, p. 69). Similarly, Clanton's retained internist expert, Dr. David Yablonsky, testified that "[i]t is common for people to think if they don't feel sick then 'it ain't broke, don't fix it.'" (Yablonsky Tr. p. 248-249). Dr. Yablonsky referred to high blood pressure as "the silent killer" when testifying about why "[v]ery significant patient education is absolutely essential to controlling blood pressure, particularly in a young person who is facing something they don't necessarily feel when it is happening." (Yablonsky Tr. p. 248). Similarly, Dr. Tolins testified about how patients routinely do not understand that medication must be taken daily, even when the patient feels better, and that they have to be educated on the chronic nature of the disease and the risks associated with not following a physician's advice. (Tolins Tr., p. 254, 347).

As pointed out in Clanton's supplemental brief on this issue, his experts also testified at trial that it is common for hypertension patients to not understand the need to take medications daily and to return to the doctor regularly. (*see* Doc. 200, p. 6). And there is certainly nothing in the record that establishes it is common knowledge in the community that there is a causal link between uncontrolled hypertension leading to kidney damage and/or failure. As Clanton points out, the Government even presented

Page 6 of 14

the testimony of Dr. Atta, its retained expert, contesting a link between uncontrolled hypertension and kidney damage.

Thus, the Court finds that a reasonable person would not know or understand the importance of taking medication regularly, monitoring one's blood pressure, and returning for regular office visits even when he or she feels well. And there is certainly nothing in the record that shows a reasonable person, unless specifically educated or otherwise informed, would know that uncontrolled hypertension may be causing harm even when he or she feels well and could lead to serious, irreversible kidney damage if left untreated.

The Seventh Circuit suggested that Clanton "had a few external clues that he was seriously unwell" and thus the undersigned "must determine how a reasonable person [in his shoes] would have acted and compare Clanton's behavior to that objective standard of care." *Clanton*, 943 F.3d at 323. The Seventh Circuit pointed to his two work-related physicals in which he was found to have high blood pressure. But, as the Court noted in its original Order (Doc. 150), Clanton was told at the 2008 physical that "his blood pressure was too high, and he needed medication to lower it before he could be cleared for work." (Doc. 150, pp. 4-5). That exam did not suggest any other medical problems (certainly nothing that would have told him he was "seriously unwell."). (Doc. 150, p. 5). At that point, he was 28 years old and had experienced no significant health issues other than childhood asthma, which he had outgrown.

What would a reasonable person have done at that point? It is most likely that a reasonable person would have gone to see a healthcare provider to get medication to

lower his blood pressure so he could return to work. Of course, that is what Clanton did—he went to see Nurse Jordan. She gave him medication and signed the form that he needed to return to work.

Then the question becomes what a reasonable person would do after he failed a *second* work physical two years later because of high blood pressure? If that individual, like Kevin Clanton, was instructed to get some medicine or see a doctor so he could be cleared to work, one would expect that a reasonable person would have gone to see a healthcare provider and then relied on what that healthcare provider told him about high blood pressure and the risks associated with it. The Court agrees with Clanton that from these two failed work-related physicals, a reasonable person would only have learned that you cannot pass a work physical with a high blood pressure reading until you see a healthcare provider and take a single or short-term dose of medications given to you by that healthcare provider. There is nothing from these facts that would tell a reasonable person that hypertension is a chronic health condition with serious consequences if it is not consistently monitored and treated on a daily basis for his lifetime. The Court respectfully disagrees that Clanton should have known he was seriously unwell based on a high blood pressure reading in two work physicals two years apart. He was feeling fine, he had no other medical conditions, and he obtained medication as directed so that he could return to work.

The 2008 trip to the emergency room was similar. Clanton sought treatment because he had a severe headache, he was told his blood pressure was high, he took medicine, and he felt better. There is nothing here that would tell a reasonable person

that he had a serious, chronic medical condition that would end up costing him his kidneys. Under these facts, a reasonable person would have learned that taking a one-time dose of medication lowers your blood pressure and resolves your symptoms.

Similarly, contrary to the Government's assertion, there is nothing to support a finding that a reasonable person would have known these things just because his wife was at one time treated for high blood pressure. Perhaps so if that person had accompanied his wife to doctor visits and learned all the reasons for her prescription medications. Here, though, while Clanton testified that he knew his wife was taking blood pressure medicine, he did not know how often or much else about it. Notably, Clanton and his wife were not even married until years after his kidney disease was diagnosed.

The Court finds that a reasonable person would seek medical treatment and follow the advice of his healthcare professional. For instance, when a healthcare professional provides written patient education materials—or verbally provides relevant education—about a condition, a reasonable person is expected to consider that information and follow it. When a reasonable person is told that it is essential that he return to the healthcare professional regularly, take his blood pressure daily at home, faithfully take the medication prescribed to him, get regular laboratory testing as ordered by his provider, and change his lifestyle (eat healthy, exercise, lose weight, and avoid tobacco and alcohol), that reasonable person is expected to do those things as well. If a reasonable person is scolded by his healthcare provider—about missed appointments, gaps in visits, unfulfilled laboratory orders, or any other potentially harmful conduct—that reasonable

person would be expected to get the message and comply. The problem here is that Nurse Jordan did *none of those things*. That point is made throughout the Court's Orders (*see* Doc. 150 pp. 30-35) and was the subject of much criticism directed at Nurse Jordan by the experts in the case. While the Court unfortunately conflated the two issues of contributory fault in its analysis and did not speak specifically about what a "reasonable person" would have done under the circumstances, the Court did explain the problem that Clanton did not understand his disease:

> But in order to be considered negligent for noncompliance, an individual must first be properly informed and educated about the disease, its risks, the necessity of the treatment regimen, and the likely health consequences of failing to follow the treatment regimen. In other words, a patient must be adequately educated so he may understand and appreciate the importance of compliance and the dangers of noncompliance. . .[]Nurse Jordan failed to provide any education at all.

(Doc. 150, p. 42). There was simply nothing in the circumstances Clanton found himself in that suggests he should have acted differently or that a reasonable person would have done so.

The Court has reviewed each of the cases cited by the Government in support of its argument that Clanton was contributorily negligent and finds none of them instructive under the facts of this case. First, in *Krklus v. Stanley*, 833 N.E.2d 952, 961 (Ill. App. Ct. 2005), the plaintiff failed to regularly take his medication to control his blood pressure and told his doctor he was taking the medication when he was not, making it more difficult to determine that he was suffering from an aortic dissection attributable to hypertension. On appeal, the case turned on the evidence admitted at trial and a jury instruction on comparative negligence. The appellate court found that "Krklus' failure to

Page 10 of 14

follow [his doctor's] advice and act of misinforming [his doctor] about his compliance therewith are exactly the type of 'substantial factor[s]' that '[brought] about his harm,'" so the evidence at trial and the given jury instruction were proper to determine comparative negligence. But here, there was no evidence that Nurse Jordan gave Clanton any advice about his condition and certainly nothing that suggests he misinformed her about his compliance.

Similarly, in *Gill v. Foster*, 626 N.E.2d 190, 195 (Ill. 1993), the plaintiff ignored medical advice. Several days after surgery and while still in the hospital, the plaintiff complained to his surgeon that he was having chest pain. Two days later, at the time of his discharge, the plaintiff complained to a nurse of chest pain. The discharge nurse, aware that the plaintiff had complained of pain before, did her own examination. She then told the plaintiff that something was wrong, but did not inform the treating physician. The plaintiff was discharged and later complained to his family physician. Turns out the plaintiff actually had a herniation of his stomach into his chest, which later required surgery. The Supreme Court found that that the jury could reasonably have found that the plaintiff was negligent *in refusing his family physician's suggestion of returning to where the surgery was performed*. It further concluded that the jury finding that this negligence contributed 50% to the plaintiff's injuries not so unreasonable as to be against the manifest weight of the evidence. Again, not the situation we have here.

In *Moller v. Lipov*, 856 N.E.2d 664, 676 (Ill. App. Ct. 2006), the plaintiff cross-appealed, one of her contentions being that the trial court erred in denying her motion for a directed verdict on the issue of comparative fault. In that case, the plaintiff's doctor

Page 11 of 14

*instructed her to return to see him if her mass grew or if her pain increased*. Both her husband and mother testified that during January and February, she regularly examined her breasts and that the pain from the mass continually worsened between February and June. She did not return to see the doctor regarding the changes until June. The appellate court found that a directed verdict was inappropriate because there was some evidence to support the plaintiff's contributory negligence in that she continued to experience pain after her mammogram and ultrasound and *she did not follow the physician's instructions to inform him*. Again, there was evidence of clear instructions that were given and a failure to follow them—not the evidence in this case.

Likewise, in *Gruidl v. Schell*, 519 N.E.2d 963, 967 (Ill. App. Ct. 1988), the plaintiff's decedent failed to follow physician instructions. On appeal, the plaintiff contended that the evidence at trial failed to establish that the decedent's contributory negligence proximately caused her injury and, therefore, the question of fact regarding her contributory negligence should not have been presented to the jury. The court concluded that the issue of the decedent's contributory negligence was properly before the jury *because the record contained evidence that the defendants instructed decedent to see them immediately if the lump or tenderness in her neck persisted or grew worse, yet decedent did nothing for approximately one year*. Again, not the facts in this case.

Finally, in *Ford-Sholebo v. United States*, 980 F. Supp. 2d 917, 997 (N.D. Ill. 2013), after trial, Judge Castillo determined that the plaintiff's repeated decisions to not take the medication prescribed for seizures *after acknowledging that discontinuation may have caused a seizure* made his contributory fault under applicable Illinois law 33%. The Court also

found that his decisions were not made on an informed basis, so the Government bore 67% of the responsibility because the actions and inactions of the correctional center personnel were a proximate cause of the plaintiff's tort damages. This case is similar to the case at hand only in that Clanton's decisions to do (or not to do) all the things the Government blames him for were not made on an informed basis, because Nurse Jordan never provided proper patient education.

Finally, even if the Court were to find that Clanton acted unreasonably by missing appointments and failing to refill his medication (and a reasonable person would have acted differently), there is no evidence that any of his conduct prior to July 2011 was the cause in fact of his kidney failure or the legal cause of his injuries. Again, the first sign of Clanton's kidney disease was in July 2011. If Nurse Jordan had met the standard of care at that time, Clanton would likely not have suffered any permanent injuries. Thus, nothing he did before July 2011 could be the proximate cause of those injuries. As noted above, "[a] plaintiff's negligence is a legally contributing cause of his harm if, but only if, it is a substantial factor in bringing about his harm and there is no rule restricting his responsibility for it." *Malanowski* 772 N.E.2d at 973 (*quoting* Restatement (Second) of Torts § 465(1) (1965)). Here, even if Clanton was even minimally negligent because a reasonable person would have acted differently (and his negligence would be minimal, *i.e.*, less than 5%, in light of the overwhelming negligence attributable to Nurse Jordan as set forth in the Court's original findings), no evidence exists in the record that his conduct was a substantial factor in bringing about the harm that eventually affected him.

## CONCLUSION

While the Court regrets not spelling out the proper standard in its Order following the bench trial, the Court discussed all of the evidence, including every fact the United States points to as Clanton's fault and why a reasonable person in his condition should have known to take his medications, return to doctor's visits, and otherwise regularly monitor his condition. Having now added the step of considering what Clanton should have known, that is, how a reasonable person would have acted under similar circumstances, the Court declines to change anything in its original findings. The harm to Kevin Clanton was caused by the negligence of Nurse Jordan as previously found and through no fault of Kevin Clanton.

The Clerk of Court is **DIRECTED** to enter judgment in favor of Kevin Clanton and against the United States in the amount of **$29,692,296** and to close this case.

**IT IS SO ORDERED.**

**DATED:   April 22, 2020**

_____
**NANCY J. ROSENSTENGEL**
**Chief U.S. District Judge**